ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

ROBIN L. HARRIS (CABN 123364)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7016
    FAX: (415) 436-7234
    robin.harris2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO.  CR 17-0557 MMC |
| Plaintiff, | ) |
| v. | ) **UNITED STATES' SENTENCING MEMORANDUM** |
| JEFFREY WERTKIN, | ) |
| Defendant. | ) Sentencing Date: March 7, 2018 |
| | ) Sentencing Time: 2:15 p.m. |

## INTRODUCTION

This is one of the most disturbing cases of public corruption ever prosecuted in the Northern District of California. A United States Department of Justice (DOJ) attorney betrayed the government and secretly stole at least 40 sealed qui tam lawsuits in order to "cash in" on inside information after he left the DOJ to work in the private sector. Defendant, Jeffrey Wertkin, embarked on a meticulously planned year-long crime spree that included using the government's confidential information to woo potential clients at his new law firm. Wertkin then escalated his efforts to profiteer from stolen government property by trying to sell some of these sealed qui tam complaints to the very companies whose conduct was under investigation by the government. The defendant's criminal conduct

culminated in a post-arrest obstruction binge wherein he returned to his law firm, destroyed evidence and, staged his office-- falsely implicating one of his former DOJ colleagues as the source for some of the contraband.

Jeffrey Wertkin abused the public trust and tried to tarnish the reputation of the DOJ in the process. Under most circumstances, the defendant's staggering abuse of his public position and the incalculable harm he caused to his former colleagues and all those who seek justice under the False Claims Act would warrant a substantial upward variance from the Guidelines range. However, because the defendant admitted his guilt very early in the process and proactively assisted the government in unraveling the full extent of his criminal scheme, the government recommends a guideline sentence of 34 months imprisonment.

## DISCUSSION

### A. Plea Agreement and Applicable Guidelines Range

On November 29, 2017, defendant pleaded guilty to Counts One through Three of a criminal information charging him with obstruction of justice in violation of 18 U.S.C. § 1505 (Counts One and Two) and interstate transportation of stolen property in violation of 18 U.S.C. § 2314 (Count Three). The parties' plea agreement was entered pursuant to Fed. R. Crim Pro 11(c)(1)(B). The parties have agreed to specific guideline calculations which result in an adjusted offense level of 19. Dkt 6 and PSR ¶ 3.

U.S. Probation has recommended that defendant is in Criminal History Category I, and has also recommended an Offense Level of 19, resulting in a Guidelines range of 30 to 37 months of imprisonment. Probation recommends a sentence of 30 months of imprisonment, followed by three years of supervised release, and a $10,000 fine. For the reasons set forth elsewhere in this memorandum, the United States recommends a sentence of 34 months imprisonment.

The government agrees with Probation's calculation of the defendant's Guidelines range of 30 to 37 months of imprisonment. The parties, pursuant to the plea agreement (Dkt 6), have also agreed to the Obstruction of Justice/Transportation of Stolen Property Guidelines set forth below:

|   |   |   |
|---|---|---|
| a. | Base Offense Level § 2B1.1(a)(2) | 6 |
| b. | Loss Amount > $250,000 and < $550,000 § 2B1.1(b)(2)(G) | + 12 |
| c. | Abuse of Position of Trust § 3B1.3 | + 2 |
| d. | Obstruction of Justice § 3C1.1 | + 2 |

|   |   |   |
|---|---|---|
| e. | Acceptance of Responsibility | -  3 |
| f. | Adjusted offense level | = 19 |

Because defendant's Adjusted Offense Level is 19 and his Criminal History Category is I, his Guidelines range is 30 to 37 months.

**B.     Offense Conduct**

*1.     Wertkin's Theft of Over 40 Sealed Complaints From DOJ*

Defendant Jeffrey Wertkin, who has a JD and PhD from Georgetown University (PSR ¶ 91) and a Bachelor's Degree from Haverford University (*Id* at ¶ 90), was an attorney licensed to practice law in the District of Columbia and the state of Maryland.  PSR ¶ 92.

From October 24, 2010, to April 12, 2016, Wertkin was employed by the United States Department of Justice in the Civil Fraud Section.  As a Trial Attorney in Civil Fraud, Wertkin specifically handled, reviewed, and worked on sealed qui tam complaints that alleged violations brought under the False Claims Act ("FCA").  Wertkin knew and understood that, by law, these complaints are required to be filed under seal, and that only the federal judge to whom the case is assigned could unseal them.  Wertkin was fully aware that the courts' sealing orders and the nature of the complaints prohibited him from showing or discussing the complaints outside of his legitimate work functions.  Wertkin also knew that revealing the contents of a sealed complaint could jeopardize and obstruct ongoing proceedings in federal courts.  Dkt 6, pg. 3 and PSR ¶ 18.  Maintaining the secrecy of these sealed qui tam complaints is also critical in terms of protecting whistleblowers from retaliation by their employers, something that Wertkin fully knew and understood.

In early 2016, Wertkin accepted a job as a partner at the law firm Akin Gump in Washington D.C. and began the process of leaving DOJ.  PSR ¶ 18.  Wertkin's salary at Akin Gump ($450,000) was triple his DOJ salary, not including a lucrative signing bonus.  PSR ¶¶ 97, 99.  Unfortunately, Wertkin's impending upward financial trajectory was, in his mind, not enough to satisfy his desire for a bigger, better house in the suburbs and private schools for his children.  PSR ¶ 28.  Nor was he confident that he could successfully perform and develop business on his own merit at Akin Gump.  PSR ¶ 44 at pg. 11. Rather than risk failing at Akin Gump, Wertkin conceived of a criminal scheme which he initiated while employed at DOJ and that he carried out and expanded over ten plus months while he worked at Akin

Gump until he was arrested on January 31, 2017. PSR ¶ 16.

During Wertkin's last month of employment with the DOJ, and after he received the offer from Akin Gump, he began secretly reviewing and collecting qui tam complaints that had not been assigned to him. Dkt 6, pg. 3. Wertkin stockpiled qui tam complaints in both electronic form and in hard copy. PSR ¶ 25. Wertkin secretly copied and stole at least 40 sealed qui tam complaints in total. *Id.* The theft was accomplished on several occasions. First, Wertkin ran electronic reports from his DOJ issued computer and opened a shared network drive to identify potential newly filed qui tam complaints to steal. He thereafter electronically copied at least 20 sealed qui tam complaints that had not been assigned to him. Second, Wertkin snuck into his boss' office (the Civil Division Fraud Section Director) late at night and took a pile of approximately 20 additional sealed complaints from his boss' desk. PSR ¶¶ 25, 26. Wertkin unstapled these sealed complaints, photocopied them all, re-stapled them and thereafter returned the originals to his boss' office. PSR ¶ 26.

Wertkin originally collected the sealed qui tam complaints with the intent to use the complaints to identify clients to solicit for business when he transitioned into private practice and, thereby, to make himself more successful at Akin Gump. PSR ¶¶ 19, 29. Wertkin knew that he could not legitimately take copies of sealed complaints with him when he left his employment with DOJ. PSR ¶ 24. Wertkin also understood that taking the qui tams was an illegal theft of government property. During the DOJ exit process, he intentionally lied to the Department of Justice about taking any government property with him in a written certification that he signed and submitted to the DOJ upon his departure. Dkt 6, pg. 3 and Exhibit 1 attached hereto.

2. *Wertkin Uses Contraband Qui Tams to Solicit Business at Akin Gump*

After he left the DOJ in April 2016, and armed with more than 40 stolen sealed qui tam complaints, Wertkin immediately set about trying to parlay the contraband into business opportunities for himself. PSR ¶ 29. While at Akin Gump, Wertkin actively pitched his legal services to companies he knew— based on stolen information--were under investigation by DOJ. PSR ¶ 29. He did so by contacting these companies, making phone calls to them and hinting that "problems" could be lurking for them. In one instance, Wertkin targeted a company he knew was the subject of a purloined qui tam complaint and told one of his partners at Akin Gump that this company "may have a problem coming up." PSR ¶ 32. This

SENTENCING MEMORANDUM
CR 17-0557 MMC                             4

company hired Wertkin based on the sales pitch he made, a solicitation that was initiated as a direct result of secret information garnered from the complaints he stole, specifically that the company was named in a sealed qui tam complaint. PSR ¶ 32. In so doing, Wertkin placed his own financial interest ahead of the public's interest and blatantly and unilaterally compromised the initial protections of anonymity afforded to whistleblowers who come forward with claims of waste, fraud and abuse under the False Claims Act. However, this was only the beginning.

   3. *Wertkin's Crimes Escalate to Selling Qui Tams to Companies Named in Complaints*

In the fall of 2016, apparently because his scheme to use stolen government property to solicit business was not paying off as quickly or lucratively as he hoped (PSR ¶ 32), Wertkin devised an even more aggressive plan for cashing in on the contraband qui tam complaints. In a stranger than fiction plot, Wertkin created a fictitious persona for himself, "Dan," and bought a burner phone which he used to contact a high ranking employee of a company headquartered in Sunnyvale. PSR ¶ 9. Wertkin knew this Sunnyvale company had been sued in one of the sealed qui tam lawsuits that Wertkin stole from the DOJ. Wertkin left a message for the Sunnyvale employee referencing a sealed False Claims Act complaint against the company filed in the Northern District of California. PSR ¶ 9. Wertkin gave his burner phone as a call back number if the employee wanted to discuss the matter further. *Id*.

On November 30, 2016, the employee called "Dan" (later identified by the FBI as Wertkin) and Wertkin offered to mail the employee the first page of the sealed complaint in order to prove to the employee that a qui tam complaint had, in fact, been filed against the company. PSR ¶ 10. Wertkin refused to email the complaint to the employee insisting instead on using the U.S. mail to transmit a redacted version of the first page of the complaint. *Id.* Wertkin offered to provide the entire sealed qui tam complaint to the company in exchange for a "consulting fee" from the company. PSR ¶ 10. Sometime after November 30, 2016, the Sunnyvale employee received a redacted copy of the first page of the sealed complaint and contacted the FBI. PSR ¶¶ 11, 12.

On December 22, 2016, the FBI initiated an undercover operation in which the Sunnyvale employee participated in numerous recorded telephone calls with Wertkin. PSR ¶¶ 12, 13. In the first recorded call on December 22, 2016, Wertkin offered to provide the employee with the complete qui tam complaint in exchange for $300,000. PSR ¶ 12. The employee tried to negotiate a lower price, but

Wertkin was unwilling to budge on his demand. *Id.* In a January 5, 2017 recorded call, Wertkin suggested the employee pay him (Wertkin) in Bitcoin and explained to the employee that the advantage to Bitcoin was that it could not be traced. PSR ¶ 13. Wertkin also told the employee that it was in his interest to purchase the complaint from Wertkin so that the company could get ahead of the government's investigation. *Id.*

On January 19, 2017, Wertkin and the employee spoke again in another recorded call. PSR ¶ 14. Wertkin proposed an in person meeting to take place in Sunnyvale on January 31, 2017 and outlined a very detailed plan for how the meeting would transpire. *Id.* Wertkin also upped his price for the complaint to $310,000, explaining that the increase ($10,000) was to cover his travel expenses to California and further explained that the higher price was non-negotiable. PSR ¶ 14.

Emboldened by the apparent success he was having selling the stolen qui tam complaint to the Sunnyvale employee, Wertkin expanded his fee-for-qui tam scheme to three additional companies named in other stolen complaints. On January 23, 2017, Wertkin, using his pseudonym "Dan," contacted an employee of a company headquartered in Oregon ("Oregon company) and referenced a sealed complaint against the Oregon company. PSR ¶ 21. Wertkin offered to mail a redacted copy of the face-sheet of the complaint to the Oregon company and to mail the entire lawsuit in exchange for a fee. *Id.* In January 2017, Wertkin also contacted an Alabama company and offered to sell it a sealed qui tam complaint in exchange for $50,000. PSR ¶ 33. Wertkin similarly made an overture to a New York company that was named in one of the qui tam complaints he stole from DOJ, but a price was not set for that proposed transaction.

On January 31, 2017, Wertkin sent a text message to "Bill" whom he had been told was a colleague of the Sunnyvale employee and would be the person meeting Wertkin at the hotel selected for the exchange of the qui tam for cash transaction. PSR ¶ 16. "Bill" was, in actuality, an FBI agent acting in an undercover capacity. Wertkin provided "Bill" with a description of the area of the hotel lobby Wertkin selected for the meeting. PSR ¶ 16. Shortly after "Bill" (the FBI agent) sat down at the predetermined location in the hotel, Wertkin approached him and handed over a copy of the sealed complaint. *Id.* After doing so, Wertkin was arrested and shortly thereafter was identified as a former DOJ trial attorney and

current partner at Akin Gump.  PSR ¶ 17.  At the time of his arrest, Wertkin was wearing a wig to conceal his identity.  PSR ¶ 16.

### 4. *Wertkin's Post-Arrest Obstruction of Justice*

On February 1, 2017, Wertkin made his initial appearance before a Magistrate Judge in the Northern District of California.  PSR ¶ 4.  Wertkin was released on a $750,000 secured bond that contained the standard conditions of release, including that he not commit another federal, state or local crime.  *Id*.  Immediately following his release, Wertkin travelled back to Washington D.C. and on February 2, 2017 returned to his office at Akin Gump.  PSR ¶ 30.  Before telling anyone at the firm that he had been arrested in Northern California, Wertkin began systematically destroying incriminating evidence of his crimes.  PSR ¶ 30.  Wertkin tore up a stack of the purloined complaints and "ripped them up."  PSR ¶ 30.  He destroyed all but two of the paper copies of stolen complaints.  *Id*.  Wertkin also "threw out" a CD-ROM containing evidence of his crimes, an AT&T bill (presumably reflecting charges on the burner phone) and "some notes" he thought might contain incriminating evidence.  PSR ¶ 30.

Wertkin also staged his office to make it appear as though one of his former colleagues at DOJ mailed him two of the stolen complaints, which Wertkin calculated might give him an explanation (albeit false) as to how he gained possession of the complaints.  PSR ¶ 31. Specifically, Wertkin placed paper copies of two complaints in an envelope that had originally been used to mail Wertkin a picture of DOJ's emblem that was signed by his DOJ colleagues (commemorating his service to DOJ).  That envelope contained the return address of an attorney who worked at DOJ.  In doing so, Wertkin intended to make it appear to law enforcement, whom he knew would search his office, that his former colleague was either negligent in enclosing the two complaints with his DOJ seal, or worse yet, that a current DOJ employee was a co-conspirator and the source of the contraband.  PSR ¶ 31.  Under either scenario, this DOJ employee was falsely implicated by Wertkin in criminal conduct that Wertkin alone was responsible for.  *Id.*

### C. **The Defendant's Conduct Was Not a Single Lapse in Judgment**

This Court has encountered defendants who have committed a single—yet significant—error in judgment and who might otherwise deserve a break at sentencing.  Jeffrey Wertkin is not one of those defendants.  Contrary to the well-intentioned sentiments expressed by his family and friends, none of

SENTENCING MEMORANDUM
CR 17-0557 MMC                                                         7

whom knew about the double life he was living, Wertkin's crimes do not represent a "one-off" where he experienced a momentary lapse in judgment. Instead, Wertkin committed his crimes over the course of almost a full year during which he had ample opportunity to reflect on what he was doing over and over again. However, instead of ceasing his misconduct after one incident (for example, his success at being hired by one of the companies he solicited based on a stolen complaint, *see* PSR ¶ 32), Wertkin escalated his criminal behavior and continued with impunity until he was caught. Wertkin's multi-faceted scheme to profit from stolen government property was an extremely calculated effort, designed to maximize the "value" of his secret, inside information.

The defendant's crimes began while he was at the DOJ and after taking an oath to uphold the Constitution "against all enemies foreign and domestic." Rather than doing so, Wertkin became the enemy from within, secretly rooting around his DOJ colleagues' offices and computer files late at night stockpiling sealed qui tam complaints with the intent to use those complaints to further enrich himself when he went to Akin Gump.

But Wertkin did not stop there. It was not enough for Wertkin to use the information from the purloined complaints to solicit business from companies he knew were named in sealed qui tam complaints. Eight months after the theft itself, in November 2016, Wertkin dramatically expanded the scope of his criminal enterprise and the potential for a quicker payoff. Wertkin went from using the complaints for an inside strategic advantage when pitching his legal services to outright shaking down companies who did not yet know they had been sued (because the qui tam complaints were sealed under court orders) by offering to sell these companies the complaints so they "could get ahead of the investigation." PSR ¶ 13. In so doing, Wertkin took grotesque advantage of his prior position as a DOJ attorney, knowing full well that the success of the False Claims Act (his area of expertise while he worked at DOJ) depends on whistleblowers coming forward with the prospect of secrecy while the government investigates their claims. Wertkin's conduct jeopardized the integrity of the civil justice

SENTENCING MEMORANDUM
CR 17-0557 MMC                                                  8

system and unfairly cast a shadow over the work of the Civil Fraud Section.

Nor did Wertkin's criminal behavior end with his arrest. Rather than reflecting on his prior bad acts and choosing not to make additional criminal choices, Wertkin upped the ante when he was released on bond from the Northern District of California. On February 2, 2017, one day after he was arraigned on a criminal complaint arising out of his attempt to sell a qui tam complaint for $310,000 to a Sunnyvale company, Wertkin returned to Washington D.C. PSR ¶ 43. Rather than coming clean and accepting immediate responsibility for his behavior, Wertkin doubled down and destroyed incriminating evidence—including stolen qui tam complaints, contemporaneous notes he made and an AT&T bill-- in his Akin Gump office. PSR ¶ ¶ 23, 43.

To the defendant's credit, when he retained his current counsel, he readily acknowledged his role and quickly indicated his intent to plead guilty. Wertkin also informed the government that his former DOJ colleague had nothing to do with his criminal scheme and that he had staged his office to falsely implicate this DOJ employee. Defendant's early acceptance of responsibility, his explanation of the extent of his crimes, and his admission of his obstructive behavior which enabled law enforcement to "clear" the current DOJ employee early on of any wrongdoing, is the primary reason the government is recommending a guidelines sentence and not something much higher. Nevertheless, we respectfully suggest that the Court should take into account that Wertkin's offenses were a continued course of conduct spanning nearly a full year, a period in which there was plenty of opportunity for the defendant to reflect on what he was doing and to stop, rather than escalate his criminal conduct.

**D.    A Sentence of 34 Months Is Sufficient but Not Greater than Necessary to Comply with 18 U.S.C. § 3553(a)**

   *1.    Nature and Circumstances of the Offense*

Defendant's obstruction of justice and transportation of stolen property was breathtaking in its scope and is the most serious and egregious example of public corruption by a DOJ attorney in recent memory. The defendant's conduct—both in scope and duration--justifies a 34-month sentence, which is

the middle of the guideline range.  Jeffrey Wertkin traded on his inside knowledge and privileged position as a DOJ attorney to thwart the truth finding process of the civil justice system.  He used qui tam complaints stolen from the government in order to line his own pockets and to pollute and corrupt federal courts' sealing orders for his financial benefit.  When Wertkin was caught red-handed trying to sell a qui tam complaint for $310,000 to an undercover agent, the defendant doubled down.  Instead of coming clean when the gig was clearly up, defendant went a step further and attempted to obstruct the criminal justice system by destroying incriminating evidence and staging his Akin Gump office to falsely incriminate one of his former DOJ colleagues.  This DOJ employee had no knowledge of the imbroglio the defendant perpetrated, creating yet another unwitting victim of the defendant's selfish scheme.

Defendant's conduct was extremely pathological.  Wertkin continued his pattern of deception by lying repeatedly and directly to potential clients whose identities (and potential exposure under the False Claims Act) were known to him based on the contraband complaints he possessed.  Defendant also invented a bogus persona "Dan" and used a burner phone to conceal his identity.  Wertkin's conduct was carefully calculated and designed to avoid detection for as long as possible.

Moreover, the instant offense was not a one-off crime, but really part of a continuing nearly year-long effort to defraud others by misusing his position as a lawyer.  Wertkin serially abused the trust that others placed in him, including his DOJ colleagues at the Civil Fraud section who had no idea their offices and confidential work product were not safe from one of their own.  Defendant lied repeatedly and directly to his employers and colleagues—the people who trusted him with confidential documents and case strategy; he lied again and abused the trust of a new set of employers and colleagues at Akin Gump.  While at Akin Gump, the defendant made business solicitations to potential clients using information stolen from the DOJ.  And, he turned the Akin Gump law firm into a crime scene when he returned to the firm after his arrest and destroyed evidence and staged his office.

In the world of corrupt public officials who lie and obstruct justice, defendant is among the very worst because, as a former DOJ attorney, he intentionally misused the prestige of his profession and the trust that was placed in him by others (including federal courts throughout the country who count on their sealing orders to be honored) to facilitate his crimes and thereafter, to cover up his misconduct.

SENTENCING MEMORANDUM
CR 17-0557 MMC                                                  10

This egregious conduct justifies a 34-month sentence.

2. *History and Characteristics of Defendant*

Defendant's history and personal characteristics also support a lengthy sentence. There is no indication in his personal history of some larger motivating factor for his antisocial behavior that has been, or could be, resolved, or would mitigate his conduct. Defendant had a privileged upbringing in Scarsdale, New York (PSR ¶ 69) in which his basic material needs were amply met. His parents provided him an environment where his athletic and academic potential flourished. PSR ¶¶ 70, 72. The defendant attended some of the best schools in America and earned both a J.D. and a PhD from Georgetown University. PSR ¶ 91. Although the defendant is receiving mental health treatment as part of this case, PSR ¶ 83, there is no reason to believe that defendant's diagnosis is anything more than narcissism and greed. As for defendant's substance abuse issues, he still appears to be in denial about the full extent of his problem, at least insofar as alcohol is concerned. PSR ¶ 86. The defendant's substance abuse problems may be substantial and should be addressed as part of his rehabilitation; they are not, however, an excuse for, or a mitigation of, his many lies and fraudulent behavior.

In stealing sealed qui tam complaints, Wertkin acted with reckless disregard for the potential for his actions to jeopardize the very cases he and his colleagues at the Civil Fraud section were entrusted with building. Because a trustworthy workforce is essential to the mission of the Department of Justice and the many other federal and state agencies who serve the public, deterring corrupt behavior is of paramount importance. This case has received national attention and we respectfully urge the Court to send a message that this type of criminal conduct will be punished to the fullest extent of the sentencing guidelines. Any deviation from the agreed-upon sentencing guideline range will communicate to other potentially corrupt government officials that the possibility of a slight prison sentence might be worth the risk in order to profit several hundred thousands of dollars. It is crucial to both specific and general deterrence that the public understand and believe that when a former DOJ attorney is caught trying to criminally profiteer from his public position, he will be dealt with severely by the system of which he was once a part.

**CONCLUSION**

With full consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court impose a Guidelines sentence of 34 months of imprisonment, three years of supervised release, and a $300 special assessment.

DATED: February 28, 2018                                              Respectfully submitted,

ALEX TSE
Acting United States Attorney

_____/s/_____
ROBIN L. HARRIS
Assistant United States Attorney