Cristina C. Arguedas (CalBN 87787)
    Email: arguedas@achlaw.com
Raphael M. Goldman (CalBN 229261)
    Email: goldman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone:   (510) 845-3000
Facsimile:    (510) 845-3003

*Counsel for Jeffrey Wertkin*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-cr-00557-MMC |
| Plaintiff, | **JEFFREY WERTKIN'S SENTENCING MEMORANDUM** |
| v. | |
| JEFFREY WERTKIN, | |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

I.  INTRODUCTION ............................................................................................. 1

II.  BACKGROUND ............................................................................................... 3

    A.  Early Life ................................................................................................. 3

    B.  Education, Career, Marriage and Family Life............................................. 4

    C.  Lurking Anxiety and Depression ............................................................. 8

    D.  Employment at DOJ, Personal and Professional Struggles, and the Context of Mr. Wertkin's Crimes ............................................................ 10

III.  MR. WERTKIN'S OFFENSES ....................................................................... 19

IV.  ARGUMENT .................................................................................................. 21

    A.  The Sentencing Guidelines ..................................................................... 21

    B.  18 U.S.C. § 3553 Factors ....................................................................... 21

        1.  The Aberrant Nature of Mr. Wertkin's Misconduct....................... 22

        2.  Psychological Factors ................................................................... 26

        3.  Post-Offense Rehabilitation .......................................................... 26

        4.  Collateral Consequences .............................................................. 29

        5.  Guidelines Overstate the Severity of Mr. Wertkin's Offense ........ 30

        6.  Family Factors.............................................................................. 31

V.  CONCLUSION............................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Cunningham v. California*, 549 U.S. 270 (2007) ...........................................................21

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................21

*Kimbrough v. United States*, 552 U.S. 85 (2007) .........................................................21

*Pepper v. United States*, 562 U.S. 476 (2011) .......................................................26, 27

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006)......................................31

*United States v. Munoz-Camarena*, 621 F.3d 967 (9th Cir. 2010) (per curiam) ...........31

*United States v. Nieto*, No. CR 10-0052 JB, 2011 U.S. Dist. LEXIS 14424 (D.N.M. Jan. 5, 2011) ....................................................................................................26

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) .................................................22

*United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011).............................................27

*United States v. Samaras*, 390 F. Supp. 2d 805 (E.D. Wis. 2005) ..............................29

*United States v. Stall*, 81 F.3d 276 (6th Cir. 2009) ......................................................22

*United States v. Stewart*, No. 8:09CR282, 2011 U.S. Dist. LEXIS 89767 (D. Neb. Aug. 11, 2011)..............................................................................................................27


**Statutes & Other Authorities**

18 U.S.C. § 1505...........................................................................................................19

18 U.S.C. § 2314...........................................................................................................19

18 U.S.C. § 3553............................................................................................*passim*

United States Sentencing Guidelines § 2B1.1...............................................................31

I.      **INTRODUCTION**

Jeffrey Wertkin comes before the Court for sentencing having pled guilty to obstruction of justice and interstate transportation of stolen property.  The crimes arose from an almost unaccountable detour in an otherwise honorable and law-abiding life— Mr. Wertkin's "reckless and absurd plan," in the words of Mr. Wertkin's father, *see* Letter of Martin W. at 2, to sell sealed *qui tam* complaints that he had taken when he left his position as an attorney at the Department of Justice.[1]

As described in the PSR, in November 2016, Mr. Wertkin placed a "cold call" to the general counsel of a company that was the defendant in one of those sealed complaints, and, not getting an answer, left the man a voicemail offering to provide information about the complaint for a fee.  Not surprisingly, the general counsel alerted the FBI, and for several months thereafter Mr. Wertkin, using the assumed name "Dan," negotiated the sale of the complaint under the silent but watchful eye of law enforcement.  After several phone calls, Mr. Wertkin came to believe that the general counsel was interested in purchasing a copy of the complaint, and offered to exchange the complaint for hundreds of thousands of dollars.  Eventually, in late January 2017, in a scene out of a B-grade action movie, Mr. Wertkin traveled to the Bay Area with plans to exchange a copy of the complaint for a bag of cash in a Sunnyvale hotel lobby.

---

[1] We submitted to the Probation Officer numerous letters of support from Mr. Wertkin's friends and family, and understand that these letters have been provided to the Court along with the Probation Department's Presentence Report ("PSR").  The letters are arranged in alphabetical order by author's name.  Also included with the PSR is a psychological report about Mr. Wertkin authored by Dr. Steven Walch and his colleagues at the Berkeley Therapy Institute.  This memorandum will cite to that report as the "Walch Report" or "Walch Rept."  Finally, the Probation Department has submitted to the Court a "personal statement" drafted by Mr. Wertkin himself to explain his personal history and discuss his crimes.  This memorandum will cite to the statement as "Personal Statement" or "Pers. Stmt."

The letters of support and the Walch Report contain information about Mr. Wertkin's children and other sensitive family information that are not excerpted in this public filing. For this information we respectfully refer the Court to the Walch Report, Mr. Wertkin's personal statement and the letter provided by Mr. Wertkin's wife, Erin.

Although unknown to any of the persons involved, Mr. Wertkin appeared at the hotel wearing a wig and sunglasses in a ridiculous attempt to conceal his identity.  He handed the complaint to an FBI agent posing as an employee of the defendant company, whereupon he was promptly arrested.

In addition to being "reckless and absurd," Mr. Wertkin's offenses were serious— and he understands that he alone is responsible for them.  Mr. Wertkin comprehends the weight of his mistakes, his betrayals of his former colleagues at the DOJ and his own ethical standards, and the harm he has caused.  Those are the factors that drove him to cooperate with the government's investigation.

Yet Mr. Wertkin's criminal misconduct, and the desperate nature of his acts, stand in stark contrast to the careful, diligent and unblemished life he led up until the point of his crimes.  Indeed, Mr. Wertkin's family members and friends, in their letters of support, uniformly express utter shock that he finds himself before the Court today.  It is a situation that begs an obvious question: why?

As we will explain below, Mr. Wertkin suffered from undiagnosed and untreated anxiety and depression.  Throughout his life, Mr. Wertkin had dealt with these fragilities by working hard and finding solace in the external approval that accompanies academic and professional success.  When Mr. Wertkin for the first time encountered significant failures in both his professional and personal lives, he did not have the internal mechanisms for coping appropriately with those problems—and he stumbled down a disastrous path.  His depression symptoms quietly mounted, dragging him down bit by bit, until he felt like he needed to take desperate actions.

Given this context, there can be no dispute that Mr. Wertkin's crimes were truly aberrant.  Moreover, after his arrest, he worked unusually quickly and proactively to come to terms with his mistakes and to start to make amends by cooperating fully with the government's investigation of the case—and by seeking treatment for, and an understanding of, the depression and anxiety that led to his errors.  Mr. Wertkin has also already suffered severe collateral consequences, including the loss of his

cherished career as an attorney and severe public embarrassment and opprobrium.

For all of these reasons—and other reasons discussed below—we submit that a sufficient sentence in this matter would be one that significantly censures Mr. Wertkin for his misconduct but nonetheless allows his family to remain in their home in Washington, D.C.  We will ask the Court to impose a sentence of imprisonment for a year and a day.

## II.    BACKGROUND

### A.    Early Life

Mr. Wertkin was born in New York City to Martin and Sandra Wertkin on May 18, 1976.  PSR ¶ 67.  His father was a surgeon and his mother trained as a nurse and medical administrator and later served as a homemaker; both are now retired.  PSR ¶ 67; Pers. Stmt. at 1.  After a few years in the city, the family moved to Westchester County, where Mr. Wertkin grew up along with his younger siblings Brian and Stephanie.  PSR ¶¶ 68-69; Pers. Stmt. at 1.

Mr. Wertkin's parents report that in his teenage years their son was hardworking and a "straight arrow":

> Since he was a teenager, Jeff has been trustworthy, hard-working and focused on public service.  When he entered high school he joined student government.  He spent countless hours before school and after school working on behalf of his fellow students and seeking to improve student life at his high school.  Whether it was fundraising for the school yearbook or serving on faculty-student committees for curriculum development, Jeff always put everything he could into every undertaking . . . .
>
> Jeff was always the straight arrow and the sensible one among his friends in high school. When he went out socially, he was often the designated driver.  That way, he didn't have to worry about getting into the car with someone who had been drinking.  And when he was designated driver, he never consumed alcohol.  He rarely came home after curfew.

Letter of Martin W. at 1; *see also* Letter of Sandra W. ("He has always been a rule follower and a fantastic role model for his siblings.  In grade school he was more apt to enforce the rules against his brother and sister than to encourage them to break the rules.").

1   Mr. Wertkin's own recollections of those years are similar.  He recalls working

2   unusually diligently at school and extra-curricular activities.  Pers. Stmt. at 1.  He says:

3   "I worked hard and sought recognition for my accomplishments . . . . I held myself to a

4   high standard and I set high expectations for myself.  I had a near perfect attendance

5   record in high school and I did not drink or experiment with drugs."  *Id.*

6   **B.      Education, Career, Marriage and Family Life**

7   Mr. Wertkin attended undergraduate school at Haverford College.  Pers. Stmt. at

8   1; PSR ¶ 72.  In college, Mr. Wertkin played for a short period on the basketball team,

9   but a serious knee injury cut short his athletic career; after that, he turned to academics

10   and hard work.  Pers. Stmt. at 1; Walch Rept. at 8-9.

11   Following graduation from college, Mr. Wertkin moved to Washington, D.C. to

12   pursue a joint J.D. and Ph.D. in government at Georgetown University.  Pers. Stmt. at 1;

13   PSR ¶ 73.  As Mr. Wertkin recounts, almost immediately upon starting law school, he

14   knew had had "found [his] calling."  *Id.*  He says: "I loved reading cases, discussing legal

15   history, and debating the ethics and policy underlying judicial opinions.  I developed a

16   true appreciation for our legal system and believed—and still believe—that justice can

17   be obtained when the system works the way it should."  *Id.*  One summer, Mr. Wertkin

18   worked as a law clerk at the Department of Justice in the Office of Special

19   Investigations; he "loved every minute of every day in the job."  *Id.* at 2.  "When my

20   eight-week internship ended, I was convinced of one thing: I would one day work at the

21   Department of Justice."  *Id.*

22   Mr. Wertkin spent four years "shuttling back and forth from the law school to the

23   graduate school," whereupon he earned his law degree.  *Id.* at 1-2.  He had not yet

24   completed his Ph.D. work, but he determined to get a job at a law firm and finish his

25   dissertation while gainfully employed.  *Id.* at 2; PSR ¶ 91.  In 2002, Mr. Wertkin joined

26   Patton Boggs as an associate.  PSR ¶¶ 73, 99; Pers. Stmt. at 2.

27   While he worked at Patton Boggs and on his dissertation, Mr. Wertkin met his

28   future wife, Erin.  PSR ¶ 100; Pers. Stmt. at 2.  As Mr. Wertkin reports, the two were "a

classic 'opposites attract' couple.  I was organized and responsible; she was fun and spontaneous. She had a large circle of friends who became part of my circle of friends." Pers. Stmt. at 2.

Erin tells a rather dramatic story about the couple's meeting:

> When I first met Jeff, I was working in Congress for Senator Feingold from Wisconsin and I had a problem.  I was one of the 23 congressional staffers that was exposed to Anthrax in 2001.  During the decontamination process of the Hart Senate Office Building, I lost the entire contents of my office which I basically used as a closet because I was working two jobs— congressional staffer by day and waitress by night.  Jeff was a friend of a- friend.  He barely knew me, but his first instinct was to offer to help me with my problem.  I sent him some information and he helped me navigate the law that Congress passed to allow staff to recoup some funds for the loss of personal items.  I was captured by his kindness as we spent hours together filling out the necessary paperwork.

Letter of Erin E. at 1.  The two grew closer, and Erin learned that "one of Jeff's defining characteristics is how quickly he offers to help other people and how much satisfaction he derives from being helpful."  *Id.*

> When our friends were negotiating leases for their apartments, they went to Jeff.  When his aunts and uncles had questions about their wills, they went to Jeff.  When my colleague got married to a man from [another country] and needed help navigating the US citizenship process, she went to Jeff. When our neighbor was having a problem with an insurance claim, he went to Jeff.  Even my parents' neighbors who live in Wisconsin call on Jeff. The list goes on. I could not possibly list all of the times that Jeff has volunteered to help out friends, friends of friends, family or neighbors who had a legal question or just needed someone to talk to about a problem.  Although Jeff is not a lawyer anymore, his instinct to help others has not diminished.  Just last week he took our 81 year-old neighbor (who lives alone) to and from the hospital for a surgical procedure and stayed at the hospital to make sure he was ok.

*Id.*

Erin also recalls how Mr. Wertkin endeared himself to her family: "I grew up the youngest of four kids and I am close with almost all of the 84 members of my large extended Catholic family.  One of the things that first attracted me to Jeff was his close relationship with his own large extended Jewish family.  From day one Jeff made a huge effort to embrace my side of the family, and in turn they embraced him right back."  *Id.*

Mr. Wertkin even earned recognition as the "Jew who saved Christmas" for brokering peace during a heated intra-family political discussion.  *Id.*  In 2006, the couple was married.  Pers. Stmt. at 2; PSR ¶ 73.

As his romantic relationship matured and culminated in marriage, Mr. Wertkin was spending "nights and weekends working to complete [his] dissertation" while also working as a lawyer at Patton Boggs; he finally earned his Ph.D. in 2008.  Pers. Stmt. at 2; PSR ¶ 91; Letter of Erin E. at 2.  After Mr. Wertkin earned his degree, Erin proposed that the couple travel the world for a year to see how the humanitarian organizations for whom Erin worked helped the less fortunate in other countries.  Pers. Stmt. at 2; Letter of Erin E. at 2.  The two spent most of 2009 traveling in developing countries and volunteering with local poverty-alleviation efforts.  PSR ¶ 76; Letter of Erin E. at 2; Pers. Stmt. at 2.  Erin recalls:

> We estimated that we ate 1000 consecutive meals together.  There is no better way to truly get to know someone than spending every single day with them on the road.  I marveled at Jeff's ability to connect with all people—from a small-town girl like myself, to the Mayor of an African town we were helping with a water filtration system, to HIV-positive orphans, to fellow travelers.   Together we tried to do our part to improve the lives of everyone we interacted with.

Letter of Erin E. at 2.

Mr. Wertkin returned to the United States "[i]nspired by the public service that [he] had seen," and shortly after—in 2010—his long-time ambition was realized when he accepted a position in the Fraud Section of the Civil Division at the Department of Justice.  Pers. Stmt. at 2; *see also* PSR ¶ 99.  Erin recalls that "Jeff was incredibly excited when he got the job at the DOJ.  After years of hearing me talk about helping people, he was so excited to be one of the 'good guys.'  He loved working at the DOJ and was so proud of work he was doing."  Letter of Erin E. at 3.  Mr. Wertkin likewise recounts that "[w]orking at the DOJ was everything I hoped it would be. The attorneys were brilliant and my supervisors quickly earned my deep respect.  The work was challenging and I felt like what I was doing was important.  I specialized in cases alleging fraud on the Medicare program, and I was proud of the work that I did to help

protect this valuable program." Pers. Stmt. at 2-3.

Mr. Wertkin and his wife have young children. Pers. Stmt. at 3; PSR ¶ 75. Erin told the Probation Department that Mr. Wertkin is a "loving father who is dedicated to his children." PSR ¶ 79. That dedication shines through a great many of the letters that Mr. Wertkin's supporters have written to this Court. His mother's characterization closely echoes that of his wife: "Jeffrey is an incredibly loving and devoted husband and father . . . . He has perfect temperament to be a father: he is patient, loving, and enthusiastic. You can see it in the way that [his daughter] adores her father and [his son] emulates his every move." Letter of Sandra W. at 1. Mr. Wertkin's mother-in-law likewise notes his "love for his children" as "[o]ne of Jeff's most enduring qualities," and describes his ability to teach and bond with his children. Letter of Barbara E. at 1-2. And his sister recounts:

> My brother is the reason I had a child and became a mother. My husband and I were thinking of not having any children. Then we spent significant time with my brother and his family. I watched him and his wife parent. They do it flawlessly; with joy, with love, with patience, and with acceptance of their own fallibility and their children's unique and individualized needs . . . . He is now my child's Godfather and should something happen to me and my husband, he is the one I would want to raise the most important person I've ever known. Despite recent events, he is still the one who I trust to bring my son up to be someone that people would look up to.

Letter of Stephanie G. at 1. Other friends and extended family share similar thoughts. *See, e.g.,* Letters of Matthew C. ("When it comes to being a good father, Jeff is absolutely best in class. Every single time I have been with Jeff and his family I have witnessed the compassion and dedication he has for his children."); Alan C. ("The joy in his eyes when he is playing with his children makes a person smile."); Brin F. ("[Mr. Wertkin's son and daughter] simply adore their father, who is loving and attentive with them and a tremendously constructive part of their daily lives."); Michele G. ("He is the Dad who starts the afternoon softball game, instructs the kids on the rules, pitches and coaches batting while keeping the adults engaged in the game."); Sarah H. ("Jeff is a kind, loving, and fun father. On vacation in 2016, we found ourselves without a planned

activity for the kids one morning.  Jeff could sense the children getting restless, so he single-handedly organized and executed an elaborate obstacle course for them involving skipping, swinging, and water balloons.  An otherwise unexciting morning turned into the highlight of the trip thanks to Jeff's energy and creativity."); Noah T. ("Jeff is . . . a dedicated and loving father within his nuclear family.  As a new father myself, I hope to emulate Jeff as a dad.").  These are just a sampling; space does not permit citation to every author who attests to Mr. Wertkin's bond with his young children.

### C.     Lurking Anxiety and Depression

At this point, the Court will have noted that Mr. Wertkin's story on its face appears to be a description of a successful and well-lived middle-class life.  But that has not been the whole tale.  As discussed in the report of Dr. Steven Walch, in Mr. Wertkin's own reflections in his personal statement, and by Mr. Wertkin's wife Erin, many of Mr. Wertkin's achievements arose ultimately from a drive deeply rooted in anxiety, depression and self-doubt.

As Dr. Walch puts it, "For years Mr. Wertkin has suffered from depression and anxiety, and he tends to be self-conscious, self-critical, inadequate and insecure." Walch Rept. at 3.  "This stems in part from serious medical issues in infancy and social difficulties in childhood, but it is also exacerbated by a psychological immaturity that has left him with inadequate tools for dealing with stress."  *Id.*

Dr. Walch's report describes an early medical trauma the scars from which left Mr. Wertkin "self-conscious and insecure throughout his life." *Id.* at 4.  Perhaps in part due to that medical issue, Mr. Wertkin has always felt a compulsion to succeed—and insecurity about potential failures.  *Id.* at 5-6.  Even during middle school, he suffered "feelings of inadequacy, insecurity" and depression.  *Id.* at 6.  As Mr. Wertkin himself recalls, "I spent a lot of my youth feeling like I was on the outside looking in.  I was a late bloomer . . . and often was uncomfortable hanging out with kids my own age . . . . [¶]  I dealt with these feelings by putting pressure on myself and seeking external validation: I worked hard and sought recognition for my accomplishments."  Pers. Stmt. at 1; *see*

*also* Walch Rept. at 6-7 ("Mr. Wertkin seems to have coped with his depressed feelings through hard work: 'I did a lot of homework.' . . . . [¶]  During our interview he reflected on this coping strategy further, stating, 'I channeled my sadness to gain the respect of my parents and peers.'").  In short, during his grade school years, "[a]lthough Mr. Wertkin succeeded at a high level academically as well as athletically, emotionally he remained distressed and overly perfectionistic, prone to periods of anxiety, depression, insecurity, and alienation . . . ."  Walch Rept. at 8.

This pattern repeated in college.  Mr. Wertkin recalls that, after an injury ended his basketball career, he again "started to feel like an outsider.  Again, I smothered those feelings in hard work.  I devoted myself entirely to academics and spent long hours studying in the library."  Pers. Stmt. at 1; *see also* Walch Rept. at 8-9.

Mr. Wertkin's anxiety manifested yet again as he was trying to complete his dissertation while also working as an associate at Patton Boggs.  This time, Mr. Wertkin's wife Erin witnessed the outward manifestations of his mental state:

> For about two years after we got married, Jeff was working full time at a law firm and spending his nights and weekends working on finishing his PhD dissertation.  I remember near the end of the process when he was completing his final chapter and getting ready for his defense, I noticed the pressure was taking a toll on him.  He worried that his dissertation wouldn't be accepted and that all his work would have been for nothing.  He worried that his work at the law firm was suffering.  I noticed he started drinking more coffee to stay awake during the day, and drinking more alcohol to go to sleep at night.  He would constantly grind his teeth and his skin began to crack, and the change in his demeanor was noticeable.  Thankfully, there was an end in sight and, of course, his dissertation was accepted and his advisor awarded him the degree with distinction.

Letter of Erin E. at 2.  Dr. Walch echoes Erin's observations:

> Mr. Wertkin did experience significant stress, anxieties, and feelings of insecurity and inadequacy during his tenure at Patton Boggs.  His stress was, characteristically, manifest in physical symptoms: "I had my first outbreak of eczema, constant diarrhea, and sleep problems.  I used coffee and booze to keep going and to get to sleep.  But we didn't have kids yet, and I managed fairly well."  His wife Erin confirmed these stress reactions, describing his "sleep problems, teeth grinding, physical preoccupations, overdrinking, and long hours of work."  They both mentioned his excessive use of substances at this time.

Walch Rept. at 9.

Dr. Walch also observes that, in part because of Mr. Wertkin's own insecurities, he had fairly limited experience with romantic relationships before he met Erin. *Id.* at 10. Dr. Walch finds that Mr. Wertkin's "lack of confidence and his limited experience with relationships produced an unhealthy, or at least immature, dependence on his wife for approval and acceptance." *Id.*; *see also id.* at 11 ("[Mr. Wertkin's] dependence on Erin's approval is apparent. 'I tried to do everything I could to make her life better. I thought if I did more around the house it would get better, and I grew frustrated when she complained.'") Still, the couple was generally happy and had a successful marriage through the middle of 2015. *Id.* at 11.

Thus, although Mr. Wertkin's anxieties and depression had caused him periodic pain and suffering, until the time of his crimes he had coped fairly well with these problems—largely through hard work, achievement and a "stiff upper lip" mentality.

### D.   Employment at DOJ, Personal and Professional Struggles, and the Context of Mr. Wertkin's Crimes

Mr. Wertkin's latent weaknesses were finally activated, with disastrous results, toward the end of his tenure at the DOJ.

In 2015, Mr. Wertkin and Erin were experiencing the usual pressures of raising two small children—which led Mr. Wertkin to experience elevated anxiety. Walch Rept. at 11. Then, Mr. Wertkin "was asked to serve as the lead counsel for DOJ in a $200 million fraud case in the Northern District of Alabama." Pers. Stmt. at 3; PSR ¶¶ 27, 74; Walch Rept. at 11. As Erin reports, Mr. Wertkin "was so excited. Although his workload doubled, he was utterly committed and he believed in the case." Letter of Erin E. at 3. But "[o]ver the course of the next few months, the problems in [Mr. Wertkin's] marriage increased and historic issues of insecurity and inadequacy worsened." Walch Rept. at 11.

The Alabama case ended up going to trial, and Mr. Wertkin himself recalls the strain the trial put on his family:

I spent four months working long hours preparing for the trial from

Washington, and then another 12 weeks in Alabama for final preparations and for the trial. Being away from my kids and family was very hard. I enjoyed working on the trial and didn't mind the 16-hour days, but I hated to be away. Erin struggled with being (essentially) a single mother, my children struggled to adapt to not having their father around, and I struggled with feelings of distance from my family. At the beginning of the trial, I tried to talk to my kids using Face Time at bedtime but they often became upset and were unable to settle down afterward. At the time [my children] had trouble understanding why I wasn't at home. By the end of the trial, Erin and I decided that it would be better to just be in touch only on the weekends.

Pers. Stmt. at 3. Erin, too, reports that although she was proud of Mr. Wertkin's work on the trial, it

put an unexpectedly large strain on the family. Jeff was away for 3 full months, and we barely spoke during the week. After a few days the kids started to notice his absence and began acting out. It was especially hard on [our son] who has a very strong bond with his Dad and relies on him for a lot of guidance and reassurance. I was working full-time and Jeff's absence put a huge strain on me. I lost almost 10 pounds over that time period because I felt like I was "on the go" from the moment I got up until the moment I collapsed exhausted.

Letter of Erin E. at 3.

Dr. Walch reflects on the effect these strains had on Mr. Wertkin. "He experienced heightened performance anxiety at work and at home, and Erin, left with most of the responsibilities at home, also became stressed . . . ." Walch Rept. at 11. "Mr. Wertkin's weekend visits and departures would upset the routine," causing tension between Mr. Wertkin and his wife, and leading the couple to argue. *Id.* "Mr. Wertkin was feeling trapped between the demands of home and those of work." *Id.* at 12. "Characteristically unpsychological in his analysis of the situation, Mr. Wertkin focused externally"—blaming his work and Erin "rather than examining his feelings of inadequacy as the source of his mounting stress." *Id.*

Mr. Wertkin also perceived pressure from Erin "to provide 'a bigger house in a safer neighborhood and better schools for the kids.'" *Id.* at 12. Erin was surprised to learn about this perception; she told Dr. Walch: "I don't understand that. We were fine financially. I don't get where he was coming from there. Really the issue was safety. A bigger house would have been nice, but the real issue was safety." *Id.* As Dr. Walch

observes:

> Whatever was actually said about it, this detail provides an important insight: Mr. Wertkin's emotional dependence on Erin left him unable to have an honest conversation about what was really happening.  He saw everything through the lens of his own insecurity and her criticism, so that when she made an off-hand comment about, say, the neighborhood or the house, he saw it as a demand rather than a fleeting thought or suggestion.  At the same time, Erin was not aware of the impact that her comments were having on him.

*Id.* at 12-13.

This increasingly stressful situation was not resolved for Mr. Wertkin at the end of the trial.  To the contrary, after a jury verdict in favor of the government left Mr. Wertkin feeling that his team had won a "major victory" and "like all the sacrifice was worth it," the trial judge *sua sponte* determined that the jury had been given the wrong jury instructions, set aside the verdict, and dismissed the case.  Pers. Stmt. at 3.  This result was described in the press as a "triumph" for the defense and an "epic loss" for the DOJ.[2]  As Erin reports, Mr. Wertkin "was devastated.  He came home two days later and he was the shell of a man.  He didn't go to work for three days and spent most of the time watching movies on his phone in bed."  Letter of Erin E. at 3.  Mr. Wertkin, too, recalls that "I felt like my life was turned upside down."  Pers. Stmt. at 3.

The distress of participating in his very first trial and his first public failure marked a significant turning point for Mr. Wertkin.  After the favorable jury verdict, Mr. Wertkin stated, "I had expected to return to work as a success—the winner of a rare *qui tam* trial—but instead that rug had been ripped out from under me, and it felt like my colleagues and supervisors treated me like I had failed.  The recognition I craved did not materialize."  *Id.*

Mr. Wertkin's feeling of failure, instituted and exacerbated by his insecure focus on achievement and external approval, spilled also into his personal life.  He recalls that

---

[2] News articles about the Alabama trial can be found at the following URLs: *https://www.law360.com/articles/718870?scroll=1*; *https://www.law360.com/articles/801212/doj-to-appeal-epic-loss-in-aseracare-fca-case*.

"after being away for three months, integrating back into my family was much harder than I thought it would be.  When I returned home my daughter regarded me as a stranger and wouldn't let me pick her up."  *Id.*  Mr. Wertkin was "devastated," *id.*, and his wife noticed that while "[h]e used to have so much patience with the kids (and [our son] especially could do no wrong), . . . when he got back from Alabama he all of a sudden had a bad temper," Letter of Erin E. at 3-4.  "Mr. Wertkin now felt even more dejected and depressed.  He was feeling unappreciated both at work and at home, and he . . . began to use substances (alcohol and marijuana)."  Walch Rept. at 13.  For Mr. Wertkin, "[e]ach day was a roller coaster of anger, regret and depression."  Pers. Stmt. at 3.

A few weeks after he returned from the Alabama trial, Mr. Wertkin's supervisor asked him to join another team going to trial in Boston.  *Id.*; Walch Rept. at 13.  Mr. Wertkin's habitual mechanism for coping with stresses was to work harder and achieve; characteristically, he wanted to take the assignment in Boston, "bury myself in work and obtain the recognition that I had hoped to get in Alabama."  Pers. Stmt. at 3.  But he felt constrained by his family obligations: "when I broached the subject with Erin, she reacted extremely negatively to the idea of another extended work trip.  I turned down the assignment."  *Id.* at 4; Walch Rept. at 13.

As Mr. Wertkin recalls, the "decision to turn down the assignment was a lose-lose decision at home and at work.  I felt bad about turning down the assignment and I felt resentment from my colleagues who looked down on me for the outcome of the Alabama case and on my decision to pass on the trial."  Pers. Stmt. at 4.  "In addition, my decision had negative consequences at home.  I brought my negative energy home from work and, in my mixed-up state, began to resent Erin and even the children.  I had always prided myself on being a patient father, but I was increasingly irritable and became quick to scold.  Communication started to break down between me and Erin . . . ."  *Id.*

In his personal statement, Mr. Wertkin candidly reflects on his mental state at the end of 2015—and his decision to make a change:

1  
2  
3  
4  
5  
6  
7  

These problems may not sound to everyone like true disasters, but I now understand that I have always been very reliant on external approval from my family and colleagues—and, for the first time as an adult, I was experiencing real obstacles and failures in those areas. I began to feel like everything was crumbling around me. I was unhappy at DOJ and I was unhappy at home. In retrospect, I can see that I did not have any coping mechanisms for my feelings, and that is why I started drinking and experimenting with marijuana . . . . My increased drinking and drug use placed even more strain on my family relationships and my depression deepened. Although I had always thought I would have a long career at DOJ, I decided that I needed a change in my life and started looking for opportunities in the private sector.

8  *Id.* at 4. When Mr. Wertkin told Erin about his plans to leave DOJ, she "couldn't believe

9  it. I tried to talk him out of it because I knew how much he loved his job." Letter of Erin

10  E. at 4.

11  As Mr. Wertkin began interviewing with private firms, his stress level only

12  increased: "At every interview I was asked about my 'business plan' and how I intended

13  to attract new clients to the firm. After I agreed to join the partnership at Akin Gump, I

14  started to experience tremendous anxiety about the move." Pers. Stmt. at 4. "I thought

15  I could handle whatever legal issues arose, but I became paralyzed with fear about

16  meeting the business expectations of the firm." *Id.* Erin saw the anxiety in her

17  husband: "Jeff was never much of a drinker, but he got into the habit of pouring himself

18  a large drink when he got home from work and would drink more at dinner and after

19  dinner. I knew something was wrong, but I thought time would heal all wounds." Letter

20  of Erin E. at 4.

21  As Mr. Wertkin struggled to come up with a plan for developing business once he

22  left DOJ, he made a start on his fateful wrong turn—with very minor transgressions that

23  escalated over time. During his interviews with Akin Gump, Mr. Wertkin had somewhat

24  exaggerated his expertise, suggesting that he was an expert in *qui tam* litigation

25  generally, rather than health care fraud more specifically. This led him to begin

26  searching out other *qui tam* complaints his office was handling as a method for

27  educating himself and becoming an expert, and later to the idea that he could take

28  some of those complaints with him when he left the DOJ so that (a) he could continue to

educate himself, and (b) he would know which companies to target with "marketing" efforts, so that, if one of the complaints against those companies was eventually unsealed, the company would think of Mr. Wertkin as a subject-matter expert:

> I started to have second thoughts about my decision to join Akin Gump, but I had already accepted the job and given notice at DOJ.  I felt stuck—like there was no turning back without looking like an idiot and making everyone upset.  I started to think about what I could do to make the transition a bit easier.  During slow times at work I started reading *qui tam* complaints that had been recently filed and served on the Fraud section.  My intention, at least initially, was to get a better sense of the types of complaints that were being brought so that I would be able to present myself as an 'expert' on the subject to prospective clients.

> As my departure date got closer, my level of anxiety also continued to rise.  I started to believe that I was setting myself up for failure, and I didn't know how to fix it.  I was having difficulty falling asleep and staying asleep.  My alcohol and marijuana use increased.  On one of my sleepless nights, I had the idea that I could use information from filed complaints to help me to identify which companies to target with my marketing efforts once I reached Akin Gump.

> Just a few days before I left DOJ, I was at the office late one evening and I went into my supervisor's office and made copies of complaints that had been filed in federal court and recently served on the Justice Department.  I had never done anything like that in my entire life.  I knew it was wrong.  But my judgment was clouded by stress and I thought that having this information would lower my anxiety about succeeding in my new position.  At the time, I rationalized that I wouldn't share the complaints with any defendant or do anything that would obstruct justice—I just hoped to use the information to identify companies that I would target for marketing purposes.  Looking back, I can see now how this step was a significant violation of trust.  When I made those copies with the intent of taking them with me, I betrayed my colleagues at the DOJ, the legal profession, and the entire justice system.

*Id.* at 4-5; *see also* Walch Rept. at 13; PSR ¶¶ 25-29.

Mr. Wertkin's ill-conceived plan to reduce his anxiety did not work at all; once he began work at Akin Gump, his possession of the complaints only increased his disquiet.  He says: "Every time my phone rang I worried that someone was going to ask me about the complaints.  I jumped every time someone walked into my office."  Pers. Stmt. at 5.  The work of a partner in a private law firm was further stress-inducing: "I was . . . wholly unprepared to deal with the business side of being a private-sector lawyer and did not have a support network to help me.  Not only was I working longer hours, but my stress

1   level climbed even higher." *Id.* "My wife Erin disliked it when I travelled or when I

2   checked my email at the dinner table, but I told her it was worth it because the extra

3   money I would earn would let us put the kids in private school and let us buy a house in

4   a nicer neighborhood." *Id.*

5         Mr. Wertkin recalls his deteriorating physical and mental state:

6       I still made it a priority to be home to see the kids at 5:30 pm, but every night

7       after they went to bed I would log into my computer and work from about
        9:30 pm until 1 am or later.  I was constantly tired and irritable.  I started

8       drinking too much coffee during the day and too much alcohol at the end of
        the night.  In addition to sleeplessness, I started to experience other

9       physical manifestations of stress.  I developed terrible eczema on my hands
        that caused deep and painful cracks, and I had a consistent dull ache in my

10      abdomen that would occasionally flare up.  I began purchasing marijuana
        in edible form, and on weekdays after I finished my work and on weekend

11      nights I would consume drugs that lowered my anxiety but also reduced my
        sociability.  Erin and I started to get into regular fights and by mid-summer

12      she started sleeping in our guest bedroom.

13  Pers. Stmt. at 5-6.  In short, Mr. Wertkin's anxiety and irritability led to a significant

14  deterioration in his marriage and feelings of isolation.  *Id.* at 6; *see also* Letter of Erin E.

15  at 4.  His stresses and mounting isolation compounded themselves at work:

16      I started to feel overwhelmed at work.  No matter how many hours I would
        put in, I felt like I was drowning and I wasn't producing high-quality work.  I

17      was exhausted from lack of sleep, but after nine or ten cups of coffee, I
        would find myself shaking from the caffeine and unable to maintain my

18      concentration.  On some days the stress became so intense that I would
        simply leave the office for an hour or two—sometimes to simply walk around

19      the block in circles.  This helped me relax in the short-term, but in the long-
        term it compounded my problems as I started to fall behind in my work.

20

21  Pers. Stmt. at 6.

22        Erin has similar recollections.  She "thought there would be a honeymoon period

23  in [Mr. Wertkin's] new job, but he was miserable immediately."  Letter of Erin E. at 4.

24  She noticed that Mr. Wertkin "couldn't get out of bed and always overslept . . . . He was

25  drinking a ton of coffee, too much booze, and though I didn't know the quantity at the

26  time, doing a lot of drugs."  *Id.*  She noticed Mr. Wertkin's physical symptoms, too: "His

27  body was physically deteriorating.  His hands were so severely cracked they often bled

28  from the simplest of tasks.  I took over bathing the kids in order to protect his hands

from water which seemed to severely irritate his skin.  He constantly complained of abdominal pain." *Id.*  "This was such a departure from the responsible, social, and kind person I fell in love with.  It was like the time when he was overwhelmed by anxiety finishing his dissertation," only this time it was worse.  *Id.*; *see also* Walch Rept. at 13-14.  "Eventually I got tired of trying to talk to him about this and started sleeping in the guest room."  Letter of Erin E. at 4; *see also* Walch Rept. at 13-14.

Dr. Walch finds that Mr. Wertkin "believed irrationally that the new job would change everything, that he could cure all his problems by doing more for his wife, getting her the bigger house in the safer neighborhood, and being a hero at work." Walch Rept. at 13.  Further, "[t]he breakdown in his marriage that began upon his return from the trial in Alabama and culminated in his wife's decision to permanently move into the guest room was a significant and persistent source of strain on Mr. Wertkin." *Id.* Mr. Wertkin "felt trapped not only by the mounting demands of work, but also by the increasing tension at home." *Id.*  "Irritability, excessive complaining, withdrawal, moodiness—all these symptoms of depression were evident and increasing throughout this period.  'For the first four years I never yelled at my kids, period.  Now I was irritable, yelling.  I had a very short fuse.'  Erin confirms this." *Id.* at 15.

> For most of his life, Mr. Wertkin ha[d] generally coped with his internal distress fairly well, by utilizing compartmentalization, avoidance, denial and compulsive defenses, hard work, and independence.  His work ethic, his compulsive organizing and neatness, his "everything has a place" mentality were to a large extent advantageous.  Although before this episode he had experienced periods of anxiety, depression, and stress, he never before acted illegally.  The difference this time was that he was experiencing unusually high levels of stress both at work and in his marriage.

*Id.* at 2.  "By late Fall 2016, Mr. Wertkin's depression and anxiety had advanced to very high levels, and his coping mechanisms continued to fail.  It was at this point that his illegal activity became more extreme, as he hatched his plan to sell *qui tam* complaints to the defendants." *Id.* at 15.

Mr. Wertkin describes the moment of his decision in vivid detail:

In November 2016, on one of the first cold days of the year in Washington

DC, I was having a particularly bad day.  I had devoted considerable effort over the previous few weeks on marketing—spending more than a hundred hours creating presentations and attending meetings—with nothing to show for it.  Even though I knew which companies to target with my marketing efforts, these efforts were not translating into clients.  I started to panic—if I couldn't succeed with this "inside information" then how could I ever expect to succeed without it?

On that particular day I needed a break but it was too cold to walk outside and so I just sat motionless at my desk staring at my computer.  I was experiencing terrible anxiety, desperation and loneliness arising from fear that I was failing in both my professional life and personal life.  I didn't know what to do.  I wanted to leave Akin Gump, but I had only been at the firm for nine months and I didn't know how I could explain to Erin why I was giving up such a large salary.

Even with the benefit of hindsight, I can still hardly make sense out of my decision to pick up my old iPhone, "cold call" the in-house counsel of a defendant named in a complaint, leave a voicemail, pretend that my name was Dan, and try to sell the complaint for money.  I believe I somehow viewed selling the complaints as a way to escape my problems.  I thought that, if I could quickly earn a substantial sum of money, I could provide the material benefits I had promised to my family upon moving to Akin Gump— a new house in a better neighborhood, private school for the children—and still leave the firm job that seemed to be the source of so much anxiety.

Pers. Stmt. at 6; *see also* Walch Rept. at 15 ("He irrationally viewed his actions as a way to escape—the money he would make from selling the complaints would allow him to leave his job at Akin Gump and fulfill his perceived promises by settling his family in a safer location and enrolling his children in private school.").

As the Presentence Report discusses, Mr. Wertkin put his foolhardy plan into action.  He tried to sell some of the sealed *qui tam* complaints he had taken from DOJ. He tried to sell one complaint for $310,000 to a defendant company in the Northern District of California—eventually flying to the Bay Area in an attempt to consummate the sale—and another for $50,000 to a defendant company in Alabama.  PSR ¶¶ 9-22.

Mr. Wertkin's desperate mental state during this time is perhaps best demonstrated by a revealing episode that occurred toward the culmination of this misconduct.  As Dr. Walch reports, "Mr. Wertkin cried while describing how trapped he felt before his arrest: 'Even when I knew I would be caught, I couldn't stop.'"  Walch Rept. at 16.  Just before Mr. Wertkin got into an Uber car to travel to his meeting to sell the complaint, he received a call from someone at the Department of Justice in

Alabama investigating "Dan's" attempt to sell a qui tam complaint. *Id.* Of course, that was an alarming event for someone who had tried illicitly to sell a sealed complaint to a company in Alabama. Any person in his right mind would have abandoned any further efforts at selling the complaints. But Mr. Wertkin did not call off his plans: "I didn't care, I did it anyway." *Id.* As part of his escapist fantasy, Mr. Wertkin donned a wig and sunglasses and went to a hotel in Sunnyvale with complaint in hand, whereupon he was arrested by the FBI. PSR ¶¶ 16-17.

After his arrest by the FBI and his subsequent release, Mr. Wertkin returned to his office at Akin Gump, removed or destroyed incriminating documents, and placed two complaints in a used FedEx envelope in an attempt to make it appear that sealed complaints had been accidentally mailed to him by a DOJ employee. PSR ¶ 23.

Although Mr. Wertkin made that one last, flailing, post-arrest effort to hide his misconduct, it is clear that he had finally hit rock bottom. As he recalls:

> My arrest was almost a relief. At some level, I had known I was on the wrong path. The arrest freed me, in a way, to face up to my anxieties and my mistakes. The agents who arrested me report that I became relaxed and chatted amiably with them on the ride to jail; I don't specifically recall that change in my demeanor, but I do remember feeling a release from the pressures of the life I had been living and at which I had been failing.

Pers. Stmt. at 7; *see also* Walch Rept. at 16-17.

III.   **MR. WERTKIN'S OFFENSES**

As the Court is aware, Mr. Wertkin pled guilty on November 29, 2017 to having committed two counts of obstruction of justice in violation of 18 U.S.C. § 1505 and one count of interstate transportation of stolen goods in violation of 18 U.S.C. § 2314. In the plea agreement and before the Court, Mr. Wertkin acknowledged his wrongful acts. *See, e.g.,* Plea Agreement ¶ 2; Dkt. 10 (transcript of plea hearing).

Mr. Wertkin knows that his actions were wrong and betrayed the trust of his former colleagues at DOJ and many others. He has fully accepted responsibility for his actions. *See* PSR ¶¶ 24-33, 44; Pers. Stmt. at 6-7. Mr. Wertkin writes:

My actions were incredibly wrong and dishonest. Looking back, I am

shocked not only at how wrong my actions were, but also how reckless. Until that moment I had achieved success through diligence, hard work and patience. I turned my back on these principles and lost my morals and my values. I often lay awake at night and think about these actions, and I weep at the tragedy that I have brought on myself.

. . . .

I feel intense feelings of regret every single day. I feel I have failed as a husband and father because my mistakes will have grave consequences for my wife and children who I vowed to love and protect. Also, I feel like I betrayed my friends and colleagues at the DOJ who I deeply respected. I worked side-by-side with these honorable people for years and together we sacrificed family time and personal time because we believed in the Department's mission to fight fraud and injustice. They trusted me and I feel horrible that I betrayed their trust. Finally, I feel I have dishonored myself and the entire legal profession. I practiced law for 15 years with a high ethical standard because I believe that the system works and justice can be obtained when attorneys behave ethically. I am deeply sorry for my crimes, and I know that I will never do anything like this again.

Pers. Stmt. at 6-7.

As we will address in more detail below, Mr. Wertkin took his arrest as an opportunity to abandon his disastrous digression. Two weeks after he arrest, he met with the United States Attorneys and agents investigating the case to give a full accounting of his wrongdoing, and has since met with his former colleagues in the Fraud Section of the Department of Justice Civil Division in order to help "mitigate all damage [he] caused to any pending or concluded lawsuits." PSR ¶¶ 3, 24-33; Plea Agreement ¶ 13; Pers. Stmt. at 7. Pursuant to the plea agreement, Mr. Wertkin has taken steps to forfeit his license to practice law. Pers. Stmt. at 7. And, perhaps most importantly, Mr. Wertkin has worked with mental health practitioners to gain insight into the roots of his criminal misadventure, and is taking medication to treat his depression. *See, e.g.,* Walch Rept., *passim*; Exhibit A (letter from Mr. Wertkin's therapist, Joshua Greene); PSR ¶¶ 83-89. As Erin reports,

Jeff has come a long way this year. He has moved past deep depression and suicidal thoughts to having a part-time job that gives him flexibility to care for the kids, help pay the mortgage, and volunteer, all of which gives him purpose. He asks for help when he needs it. I believe this combination of antidepressants, having a job, and spending more time with the kids and volunteering has put him back on track. I actually get some comfort in knowing that he is a lousy criminal. I know he will never do anything so

1   stupid ever again.

2   Letter of Erin E. at 5.

3   **IV.    ARGUMENT**

4       In light of Mr. Wertkin's prompt cooperation into the investigation of his own

5   crimes, the truly aberrant nature of his misconduct, his post-offense rehabilitation, the

6   collateral consequences Mr. Wertkin is already suffering, and the impacts a long prison

7   term would have on Mr. Wertkin's young family, we will ask the Court to impose a

8   sentence of imprisonment for a year and a day.

9       **A.    The Sentencing Guidelines**

10      Mr. Wertkin has agreed with the government that the U.S. Sentencing

11  Guidelines, as applied in his case, yield an adjusted offense level of 19.  Plea

12  Agreement ¶ 7.  The probation department concurs with this calculation, and notes that

13  the Guideline range, for a defendant like Mr. Wertkin with no criminal history, yields a

14  sentencing range of 30 to 37 months imprisonment.  PSR ¶¶ 57, 107.

15      **B.    18 U.S.C. § 3553 Factors**

16      The U.S. Sentencing Guidelines are advisory and establish only a "starting point"

17  for the district court's sentencing determination.  *Gall v. United States*, 552 U.S. 38, 57

18  (2007); *accord Cunningham v. California*, 549 U.S. 270, 286-87 (2007).  District courts

19  must consider the Guidelines, but should "tailor the sentence in light of other statutory

20  concerns, as well."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Specifically,

21  courts must determine the appropriate sentence by considering all of the factors set

22  forth in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49-50.

23      Section 3553(a) makes clear that the appropriate sentence is one that is

24  "sufficient, but not greater than necessary, to comply with the purposes set forth in

25  paragraph 2" of Section 3553(a).  These purposes include: the nature and

26  circumstances of the offense; the history and characteristics of the defendant; the need

27  for the sentence imposed to reflect the seriousness of the offense, promote respect for

28  the law, and to provide just punishment for the offense; the need for the sentence

1   imposed to protect the public from further crimes of the defendant; and the kinds of

2   sentences available.  18 U.S.C. § 3553(a)(2).

3        The Probation Officer notes that Mr. "Wertkin has some mitigating factors that

4   would ordinarily support a variance from the guideline range," but recommends that the

5   Court impose a sentence at the low end of the applicable range—that is, 30 months

6   imprisonment.  PSR Sentencing Recommendation at 2-3.  We submit that several

7   § 3553 factors militate in favor of a variance from the guideline range in this matter.

8        <u>1.    The Aberrant Nature of Mr. Wertkin's Misconduct</u>

9        When the crimes before a sentencing court are an extreme departure from an

10  otherwise well-led life and there is no likelihood of re-offense, a variance from the

11  guideline range may be warranted.  *See United States v. Pauley*, 511 F.3d 468, 470

12  (4th Cir. 2007); *United States v. Stall*, 81 F.3d 276, 279 (6th Cir. 2009).  Although here

13  Mr. Wertkin's misconduct continued over the course of several months, there can be

14  little doubt that it was nonetheless an aberrant detour—one that he will never repeat.

15       Mr. Wertkin's life until 2016 was a story of success and achievement.  He had

16  never committed a crime, and had lived a "straight-arrow" life that included more than a

17  half-decade of service to the U.S. Department of Justice.  Indeed, his colleagues who

18  worked with him at the Department of Justice described him as a dedicated public

19  servant with a passion that inspired others.  In an interview with the Probation Officer,

20  Mr. Wertkin's former supervisor explained that, "based on Wertkin's intensity and talent,

21  Wertkin was at the top of the list for the Fraud Section's most difficult case

22  assignments."  PSR ¶ 34.  His most recent DOJ performance evaluation included a

23  more expansive assessment of his work:

24       With another year and several more cases under his belt, Mr. Wertkin's
         enthusiasm and work ethic has not waned a bit.  His full range of legal skills
25       were on display this year, as he settled multiple, hard-fought cases and
         assumed the lead role in preparing a case for trial to commence in August.
26

27       ….

28       Mr. Wertkin is a smart, talented attorney who thinks strategically and

creatively about his cases with highly successful results.  Rarely does he encounter an obstacle in a case that he cannot find a way to overcome.  His passion and energy inspire all those who work with him.  We thank him for his dedication, his willingness to tackle challenging tasks, and his many other contributions to the mission of the office.

Exhibit B.[3]  These sentiments were echoed by an attorney who worked with Mr. Wertkin on the Alabama trial, who called Mr. Wertkin "extremely dedicated, one of the hardest working DOJ lawyers I ever met . . . . And the whole time I was with him, which I can't count the number of hours, he displayed great integrity, and he had serious concern for the interests of the United States."[4]

Similarly, the letters that Mr. Wertkin's friends and family have written to this Court have a feature that repeats over and over: the authors express their utter shock that Mr. Wertkin committed a crime.  Space does not permit citation to each such letter, but we quote some representative samples below:

- Mr. Wertkin's wife Erin writes movingly about the moment when Mr. Wertkin "got back from California and he told me what he did[.]  I was shocked.  The craziness of his actions was so antithetical to his personality that it wasn't just shocking, it was surreal.  He had to tell me three times before it started to sink in."  Letter of Erin E. at 5.  She also writes of her struggle to assimilate the reality of his misconduct.  She says that, although "I hate Jeff some days," she has "had a lot time to think through how he got here, and who he is.  I've asked myself, is he still the same kind person that goes out of way to help others, who is thoughtful, loving, and the person I want to be with for the rest of my life?  The

---

[3] We have redacted Mr. Wertkin's DOJ performance evaluation in an abundance of caution to omit references to specific cases and work activities so as to avoid any issues relating to attorney work product or confidentiality.  We will provide an unredacted version to the Court and government counsel upon request.

[4] See Spencer S. Hsu, *Ex-Justice Dept. Lawyer Offered to Sell Secret U.S. Whistleblower Lawsuits to Targets of the Complaints*, Washington Post, Jan. 25, 2018 (available at *https://www.washingtonpost.com/local/public-safety/ex-justice-dept-lawyer-peddled-secret-us-whistleblower-suits-to-try-to-impress-his-bosses-with-new-clients/2018/01/24/49b7d934-e414-11e7-a65d-1ac0fd7f097e_story.html?utm_term=.93a0390cb5a8*).

answer is a resounding, yes.  Jeff is a kind, caring person who doesn't want to hurt anyone.  I have thought a lot about the power of forgiveness and redemption.  I forgave Jeff because this event does not define who he is or who he has been for the last 16 years I've known him." *Id.*

- One close friend reveals that "I'm as shocked by this as anything I've ever been forced to confront in my personal or professional life."  Letter of Mark W. at 1.

- Another old friend writes that "[w]hen the initial news broke of Jeff's crimes, it was an immense shock to everybody that knew him in his personal and professional lives."  Letter of Daniel B. at 2.

- Still another friend writes: "When [Mr. Wertkin] called me with news of his crimes late last year I could not imagine what he was about to tell me—and honestly, I still have trouble believing that he made a mistake of this magnitude."  Letter of Phineas B. at 1.

- A family friend states: "It is with a heavy, bewildered heart that I write this letter, because the Jeffrey Wertkin I have known for 14 years has little in common with the person who has pled guilty before you."  Letter of Danielle B. at 1.

- Another friend describes that "[i]t felt like a bomb went off a year ago when we found out what happened, and we could not make any sense of it . . . . None of the mistakes he made squares with the person I know.  He is someone of strong moral character and integrity, and the crimes he has committed are not representative of the person I know well."  Letter of Matthew C. at 2.

- Mr. Wertkin's father-in-law attests that "it was a complete shock to all in our family that he could have violated the law.  [¶]  This action is completely out of character with the Jeffrey that we know and love, and the Jeff that he aspired to be all of his life."  Letter of James E. at 1.

- Mr. Wertkin's brother writes to the Court: "I hope that you can understand how incredibly unbelievable this all is to anyone who knows Jeff and that we wouldn't believe it if he hadn't told us it's true."  Letter of Brian W. at 1.

Indeed, even Mr. Wertkin is stunned when he contemplates his own misbehavior.  He writes: "Looking back, I am shocked not only at how wrong my actions were, but also how reckless . . . . [¶]  I am seeking counseling and I hope someday I will be able to understand how I could have abandoned my principles and my honor to engage in such acts.  For now, I know only that my depression and anxiety overwhelmed me in a manner I could never have anticipated.  I veered down a terrible path that violated everything I believed in and had been working toward."  Pers. Stmt. at 6.

As Dr. Walch observes, "many white-collar crimes involve elements of greed, justification, and entitlement (feeling one has a right to things one didn't earn).  In this case, however, we need to look deeper for the cause, because Mr. Wertkin is not a man who normally believes rules are there to be broken.  Nor is he someone who cheats or embraces values of greed or feelings of entitlement."  Walch Rept. at 17.  "On the contrary, throughout his young life and for most of his career at the Department of Justice he was a very hard and dedicated worker, a loving and loyal husband, and a devoted father to his children.  'I joined the Department of justice as a true believer in justice and ethical behavior.'"  *Id.*

Mr. Wertkin does not suffer from sociopathy or any similar personality disorder. *Id.* at 18 & Report re Psychometric Testing.  Rather, Dr. Walch believes that

> Mr. Wertkin committed his violations during a period of heightened anxiety and depression, a sense of impending failure at work and a deteriorating marriage.  Combined with historic personal issues of insecurity, inadequacy, and low self-esteem, his ability to cope was overtaxed, leading to internal distress and uncharacteristic misbehaviors.  Mr. Wertkin's violations were attempts to magically solve his emotional and marital problems; if he could escape his job, move his family to a new home and enroll his kids in private schools, he would once again gain Erin's respect, love, and appreciation.  All of this further underscores that he had limited resources for dealing with the problems of marriage and nurturing intimacy.

*Id.* at 18.

Erin agrees with this assessment.  She writes that Mr. Wertkin was

> crushed by the loss of a major case, truly intense pressure to build a business, sleeplessness from stress and from little kids that don't sleep through the night and physical pain.  I don't think Jeff ever experienced

failure growing up.  I don't think he had coping mechanisms to deal with failure.  I don't think he's ever said "I need help".  I truly believe that his inability to ask for help is the reason why he lost his mind and we ended up here.

Letter of Erin E. at 5.

Mr. Wertkin attests that he "will never do anything like this again."  Pers. Stmt. at 7.  Dr. Walch agrees that there is "little or no danger that Mr. Wertkin will re-offend."  Walch Rept. at 18.  And Erin "know[s] he will never do anything so stupid ever again."  Letter of Erin E. at 5.

We submit that, in light of the vast departure that these crimes represent in the context of Mr. Wertkin's life, a variance from the guideline sentence is appropriate.

### 2.   Psychological Factors

Relatedly, Mr. Wertkin committed his crimes at a time of psychological upheaval, as reflected in Dr. Walch's report and Mr. Wertkin's own personal statement.  While Mr. Wertkin's depression and anxiety—and his inadequate mechanisms for coping with his failures—do not excuse his behavior, we believe they are mitigating and explanatory factors.  As Mr. Wertkin's depression and anxiety rose, his actions became increasingly irrational.  For someone who worked in law enforcement and spent many years investigating fraud schemes, Mr. Wertkin's inept acts reek of desperation.  His willingness to "cold call" the general counsel of a company—putting his career and the well-being of his cherished family at risk—for a relatively small sum compared to his earning potential reveals a man who truly believed he was at the end of his rope.   Such circumstances will support a variance from the guideline sentence in an appropriate case, *see, e.g., United States v. Nieto*, No. CR 10-0052 JB, 2011 U.S. Dist. LEXIS 14424 at *14-15 (D.N.M. Jan. 5, 2011), and we submit that this in one such case.

### 3.   Post-Offense Rehabilitation

Likewise, Mr. Wertkin has demonstrated significant post-offense rehabilitation.  The United States Supreme Court has recognized that post-offense rehabilitation "may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range."  *Pepper v. United States*, 562 U.S. 476, 481 (2011)

(considering post-sentencing rehabilitation).  The *Pepper* Court observed that

> evidence of . . . rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing.  For example, evidence of . . . rehabilitation may plainly be relevant to "the history and characteristics of the defendant." § 3553(a)(1).  Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2)—in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D); [citation] . . . . [R]ehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2)."

*Id.* at 491.  Although the *Pepper* Court's holding related to post-sentencing rehabilitation, the principles upon which the Court relied plainly apply as well in the context of post-offense, pre-sentencing rehabilitation.  *See, e.g., United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011); *United States v. Stewart*, No. 8:09CR282, 2011 U.S. Dist. LEXIS 89767 at *6-8 (D. Neb. Aug. 11, 2011); *see also United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (affirming a variance to probation for post-arrest rehabilitation, noting that rehabilitation was genuine and the defendant was a positive contributor to society).  The Court should consider the following facts that demonstrate Mr. Wertkin's robust post-offense rehabilitation.

First, and most obviously, after his arrest Mr. Wertkin promptly agreed to cooperate with the U.S. government's investigation into his own misconduct, giving a full accounting of his misdeeds.  Then, as part of his plea agreement, he took full responsibility for his actions, and further agreed to meet with employees of the DOJ section in which he had worked to help mitigate the damage he caused.

Second, Mr. Wertkin has demonstrated true contrition.  As discussed throughout this memorandum, Mr. Wertkin unquestionably understands his wrongdoing and is committed to making amends.  In fact, he has proposed to make himself an "anti-example" of how to behave by designing an educational program to talk publicly about his own mistakes.  Pers. Stmt. at 8.  In some ways, that process has already begun.  As

reflected in the letters of support this Court has received, Mr. Wertkin has spoken forthrightly with both friends and family about his misconduct—a process that was surely both painful and embarrassing, and demonstrates his determination to accept responsibility and walk a righteous path. *See, e.g.*, Letters of Phineas B. ("He was honorable in his approach to sharing the news directly, as hard as that must have been."); Danielle B. ("He has been plainspoken about his failures to his family, his profession, and his friends. His distress is not merely over the outcome of his actions, but the actions themselves.").

Third, Mr. Wertkin has taken steps to address the underlying psychological weaknesses that led to his misconduct. As Erin attests, "Jeff fell down in the most dramatic way," but he "has come a long way this year": "[s]ince his arrest, Jeff more closely resembles the person I came to love." Letter of Erin E. at 5. Mr. Wertkin is taking medications and undergoing counseling, and working hard to gain insight into his failings. PSR ¶¶ 83-89. He has been seeing a therapist frequently and consistently since March. Exhibit A at 1. His therapist makes the following observation:

> I have seen a transformation over time of his thinking and feelings that seem to be more consistent with Jeff's historical presentation. He is now clear-headed and is able to investigate in therapy why he has made the choices he has over the last couple of years, and how he has negatively impacted others by making these choices. Jeff accepts responsibility for his crimes, and in doing so exhibits strength in character; he presents with goals to improve himself, to learn from his mistakes, and to being open to learn from others.

*Id.*

Fourth, in light of the impact of Mr. Wertkin's substance abuse on his misbehavior, since his arrest Mr. Wertkin has abstained from drug use. *See* Pers. Stmt. at 4; PSR ¶¶ 86-89.

Fifth, since his arrest, Mr. Wertkin has been an active volunteer and used his time productively. Prior to withdrawing from the District of Columbia Bar and Maryland Bar, Mr. Wertkin attended clinics twice a month on behalf of the Neighborhood Legal Services Program (NLSP), a nonprofit law firm that provides free legal information,

advice and representation to low-income District of Columbia residents on civil legal matters.  *See* Pers. Stmt. at 7; PSR ¶ 77.  Mr. Wertkin has also devoted time to another local organization called So Others Might Eat (SOME), where he volunteers in the dining room serving lunch and occasionally breakfast.  *Id.*

Mr. Wertkin's robust efforts to leave his mistakes behind him warrant a variance.

### 4.    Collateral Consequences

When a defendant suffers harsh collateral consequences from a conviction, the sentencing court may take account of those already-occurring punishments in fashioning a sufficient sentence.  *See, e.g., United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005).  Mr. Wertkin has suffered some significant consequences beyond those that would normally accompany any criminal conviction.

This case has yielded significant—and very embarrassing—press attention.  Mr. Wertkin, and his family along with him, has seen his misdeeds played out in the newspapers in the most public way.  *See, e.g.,* Kelly Phillips Erb, *So A Former DOJ Attorney Wearing A Wig Walked Into A Bar...*, Forbes, Feb. 10, 2017; Peter J. Henning, *Throwing Away a Legal Career for $310,000*, N.Y. Times, Feb. 13, 2017; Joel Rosenblatt & Jef Feeley, *Lawyer in Wig Who Peddled Secret U.S. Suit to Plead Guilty*, Bloomberg, Nov. 2, 2017.[5]  Every criminal conviction leads to social opprobrium, of course, but Mr. Wertkin and his family have already swallowed a double dose of that condemnation.

Likewise, Mr. Wertkin has agreed to forfeit his law license.  His law license was more than the ticket that permitted him to pursue his dream job, it was an integral part of his identity.  *See* Pers. Stmt. at 1-2 ("People would come to me for all kinds of help . . .

---

[5] The cited articles are available on the internet at the following URLs: *https://www.forbes.com/sites/kellyphillipserb/2017/02/10/so-a-former-doj-attorney-wearing-a-wig-walked-into-a-hotel/#33b3c5163c94*; *https://www.nytimes.com/2017/02/13/business/dealbook/throwing-away-a-legal-career-for-310000.html*; and *https://www.bloomberg.com/news/articles/2017-11-02/lawyer-caught-in-wig-peddling-suit-to-admit-guilt-attorney-says.*  Numerous others can be found through a simple web search.

but it gave me a sense of belonging and so I didn't mind."). His work in the law gave him purpose, joy, and pride. *Id.*; *see also* Letter of Erin E. at 1 ("He was a great lawyer and truly enjoyed using his skills to help other people."). As Mr. Wertkin's mother notes, Mr. Wertkin demonstrated a proclivity for the law from a very early age. *See* Letter of Sandra W. at 2. He "found [his] calling" when he went to law school and once "loved" his work at the DOJ. Pers. Stmt. at 1-3; Letter of Erin E. at 3. Losing his law license, and the career that he built over fifteen years, is a significant punishment for Mr. Wertkin.

In addition to practicing law, Mr. Wertkin enjoyed teaching and held several part-time positions as an educator. He was an adjunct professor at Georgetown University's Public Policy Institute where he taught a graduate-level class on federal regulations; he was an instructor for a Department of State program designed to help prepare foreign-service officers for their work in the diplomatic corps; and he was an instructor for Kaplan Test Prep. PSR ¶¶ 96, 98, 101. Following the news coverage of Mr. Wertkin's arrest, he lost all three positions over concern for how his continued employment would affect the reputation of Georgetown University, the Department of State, and Kaplan Test Prep respectively. *Id.*

Beyond drawing significant negative press attention and ending his career, Mr. Wertkin's actions have brought censure from his friends, former colleagues, and community in Washington, D.C. It is a testament to his previous standing in the legal community that so many attorneys and former government officials, including former DOJ attorneys, have been willing to write letters on his behalf. Nonetheless, Mr. Wertkin's actions have marred his personal relationships and destroyed his standing in his community, and he lives with the regret and remorse of those consequences every single day. Pers. Stmt. at 6.

5.    Guidelines Overstate the Severity of Mr. Wertkin's Offense

Although we agree that the guideline range reflected in the plea agreement is properly calculated, and that under the Guidelines Mr. Wertkin is appropriately subject

to all of the adjustments included in that calculation, we submit that the resulting offense level overstates the severity of Mr. Wertkin's offense.  In particular, the guideline range that applies under U.S.S.G. § 2B1.1 is significantly enhanced because the stolen property that Mr. Wertkin transported across state lines—the sealed *qui tam* complaint—is valued at over $250,000.  The amount was not based on the inherent or market value of the complaint, but rather on an amount set by Mr. Wertkin after several conversations with an individual cooperating in a federal investigation.  We submit that the core of Mr. Wertkin's offense was his breach of trust and disloyalty to the government and that his culpability is therefore most accurately reflected in the obstruction of justice counts, the guideline for which yields a somewhat lower offense level than the theft count.  *See* PSR ¶ 47.  The lower offense level reflects a sentence more than sufficient to satisfy the purposes of § 3553(a).

### 6.   Family Factors

Finally, a defendant's "family responsibilities" are "an aspect of the defendant's 'history and characteristics,'" and are therefore a relevant consideration under 18 U.S.C. § 3553(a)(1).  *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006), *as amended on pet'n for reh'g, overruled on other grounds as stated in United States v. Munoz-Camarena*, 621 F.3d 967, 969-70 (9th Cir. 2010) (per curiam).  Mr. Wertkin has acknowledged and shows great remorse for the impacts that his actions will have on his family.  Pers. Stat. at 6-7.  Similarly, Erin has shared her worries about what a significant prison sentence might mean for their fragile family and two young children.  Letter of Erin E. at 5.  As the probation department recognizes, a significant prison sentence in this matter would have serious consequences for Mr. Wertkin's wife and young children: "in the event he is incarcerated for one year or less, his wife's mother will move to Washington D.C. to assist with child care.  If Wertkin is incarcerated for more than one year, it is likely they will need to sell their home and his wife and children will move to Wisconsin" to live with Erin's parents.  PSR ¶ 75.  Erin works full-time at a non-profit organization, but her salary is insufficient to meet the financial obligations

1  imposed by their mortgage and the costs of child care.  Once the liens used to secure

2  Mr. Wertkin's pre-trial release are removed from their properties, Mr. Wertkin and his

3  wife will begin the process of liquidating their real estate holdings to satisfy their short-

4  term expenses and other obligations.  They strongly wish to avoid uprooting their

5  children from their home and school, especially during a period when their father is

6  incarcerated.  However, they agree that if Mr. Wertkin is unable to work for an extended

7  period of time, it would be better for Erin and the children to move to Wisconsin and

8  reserve the couple's retirement savings for the children's future needs rather than

9  liquidate their IRA account merely to extend their time in Washington, D.C. for a short

10  time.

11      Along with the facts of Mr. Wertkin's close bond with his children, and his role as

12  their primary caretaker, these circumstances militate in favor of a sentence that

13  punishes Mr. Wertkin and expresses condemnation for his wrongdoing, but nonetheless

14  permits his family to remain in its home.

15  **V.    CONCLUSION**

16      For all of the reasons stated above, we submit that a sentence of imprisonment

17  for a year and a day would be "sufficient, but not greater than necessary."  § 3553(a).  A

18  person observing Mr. Wertkin's case after such a sentence would note that he had been

19  sentenced to prison, lost his law license and his ability to find full-time employment, and

20  suffered excruciating public humiliation—all after forthrightly admitting his misconduct

21  and working to make amends.  Such an outcome would provide adequate deterrence

22  and promote respect for the law while providing just punishment to Mr. Wertkin.

23  //

24  //

25  //

26  //

27  //

28  //

JEFFREY WERTKIN'S SENTENCING MEMORANDUM
*United States v. Jeffrey Wertkin*, No. 17-cr-00557-MMC

Dated: February 28, 2018

Respectfully submitted,                ARGUEDAS, CASSMAN & HEADLEY, LLP

By: _____/s/_____
Cristina C. Arguedas
Raphael M. Goldman
803 Hearst Avenue
Berkeley, CA 94710
(510) 845-3000

*Counsel for Jeffrey Wertkin*