PAGES  1-54

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) NO. CR 17-0557 MMC |
| | ) |
| JEFFREY WERTKIN, | ) |
| | )  SAN FRANCISCO, |
| | )  CALIFORNIA |
| DEFENDANT. | )  WEDNESDAY |
| | )  MARCH 7, 2018 |
| | )  2:15 O'CLOCK P.M. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**
UNITED STATES ATTORNEY'S OFFICE
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CALIFORNIA 94102
**BY:  ROBIN L. HARRIS, ASSISTANT UNITED STATES ATTORNEY**
       **WILLIAM FRENTZEN, ASSISTANT UNITED STATES ATTORNEY**


**FOR DEFENDANT:**
**ARGUEDAS, CASSMAN & HEADLEY, LLP**
803 HEARST AVENUE
BERKELEY, CALIFORNIA 94710
**BY:  CRISTINA C. ARGUEDAS, ATTORNEY AT LAW**
       **RAPHAEL M. GOLDMAN, ESQUIRE**
       **TED CASSMAN, ESQUIRE**


*REPORTED BY:    KATHERINE WYATT, CSR 9866, RMR, RPR*

MARCH 7, 2018                          2:15 O'CLOCK P.M.


**P R O C E E D I N G S**

    **THE CLERK:**  CALLING CRIMINAL CASE 17-557, UNITED
STATES OF AMERICA VERSUS JEFFREY WERTKIN.

    **MS. HARRIS:**  GOOD AFTERNOON, YOUR HONOR.  ROBIN
HARRIS AND WILLIAM FRENTZEN ON BEHALF OF THE UNITED STATES?

    **MR. FRENTZEN:**  GOOD AFTERNOON, YOUR HONOR.

    **MS. ARGUEDAS:**  AND CRIS ARGUEDAS AND RAFAEL GOLDMAN
FOR MR. WERTKIN, WHO IS PRESENT.  GOOD AFTERNOON.

    **THE COURT:**  GOOD AFTERNOON.

    AND FOR UNITED STATES PROBATION?

    **PROBATION OFFICER:**  KYLE POLLAK FOR U.S. PROBATION.

    **THE COURT:**  KYLE POLLAK.

    OKAY.  I'M WRITING EVERYBODY DOWN.  OKAY. ALL RIGHT.

    EVERYONE IS READY TO PROCEED THIS AFTERNOON.
CORRECT?

    **MS. HARRIS:**  YES, YOUR HONOR.

    **MS. ARGUEDAS:**  YES.

    **THE COURT:**  OKAY.  I ASSUME ALL THESE PEOPLE IN THE
COURTROOM ARE NOT HERE FOR ANY OTHER CASE.

    **MS. ARGUEDAS:**  CORRECT.

    **THE COURT:**  THEY ARE HERE BECAUSE THEY ARE INTERESTED
IN MR. WERTKIN'S CASE.  I WANT TO INDICATE WHAT I RECEIVED.  I
WANT TO MAKE SURE THAT I'M NOT MISSING ANYTHING THAT ANYBODY

1    SUBMITTED.

2              SO MR. POLLAK'S PRESENTENCE REPORT.  AND ALSO, OF

3    COURSE, THERE WAS A PLEA AGREEMENT IN THIS CASE.

4              THE COURT ALSO RECEIVED SENTENCING MEMORANDA FROM

5    THE GOVERNMENT AND FROM THE DEFENDANT.  IN CONNECTION WITH THE

6    DEFENDANT'S SENTENCING MEMORANDUM, THERE ARE EXHIBITS THAT WERE

7    PROVIDED AND ALSO VARIOUS LETTERS.  SO MAYBE I'LL JUST SAY IN

8    CONNECTION WITH THE GOVERNMENT'S -- I'LL TAKE THAT FIRST

9    BECAUSE IT'S SHORTER -- I RECEIVED VICTIM IMPACT STATEMENTS

10   FROM THE DEPARTMENT OF JUSTICE AND ALSO FROM AN ASSISTANT

11   DIRECTOR AT THE DEPARTMENT OF JUSTICE WHO HAD BEEN AFFECTED BY

12   MR. WERTKIN'S CONDUCT.  AND THEN, ALSO WHAT I RECEIVED MORE

13   RECENTLY IN THAT REGARD IS A VICTIM IMPACT LETTER FROM AKIN

14   GUMP IN WHICH THEY WANTED TO MAKE CLEAR -- I DON'T KNOW IF YOU

15   COULD CALL THEM "VICTIMS" EXACTLY -- BUT WANTED TO MAKE CLEAR

16   THAT THEY DID NOT FEEL THAT THEY HAD PUT UNDUE PRESSURE ON

17   MR. WERTKIN.

18             THEN ON BEHALF OF THE DEFENDANT -- BECAUSE THIS IS

19   SO LENGTHY I THOUGHT I WOULD WAIT AND DO THAT NEXT -- I HAVE

20   THE SUMMARY OF THE PSYCHOLOGICAL ASSESSMENT THAT WAS PERFORMED

21   BY THE BERKELEY THERAPY INSTITUTE.  AND THAT'S A RATHER LONG

22   REPORT.

23             ALSO AN PERSONAL STATEMENT FROM MR. WERTKIN, AND 85

24   SEPARATE LETTERS WRITTEN ON BEHALF OF MR. WERTKIN FROM FAMILY

25   MEMBERS, FRIENDS, PEOPLE WHO HE HAS COME IN CONTACT WITH OVER

```
 1    HIS YEARS IN VARIOUS PLACES.
 2              AND THEN, SEPARATELY, A SUPPLEMENTAL LETTER FROM HIS
 3    WIFE WHO HAD ALREADY WRITTEN ONE LETTER AND THEN WROTE ANOTHER
 4    ONE.  SO JUST TO INDICATE TO YOU I'VE READ ALL OF THESE THINGS,
 5    INCLUDING, AS I SAY, ALL OF THE LETTERS.  SO I'M NOT SURE WHERE
 6    EXACTLY YOU WANT TO THE START.
 7              THE GOVERNMENT BY THE PLEA AGREEMENT BOUND
 8    THEMSELVES TO A GUIDELINE RANGE SENTENCE.  AND EVERYBODY PRETTY
 9    MUCH HAS ANTICIPATED THAT WOULD COME OUT TO 30 TO 37 MONTHS,
10    AND IT DID.
11              THEY ARE RECOMMENDING WHAT THEY DESCRIBED AS A
12    MID-RANGE. AND THE DEFENDANT IS ASKING FOR ESSENTIALLY A YEAR
13    AND A DAY WITH SUPERVISED RELEASE CONDITIONS.  A YEAR AND A DAY
14    MEANING ESSENTIALLY TEN MONTHS OR TEN MONTHS AND A FEW DAYS,
15    BECAUSE IT'S NOT ANTICIPATED HE WOULD COMMIT ANY WRONGFUL ACTS
16    WHILE IN CUSTODY.
17              SO I DON'T KNOW. I GUESS WE COULD START WITH THE
18    GOVERNMENT, MS. HARRIS.
19              MS. HARRIS:  THANK YOU, YOUR HONOR.
20              AND THEN, I WOULD ASK THE COURT'S PERMISSION -- I
21    DON'T KNOW IF THE DEFENDANT PLANS TO ELOCUTE -- BUT IF HE DOES
22    THAT I WOULD HAVE AN OPPORTUNITY TO ADDRESS ANYTHING THE
23    DEFENDANT OR DEFENSE COUNSEL SAY THAT I HAVEN'T ALREADY
24    ANTICIPATED IN MY OWN REMARKS.
25              THE COURT:  OKAY.  WELL, I THOUGHT WE WOULD START
```

1    WITH YOU PRIMARILY BECAUSE IT'S THE GOVERNMENT'S PROSECUTION,

2    AND THEY WOULD ORDINARILY GO FIRST UNDER THOSE CIRCUMSTANCES.

3    BUT I WON'T PRECLUDE YOU FROM COMMENTING ABOUT WHATEVER THE

4    DEFENDANT MIGHT SAY, AS WELL.

5            AND, OF COURSE, MOSTLY YOU KNOW WHAT THEY ARE GOING

6    TO SAY. I KNOW WHAT THEY ARE GOING TO SAY, AND I KNOW WHAT YOU

7    ARE GOING TO SAY, PRETTY MUCH.  BUT, STILL, I THINK, YOU KNOW,

8    I SHOULD HEAR FROM EVERYONE. AND GIVEN THE NUMBER OF PEOPLE WHO

9    ARE HERE, THEY PROBABLY HAVEN'T HEARD EVERYTHING THAT I'VE

10   READ. SO I THINK YOU SHOULD GO AHEAD.

11           **MS. HARRIS:**  THANK YOU, YOUR HONOR.

12           **THE COURT:**  ALL RIGHT.

13           **MS. HARRIS:**  WELL, I WANT TO START WITH WHERE I THINK

14   THIS CASE SHOULD START, WHICH IS THE VICTIMS. AND THE VICTIMS

15   ARE NOT THE WERTKIN FAMILY.  THEY ARE NOT THE DEFENDANT. THE

16   VICTIMS IN THIS CASE ARE THE DEPARTMENT OF JUSTICE WHOSE

17   REPUTATION THIS DEFENDANT HARMED, WHOSE COLLEGIALITY HE HARMED,

18   WHOSE TRUST HE HARMED AND WHO HE BETRAYED IN THE GROSSEST

19   MANNER.

20           IT'S ALSO THE DEFENDANT'S INDIVIDUAL FORMER

21   COLLEAGUES, BOTH AT THE AKIN GUMP LAW FIRM AND, MOST

22   IMPORTANTLY, AT THE DEPARTMENT OF JUSTICE.  WHEN YOU WORK FOR A

23   PUBLIC INSTITUTION LIKE A D.A.'S OFFICE OR A U.S. ATTORNEY'S

24   OFFICE, YOU HAVE AN ESPRIT DE CORPS THAT IS COMPLETELY

25   DEPENDENT ON THE HONESTY AND INTEGRITY OF YOUR COLLEAGUES.

1         YOU HAVE TO BELIEVE THAT YOUR OFFICES ARE SAFE AT

2  NIGHT FROM A FELLOW COLLEAGUE ROOTING AROUND TO SECRETLY PILFER

3  YOUR FILES FOR IMPROPER GAIN.

4         THAT IS SO FUNDAMENTAL TO THE WORKFORCE AND SO

5  FUNDAMENTAL TO THE PUBLIC'S PERCEPTION OF WHAT WE DO AS

6  GOVERNMENT ATTORNEYS.  AND HE VIOLATED THAT AND VICTIMIZED HIS

7  INDIVIDUAL CLIENTS -- COLLEAGUES.

8         I'D ALSO LIKE TO TALK ABOUT THE DOJ EMPLOYEE WHO HE

9  PERSONALLY VICTIMIZED BY HIS POST-ARREST CONDUCT. I KNOW YOU

10 RECEIVED A LETTER FROM HER, BUT I THINK WHAT HE DID TO HER

11 SPEAKS ABOUT A STRAIN OF DECEIT THAT I FEEL HAS RUN THROUGH THE

12 DEFENSE FILINGS IN THIS CASE.

13         IT WAS NOT A WAKE-UP CALL FOR HIM WHEN HE WAS

14 ARRESTED. IT WAS THE START OF WHAT HE REALIZED WAS GOING TO BE

15 A TERRIBLE DOWNWARD SPIRAL.  AND RATHER THAN COMING CLEAN, HE,

16 AFTER BEING IN THE CRIMINAL JUSTICE SYSTEM AND BEING RELEASED

17 BY MAGISTRATE BEELER BASED ON A COURT ORDER THAT SAID HE

18 SHOULDN'T COMMIT ANYMORE FEDERAL, STATE OR LOCAL CRIMES, HE OF

19 ALL PEOPLE WHO SHOULD UNDERSTAND WHAT THAT MEANS, WENT BACK TO

20 WASHINGTON, D.C., AFTER HAVING MANY, MANY HOURS TO REFLECT ON

21 ALL OF THIS, AND HE COMMITTED MORE OUTRAGEOUS CRIMES AND

22 OBSTRUCTED JUSTICE FURTHER.

23         AND THE WORSE THING HE DID WAS TRY TO INVEIGLE A

24 FORMER COLLEAGUE AND HAVE HER TAKE THE BLAME AND THE BRUNT FOR

25 HIS CRIMINAL CONDUCT. SO SHE WAS A VICTIM HERE. I THINK THE

1    FALSE CLAIMS ACT ITSELF, WHICH IS SUCH AN POWERFUL AND

2    IMPORTANT TOOL TO DETER FRAUD, WASTE AND ABUSE WAS A VICTIM.

3            THE DEPARTMENT OF JUSTICE'S CREDIBILITY IS SO

4    ESSENTIAL TO ABLE TO PERFORM ITS RESPONSIBILITIES ON BEHALF OF

5    THE AMERICAN TAXPAYERS.  AND THE FALSE CLAIMS ACT IS INCAPABLE

6    OF DETERRING FRAUD IF THE DEPARTMENT OF JUSTICE CAN'T BE

7    TRUSTED BY WHISTLEBLOWERS.  AND THE DEFENDANT'S SELFISH CONDUCT

8    COMPROMISED ALL OF THAT.

9            THE WHISTLEBLOWERS IN THIS COUNTRY WERE VICTIMS

10   HERE. THEY TAKE INCREDIBLE PERSONAL RISK WHEN THEY COME FORWARD

11   WITH CLAIMS OF FRAUD, WASTE AND ABUSE.  AND WE HAVE NO WAY OF

12   MEASURING WHAT CHILLING IMPACT THERE MIGHT BE ON WHISTLEBLOWERS

13   BASED ON WHAT THE DEFENDANT DID IN COMPROMISING THEIR SECRECY.

14           **THE COURT:**  IF I COULD STOP YOU FOR JUST A MOMENT.

15   IF MR. GOLDMAN, IF YOU AND MR. WERTKIN WANT TO SIT DOWN, IT'S

16   OKAY. I WAS GOING TO SAY THAT I THINK THESE PRESENTATIONS MIGHT

17   BE FAIRLY LENGTHY.  IF IT'S EASIER FOR YOU TO SIT, IT'S FINE.

18           **MR. GOLDMAN:**  THANK YOU, YOUR HONOR.

19           **THE COURT:**  I DON'T KNOW IF MR. FRENTZEN IS GOING TO

20   CHIME IN, SO HE MAY WANT TO STANDBY.

21           **MS. HARRIS:**  HE'S WELCOME TO.

22           **THE COURT:**  HE IS ALSO WELCOME TO SIT DOWN.

23           **MR. FRENTZEN:**  THANK YOU, YOUR HONOR.  I'M FINE.

24           **MS. HARRIS:**  AND THEN, ANOTHER VERY IMPORTANT VICTIM

25   THAT HAS TO BE MENTIONED HERE ARE THE FEDERAL COURTS THROUGHOUT

1    THE COUNTRY. THE DEFENDANT DEFIED YOUR HONOR'S COLLEAGUES'

2    SEALING ORDERS, ESPECIALLY TWO IN THIS VERY DISTRICT, TWO OF

3    YOUR BRETHREN.  BUT HE STOLE AT LEAST 40 OF THESE SEALED

4    COMPLAINTS, ALL OF WHICH HAD FEDERAL JUDGES THROUGHOUT THE

5    COUNTRY WHO RELY ON THE DEPARTMENT AND RELATE AS COUNSEL

6    HONORING THOSE SEALS.

7           THEY ARE CRUCIAL FOR THE FALSE CLAIMS ACT PROVISIONS

8    TO BE ENFORCED AND SO THE GOVERNMENT CAN INVESTIGATE THOSE

9    CLAIMS AND GIVE INITIAL PROTECTION TO THE WHISTLEBLOWERS OF

10   SECRECY WHILE THOSE CLAIMS ARE BEING INVESTIGATED.  AND HE

11   VIOLATED THIS COURT'S ORDERS THROUGHOUT THE COUNTRY.

12          SO THE VICTIMS HERE ARE THOSE THAT I'VE MENTIONED. I

13   ALSO WANT TO ADDRESS THE DEFENDANT'S PERSONAL STATEMENT BECAUSE

14   I WAS NOT ABLE TO DO THAT IN MY SENTENCING MEMORANDUM.  I HAD

15   NOT RECEIVED IT.

16          THE PERSONAL STATEMENT WAS TOTALLY SELF-SERVING.

17   AND I SUPPOSE BY NATURE IT WOULD HAVE TO BE. BUT IT'S MOST

18   NOTABLE FOR WHAT THE DEFENDANT DIDN'T SAY AND WHAT HE DIDN'T

19   ACKNOWLEDGE, NOT FOR WHAT HE DID SAY.

20          THE DEFENDANT STATES IN HIS PERSONAL STATEMENT THAT

21   HIS ARREST CAME HAS A RELIEF AND A RELEASE FOR HIM. BUT THE

22   ARREST WASN'T A RELIEF AND A RELEASE.  IT DIDN'T STOP HIM FROM

23   COMMITTING ADDITIONAL VERY, VERY SERIOUS CRIMES.  AND THAT, TO

24   ME, SPEAKS VOLUMES ABOUT THE CHARACTER OF THE DEFENDANT.

25          HE VIOLATED JUDGE BEELER'S ORDER AFTER HE WAS

1  RELEASED ON BOND IN THIS CASE. HE WAS ORDERED NOT TO COMMIT ANY

2  FURTHER STATE, FEDERAL OR LOCAL CRIMES.  AND HE WENT BACK TO

3  WASHINGTON D.C., AND HE COMMITTED FEDERAL OBSTRUCTION OF

4  JUSTICE WHEN HE BASICALLY TRASHED INCRIMINATING EVIDENCE IN HIS

5  OFFICE AND STAGED HIS OFFICE TO FRAME A FORMER COLLEAGUE.

6          AND RATHER THAN THE ARREST TRIGGERING A RELEASE SO

7  THAT HE COULD FACE UP TO HIS CRIMES, IT DIDN'T DO THAT.  IT

8  JUST SHOWED WHO HE REALLY IS, WHICH IS SOMEONE WHO ONLY THINKS

9  ABOUT HIMSELF FIRST.

10          AND THERE'S NO MENTION IN HIS PERSONAL STATEMENT OR

11  EVEN ACKNOWLEDGING THE VERY PERSONAL THING HE DID TO AN

12  IMPORTANT COLLEAGUE, OR A FORMER COLLEAGUE OF HIS, THE WOMAN AT

13  THE DEPARTMENT OF JUSTICE WHO YOU GOT A LETTER FROM.

14          AND I WANT TO TALK ABOUT SOME OF THE THINGS -- THOSE

15  ARE THE THINGS THAT HE DIDN'T MENTION IN HIS PERSONAL STATEMENT

16  AND HE DIDN'T ACKNOWLEDGE.  BUT I WANT TO ALSO TALK ABOUT SOME

17  OF THE THINGS HE DID SAY. ONE OF THE THINGS THE DEFENDANT SAID

18  IN HIS PERSONAL STATEMENT IS THAT HE DEVELOPED A TRUE

19  APPRECIATION FOR OUR LEGAL SYSTEM.  AND HE BELIEVED AND STILL

20  BELIEVES THAT JUSTICE CAN BE OBTAINED WHEN THE SYSTEM WORKS THE

21  WAY IT SHOULD.

22          I WOULD HOPE THAT THAT IS THE OVERARCHING THEME OF

23  THIS SENTENCING, BECAUSE JUSTICE WILL ONLY PREVAIL IF THIS

24  DEFENDANT RECEIVES A GUIDELINE SENTENCE, AND I RESPECTFULLY

25  SUGGEST THE GUIDELINE SENTENCE SUGGESTED BY THE GOVERNMENT,

1    WHICH IS 34 MONTHS.

2              THE DEFENDANT SAYS ALSO:

3                   "I BEGAN TO QUESTION THINGS I NEVER DOUBTED

4              BEFORE.  DOES THE SYSTEM EVEN WORK?"

5              WELL, IT WON'T IF HE GETS A SENTENCE BELOW THE

6    GUIDELINES. SO WE WILL FULFILL, I HOPE IN THIS SENTENCING, HIS

7    HOPES AND DREAMS ABOUT THE LEGAL SYSTEM.

8              HE TALKS ABOUT HIS FORMER COLLEAGUES.  AND HE SAYS:

9                   "I WORKED SIDE-BY-SIDE WITH THESE HONORABLE

10             PEOPLE FOR YEARS.  AND TOGETHER WE SACRIFICED

11             FAMILY TIME AND PERSONAL TIME BECAUSE WE BELIEVED IN

12             THE DEPARTMENT'S MISSION TO FIGHT FRAUD AND

13             INJUSTICE."

14             IN THAT, HE ACKNOWLEDGED THAT EVERYONE MADE

15   SACRIFICES.  THAT HIS ONE TRIAL WAS NOT UNIQUE.  WE ALL MAKE

16   THOSE SACRIFICES, AND ALL OF OUR FAMILIES STAND BEHIND US AND

17   SACRIFICE EQUALLY WHEN WE CONTRIBUTE TO THE MISSION.

18             BUT THE MISSION OF THE DEPARTMENT OF JUSTICE CANNOT

19   WORK IF WE HAVE ONE DISHONEST ROGUE ACTOR.  IT CALLS INTO

20   QUESTION EVERYTHING WE DO, BECAUSE ALL WE HAVE IS OUR HONESTY

21   AND OUR INTEGRITY.

22             AND THEN, ONE OF THE MOST OFFENSIVE THINGS I THINK

23   THE DEFENDANT SAID IN HIS PERSONAL STATEMENT IS AT THE VERY END

24   WHEN HE TALKS ABOUT WANTING TO TRAIN HIS FORMER COLLEAGUES AT

25   THE DEPARTMENT OF JUSTICE.

1    I'LL TALK ABOUT THAT A LITTLE MORE WHEN I ADDRESS

2    HIS WIFE'S LETTER BUT HE SAYS:

3          "THERE'S NO TRAINING FOR INCOMING AND OUTGOING

4          FEDERAL EMPLOYEES."

5    THAT IS NOT TRUE. THERE IS.  WE RECEIVE REGULAR

6    ETHICS TRAINING, AND THE DEFENDANT GOT IT.

7    AND ABOUT THE TEMPTATIONS, ANXIETY AND PRESSURES

8    THAT ACCOMPANY A MOVE OUT OF THE GOVERNMENT. TO MY KNOWLEDGE,

9    THE DEFENDANT IS THE ONLY PERSON WHO SUCCUMBED TO THOSE

10   TEMPTATIONS AND ANXIETY.  WE'RE UNAWARE OF ANYONE ELSE WHO SO

11   CRAVENLY USED THEIR POSITION FOR PERSONAL GAIN.

12   AND THEN HE SAYS:

13          "THE IMPROPER USE OF INFORMATION IS LIKELY A

14          BIGGER PROBLEM THAN ONE ISOLATED CASE."

15   THAT IS NOT TRUE.  AND TO SUGGEST THAT THERE ARE

16   OTHER ROGUE EMPLOYEES LIKE THIS DEFENDANT WAS ABSOLUTELY

17   IMPROPER.  AND TO THROW THAT IN ON HIS WAY OUT WAS TO CAST

18   ASPERSIONS WHERE THEY CERTAINLY DON'T BELONG.

19   SO THE OTHER THING I WOULD LIKE TO ADDRESS IS THE

20   PSYCHIATRIC REPORT FROM DR. WALCH.  I WASN'T ABLE TO ADDRESS

21   THAT IN MY SENTENCING MEMO.

22   I WOULD POINT OUT, AND THE COURT IS AWARE, THAT

23   THERE'S NO PSYCHIATRIC DIAGNOSIS FROM DR. WALCH, WHO WAS PAID

24   BY THE DEFENDANT AND EVALUATED BY HIM WITHIN A MONTH OF HIS

25   ARREST.

1    THERE'S NO PSYCHIATRIC DIAGNOSIS WHICH WOULD

2  MITIGATE OR EXPLAIN HIS CRIMES. THE DOCTOR CONCLUDES THAT THE

3  DEFENDANT SUFFERS FROM DEPRESSION AND ANXIETY.

4    THAT FACT DOESN'T SEPARATE HIM FROM MANY OTHER

5  DEFENDANTS WHO COME BEFORE THIS COURT.  BUT WHAT IS CLEAR IN

6  DR. WALCH'S REPORT, AND WHAT I WANT TO PAY PARTICULAR ATTENTION

7  TO IS WHAT IS TRULY AT THE ROOT OF WHAT I SUGGEST WAS THE BASIS

8  FOR THESE CRIMES, AND THAT'S NARCISSISM AND GREED.

9    THE DEFENDANT IS VERY SELF-ABSORBED, AND THE DOCTOR

10  ACKNOWLEDGES HOW MUCH FOCUS AND OBSESSION HE SPENDS ON HIMSELF.

11    HE SAYS THE DEFENDANT RELATES THAT WHEN HE HAD HIS

12  ONE TRIAL AT THE DEPARTMENT OF JUSTICE -- AND I ALSO WANT TO

13  ADD WHEN I TALK ABOUT THE TRIAL THE DEFENDANT HAD, HIS JOB

14  TITLE WHILE HE WAS AT THE DEPARTMENT OF JUSTICE WAS "TRIAL

15  ATTORNEY." THAT WAS THE JOB.

16    HE SAID HE EXPECTED TO COME BACK AFTER HIS TRIAL A

17  HERO, FEELING LIKE THIS WORK AND SACRIFICES AT HOME WERE

18  REWARDED.  INSTEAD, HE FELT UNACKNOWLEDGED AND UNSUPPORTED BY

19  HIS BOSS, WHO MR. WERTKIN FELT SHOULD HAVE APPEALED THE CASE.

20    DID THAT JUSTIFY STEALING FROM HIS BOSS' OFFICE?

21  MR. WERTKIN IN HIS PERSONAL STATEMENT TELLS THE COURT THAT HE

22  DIDN'T THINK HE COULD LIVE UP TO THE EXPECTATIONS OF BEING A

23  PARTNER IN PRIVATE PRACTICE.  AND THAT EVEN BEFORE HE GOT TO

24  THE LAW FIRM HE HAD DOUBTS ABOUT HIS ABILITY TO SUCCEED, SO HE

25  STOLE THE COMPLAINTS TO GIVE HIMSELF AN INSIDE ADVANTAGE AND

1  KNOWHOW TO, AND WHO TO PITCH FOR BUSINESS.

2           BUT HE TELLS DR. WALCH, THE PSYCHIATRIST,

3  MR. WERTKIN BECAME PREOCCUPIED BY HIS RELATIVE LEVEL OF

4  COMPENSATION. THIS IS AT THE LAW FIRM.  HE REALIZES THAT,

5  QUOTE, HE WAS MAKING ALMOST THE LOWEST SALARY AT THE FIRM.

6           SO THE DEFENDANT IS SAYING THAT ALTHOUGH HE DIDN'T

7  IN ANY WAY SUCCEED OR PERFORM UP TO THE FIRM'S EXPECTATIONS,

8  THEY WERE UNDERPAYING HIM FOR HIS NONPERFORMANCE.  REALLY, HE

9  WAS MOTIVATED BY MONEY AND GREED, AND THAT'S WHAT THIS WAS ALL

10 ABOUT.

11          AND I ALSO DISAGREE BASED ON EVERYTHING WE HAVE SEEN

12 IN THIS CASE AND EVERYTHING THAT'S BEEN PRESENTED TO THE COURT,

13 I DISAGREE WITH THE DOCTOR'S CONCLUSION. HE SAYS:

14               "SUPERFICIALLY, MANY WHITE COLLAR CRIMES INVOLVE

15               ELEMENTS OF GREED, JUSTIFICATION AND ENTITLEMENT."

16          THAT IS EXACTLY WHAT THIS CRIME AND THIS CASE

17 INVOLVED.

18          AND HE SAYS THAT:

19               "MR. WERTKIN IS A MAN WHO NOT NORMALLY BELIEVES

20               RULES ARE THERE TO BE BROKEN -- IS NOT A MAN."

21          HE BROKE RULES BEYOND WHAT ANYBODY CAN POSSIBLY

22 FATHOM WHO WORKS FOR THE DEPARTMENT OF JUSTICE, AND HE WAS AND

23 STILL IS ENTITLED.  AND I'LL GET TO THAT IN A MINUTE.

24          I WANT TO TALK ABOUT THE DEFENDANT'S FINANCIAL

25 PICTURE, BECAUSE THERE'S A GREAT DEAL OF SELF PITY ABOUT THE

1  FINANCIAL PRESSURES THE DEFENDANT THOUGHT THAT HE WAS UNDER. HE

2  WAS MAKING $450,000 AT AKIN GUMP, AND THAT DOESN'T INCLUDE THE

3  SIGNING BONUS HE WAS GIVEN BY THE LAW FIRM.

4          HE HAD OWNED RENTAL PROPERTY IN WASHINGTON D.C. THAT

5  WAS WORTH $400,000, AND WHERE THERE WAS ONLY ABOUT $100,000

6  MORTGAGE.  HE COULD HAVE SOLD THAT RENTAL PROPERTY AND MADE AS

7  MUCH AS HE DID FROM SELLING THE QUI TAM. HE CHOSE NOT TO. HE HAD

8  A VERY GOOD FINANCIAL PICTURE.

9          HE OWNS A CONDO IN WASHINGTON D.C. WORTH ALMOST A

10  MILLION DOLLARS, AND HE HAS ALMOST $250,000 IN CASH ALONE.

11          HE WANTED A GET-RICH-QUICK SCHEME, AND THAT'S WHY HE

12  DID WHAT HE DID. HE HAD OPTIONS.  AND JUST SITTING THROUGH THIS

13  COURT'S LAW AND MOTION WE SAW DEFENDANTS WHO HAD A TRULY, TRULY

14  HORRIFIC BACKGROUNDS, AND WHO DON'T HAVE A COURTROOM FILLED WITH

15  FAMILY SUPPORT, AND THEY DIDN'T ASK FOR SELF-PITY IN THE WAY

16  THAT WE'VE SEEN HERE.

17          I ALSO WANT TO SAY THAT THE SENTENCE THAT'S BEING

18  RECOMMENDED BY THE DEFENSE, THERE IS NO JUSTIFICATION FOR THAT.

19  THERE ARE NO TRUE MITIGATING FACTORS HERE.

20          THERE'S A LOT OF TALK IN THE LETTERS FROM THE

21  DEFENDANT'S FAMILY AND FRIENDS, AND ESPECIALLY FROM THE

22  DEFENDANT'S WIFE ABOUT THE EFFECT HIS INCARCERATION WILL HAVE ON

23  THE DEFENDANT'S CHILDREN.

24          YOU AND I HAVE BEEN HERE A LONG TIME.  EVERY

25  DEFENDANT THAT COMES THROUGH THE COURT THAT IS BETWEEN THE AGE

1    OF 25 AND 55 HAS CHILDREN, AND ALL OF THEM ARE AFFECTED BY THEIR

2    CRIMINAL BEHAVIOR.

3              BUT IF THERE'S ANYONE WHO SHOULD HAVE UNDERSTOOD, OR

4    AT LEAST ANTICIPATED, THE IMPACT OF HIS CRIMES ON HIS FAMILY IT

5    WOULD BE A DEPARTMENT OF JUSTICE TRIAL ATTORNEY.

6              AND HERE, UNLIKE SO MANY OF THE DEFENDANTS THIS COURT

7    SEES, THERE'S ANOTHER FULLY FUNCTIONAL PARENT. THE DEFENDANT'S

8    WIFE IS FULLY CAPABLE. THEY HAVE AMPLE MEANS AND FAMILY SUPPORT

9    TO TAKE CARE OF THE CHILDREN FOR WHAT IS REALLY A VERY MINIMAL

10   PERIOD OF INCARCERATION.

11             WE KNOW THAT 34 MONTHS IS A VERY MODEST SENTENCE IN A

12   CASE LIKE THIS. THE COURT HAS DEALT WITH SO MANY SINGLE PARENTS,

13   AND WE ALL HAVE, WHERE THERE IS NO FAMILY SUPPORT FOR THE

14   CHILDREN. WHERE THEY HAVE NOTHING, AND THOSE ARE MITIGATING

15   FACTORS.  NOT HAVING A ROBUST FAMILY AND AMPLE MEANS. IT'S NOT A

16   MITIGATING FACTOR THAT THE DEFENDANT DIDN'T GET THE GLORY FOR

17   HIS ONE TRIAL AT THE DEPARTMENT OF JUSTICE THAT HE THOUGHT HE

18   SHOULD HAVE.

19             NOT BEING TREATED LIKE A HERO BY YOUR GOVERNMENT

20   COLLEAGUES IS NOT A MITIGATING FACTOR. FEELING UNDERPAID AT AKIN

21   GUMP IS NOT A MITIGATING FACTOR.  AND FEELING UNAPPRECIATED BY

22   HIS WIFE AT HOME IS NOT A MITIGATING FACTOR.

23             AND I THINK COMING FROM A GOOD FAMILY AND A

24   PRIVILEGED WORK BACKGROUND ISN'T A MITIGATING FACTOR, EITHER.

25             SO WHEN YOUR HONOR CONSIDERS WHAT IS THE APPROPRIATE

1   SENTENCE HERE, IN MY MIND THE CASE REALLY BOILS DOWN TO WHETHER

2   WE'RE GOING TO HAVE TWO SETS OF RULES.  ARE WE GOING TO HAVE ONE

3   SET OF RULES FOR WEALTHY, PRIVILEGED AND WELL-EDUCATED PEOPLE

4   WHO HAVE HAD EVERY ADVANTAGE IN LIFE, AND ANOTHER SET OF RULES

5   FOR THOSE WHO HAVE NO FAMILY.  THEY HAVE NO MONEY, AND THEY HAVE

6   NO REAL ABILITY TO MANIPULATE THEIR CRIMINAL CONDUCT INTO

7   VICTIMHOOD.

8            AND SO WHEN I LOOK AT THE 3553 FACTORS WHAT I WANT TO

9   STRESS TO THE COURT IS YOU THINK ABOUT THE TRUE VICTIMS OF THIS

10  CASE, AND THOSE ARE THE ONES I ALREADY MENTIONED.  THIS OFFENSE

11  IS EXTREMELY SERIOUS. AND THIS SENTENCE SHOULD PROMOTE RESPECT

12  FOR THE LAW, AND IT WON'T IF ONE OF OUR OWN, AN INSIDER, GETS A

13  REDUCED SENTENCE FOR VIOLATING AND DEGRADING THE CIVIL AND

14  CRIMINAL JUSTICE SYSTEM.

15           I WANT TO ADDRESS THE WIFE'S LETTER THAT WE JUST

16  RECENTLY RECEIVED. SHE SUGGESTS HOME DETENTION AND AN

17  AROUND-THE-COUNTRY SPEAKING TOUR.  THAT WOULD SENT A DEVASTATING

18  MESSAGE TO THE WHISTLEBLOWER COMMUNITY, TO THE PUBLIC AND TO THE

19  COURT.

20           AT SPEAKING TOUR BY THIS DEFENDANT IS ABSURD.  LET ME

21  POINT OUT THAT THE DEPARTMENT OF JUSTICE HAS HEARD ALL IT NEEDS

22  TO HEAR FROM JEFFREY WERTKIN.  WE DO NOT NEED TO HEAR ANYTHING

23  FURTHER FROM HIM.

24           MRS. -- THE DEFENDANT'S WIFE SAYS THAT HE CAN'T BE

25  AWAY FROM HIS KIDS; THAT A TWO-DAY STINT IN NEW YORK WAS

1   DEVASTATING.  YET SHE WANTS HIM TO TRAVEL ALL AROUND THE COUNTRY

2   LECTURING OTHER PEOPLE ABOUT THINGS WE ALL KNEW AND LEARNED WHEN

3   WE WERE IN KINDERGARTEN.

4          WE THINK THIS IS A TRANSPARENT ATTEMPT TO REALLY

5   AVOID PAYING THE PIPER AND GOING TO JAIL.  AND THAT'S WHERE THE

6   DEFENDANT NEEDS TO GO TO FACE UP TO THE MAGNITUDE OF THE CRIMES

7   HE DID.

8          THIS IS ABOUT PUNISHMENT, TOO.  AND, MOST

9   IMPORTANTLY, YOUR HONOR, NO ONE IS ABOVE THE LAW, AND ESPECIALLY

10  NOT A DOJ TRIAL ATTORNEY. THE SENTENCE HERE MUST PROVIDE JUST

11  PUNISHMENT.  AND 34 MONTHS IS A VERY REASONABLE SENTENCE.  IT'S

12  LESS THAN ONE MONTH FOR EVERY QUI TAM HE STOLE.  AND THIS IS A

13  CASE THAT REALLY CRIES OUT FOR A STRONG SENTENCE WITHIN THE

14  GUIDELINES.

15          THE WHISTLEBLOWER COMMUNITY IS WATCHING THIS CASE.

16  THE LEGAL COMMUNITY IS WATCHING THIS CASE.  OUR DEPARTMENT IS

17  WATCHING THIS CASE, AND THE PUBLIC IS. AND NO ONE, ESPECIALLY

18  NOT THIS DEFENDANT, IS ABOVE THE LAW.  SO THAT IS WHY I REALLY,

19  REALLY WANT TO URGE THE COURT TO GIVE A GUIDELINE SENTENCE, AND

20  THE ONE THAT WE'VE SUGGESTED SEEMS APPROPRIATE.

21          **THE COURT:**  OKAY.  THANK YOU, MS. HARRIS.

22          I'LL HEAR FROM YOU, MS. ARGUEDAS.

23          **MS. ARGUEDAS:**  GOOD AFTERNOON, YOUR HONOR.

24          **THE COURT:**  GOOD AFTERNOON.

25          **MS. ARGUEDAS:**  SO I HAVE THESE PREPARED REMARKS, BUT

1 I WANT TO SAY A COUPLE OF THINGS BEFORE I START IN ON THEM.

2       FIRST OF ALL, DEFINITELY THE DEPARTMENT OF JUSTICE

3 IS A VICTIM IN THIS CASE. AND I HAVE A GREAT DEAL OF RESPECT

4 FOR THE PROSECUTORS ON THE OTHER SIDE IN THIS CASE, BUT I THINK

5 WHAT WE JUST HEARD WAS A VICTIM TALKING.  AND I KNOW THAT WHAT

6 WE JUST HEARD WAS A DISTORTION OF THE ARGUMENTS THAT WE HAVE

7 MADE TO THE COURT.

8       **THE COURT:**  LET ME JUST OFFER, AGAIN, IF MR. FRENTZEN

9 AND MS. HARRIS, AND ALSO THE PROBATION OFFICER WANT TO SIT DOWN,

10 THAT'S FINE. IT'S UP TO YOU.

11       **MR. FRENTZEN:**  I'M FINE STANDING UP, YOUR HONOR,

12 UNLESS I'M MAKING SOMEONE NERVOUS.  I DON'T THINK SO.

13       **MS. ARGUEDAS:**  NOT ME.

14       **MR. FRENTZEN:**  I KNEW THAT.

15       **MS. ARGUEDAS:**  I SAY THAT WITH RESPECT. I THINK I

16 UNDERSTAND THE EMOTION THAT COMES FROM WHAT JEFF HAS DONE. AND

17 THAT IS WHY ONE OF THE VERY FIRST THINGS THAT I WAS GOING TO SAY

18 TO YOU IS ONE THING THAT WE CAN ALL AGREE ON IS THAT JEFF'S

19 CONDUCT WAS SERIOUS, AND IT HAS TO BE PUNISHED, AND IT HAS TO BE

20 PUNISHED WITH PRISON.

21       SO LET'S GET THAT OUT OF THE WAY RIGHT OFF THE BAT.

22 BUT MANY OF THE THINGS THAT YOU JUST HEARD ARE KIND OF A

23 CHERRY-PICKED, TAKING A LINE OR TWO OUT OF OUR BRIEF AND SAYING

24 THAT'S WHY WE THINK THAT HE SHOULD GET A LESSER SENTENCE.  AND

25 THAT'S NOT THE CASE.

1    BUT THE OTHER THING I WANT TO TALK ABOUT RIGHT OFF

2  THE BAT IS THIS IDEA THAT JEFF PURPOSELY AND DELIBERATELY TRIED

3  TO SET UP THE FORMER COLLEAGUE IN HIS OFFICE TO GET IN TROUBLE.

4    **THE COURT:**  WELL, I THINK IF YOU WERE MAKING A

5  CLOSING ARGUMENT TO THE JURY I WOULDN'T LET YOU CALL HIM "JEFF."

6    **MS. ARGUEDAS:**  I'M SORRY.

7    **THE COURT:**  SO I THINK I SHOULD SAY THAT TO YOU NOW

8  WITH RESPECT TO, I GUESS, MAKING THE ARGUMENT TO MYSELF, ALSO.

9  OKAY.

10    **MS. ARGUEDAS:**  ALL RIGHT.  I WASN'T TRYING TO BE

11  OVERLY-FAMILIAR. THAT'S --

12    **THE COURT:**  NO.  I'M SURE THAT IN ALL YOUR, YOU KNOW,

13  INTERACTIONS WITH HIM YOU TALK TO HIM AS "JEFF."

14    **MS. ARGUEDAS:**  YES.  OKAY.

15    **THE COURT:**  BUT SINCE WE'RE IN COURT HE SHOULD BE

16  "MR. WERTKIN."

17    **MS. ARGUEDAS:**  OKAY.  HE -- AND THE GOVERNMENT KNOWS

18  THIS, BECAUSE A LOT OF WHAT THEY KNOW ABOUT WHAT HE DID IN HIS

19  OFFICE AFTER BEING ARRESTED THEY KNOW BECAUSE HE TOLD THEM WHEN

20  WE WENT IN TO COOPERATE AND CONFESS.

21    AND THAT IS THIS:  HE PUT THOSE COMPLAINTS IN A

22  FEDEX PACKAGE THAT HAD COME TO HIM FROM THE DEPARTMENT OF

23  JUSTICE HOPING THAT SOMEBODY -- OR HE'D BE ABLE TO -- SOMEBODY

24  WOULD THINK THAT SOMEONE HAD INADVERTENTLY SENT THEM TO HIM.

25  NOT HOPING OR EVEN KNOWING OR REALIZING THAT ANYBODY WOULD

1    THINK THAT A PARTICULAR PERSON THERE WAS IN -- ACTING IN

2    CONCERT WITH HIM.

3              THE MINUTE THAT MR. WERTKIN HEARD THAT THAT'S WHAT

4    THEY WERE THINKING, BECAUSE THEY SAID THAT TO ME, THE

5    GOVERNMENT SAID THAT TO ME, WE IMMEDIATELY ANSWERED THAT. FIRST

6    THROUGH ME ON THE TELEPHONE WITH THE GOVERNMENT, AND THEN WHEN

7    HE WENT IN TO BE CONFESSED.

8              SO IT'S ALL BAD, BUT I DON'T WANT IT TO BE --

9    ANYTHING TO BE ON THIS RECORD, BECAUSE THERE IS NO EVIDENCE TO

10   SUPPORT IT, THAT HE WAS DOING SOMETHING THAT HE KNEW WAS GOING

11   TO GET SOMEBODY IN TROUBLE IN THE DEPARTMENT OF JUSTICE, AND HE

12   WAS DOING IT FOR THAT REASON, BECAUSE IS THAT NOT THE CASE.

13             SO HIS CONDUCT IS SERIOUS. IT HAS TO BE PUNISHED. HE

14   HAS TO GO TO PRISON. JEFF WERTKIN KNOWS THIS. HE FEELS THE

15   WEIGHT OF HIS CONDUCT ENORMOUSLY, AND HE'S DEEPLY ASHAMED ABOUT

16   IT.

17             SO FOR THE GOVERNMENT TO KIND OF MOCK HIS STATEMENT

18   IN WHICH HE SAYS HE'S ASHAMED ABOUT IT, IS NOT FAIR. YOU SAID,

19   TOO, A LOT OF THE PEOPLE ARE HERE FOR MR. WERTKIN.  AND, YES,

20   HIS PARENTS, HIS WIFE'S PARENTS AND A WHOLE LOT OF OTHER FAMILY

21   MEMBERS AND FRIENDS ARE HERE. YOU SAW FROM MANY OF THE LETTERS,

22   BUT ALSO PARTICULARLY THIS LAST LETTER THAT HIS WIFE SENT IN.

23   HE'S TELLING HIS FRIENDS AND FAMILY AND COLLEAGUES WHAT HE DID,

24   AND HE'S WEEPING AND CRYING WHEN HE DOES IT.

25             SO THEY ARE WRONG IF THEY SAY HE IS NOT DEEPLY

1    ASHAMED. HE IS. AND IF WE NEEDED TO WE COULD BRING IN 20 PEOPLE

2    WHO COULD DESCRIBE THAT.

3          IT IS ALSO NOT REALLY ARGUABLE THAT HIS CONDUCT WAS

4    A COMPLETE DEPARTURE FROM EVERY OTHER YEAR OF HIS 40-YEAR LIFE.

5    THAT IS PROVEN OVERWHELMINGLY. I THOUGHT THERE WERE 87 LETTERS,

6    ACTUALLY.  YOU SAID 85.

7          **THE COURT:**  WELL, I DON'T KNOW.  THE COVER SAID "85."

8          **MS. ARGUEDAS:**  OKAY.

9          **THE COURT:**  WELL, LET ME PUT IT THIS WAY:  IT'S NOT A

10   COVER FROM YOU.  IT'S A COVER FROM THE PROBATION OFFICER.

11         **MS. ARGUEDAS:**  OKAY.  NO, I THINK IT'S 87.

12         **THE COURT:**  THEY MAY HAVE MISCOUNTED.  I DID NOT TRY

13   TO, YOU KNOW, COUNT THE LETTERS.

14         **MS. ARGUEDAS:**  RIGHT.

15         **THE COURT:**  IT WAS ENOUGH TO READ THEM ALL.  BOTH

16   MR. WERTKIN AND HIS WIFE HAVE VERY LARGE FAMILIES, VERY

17   SUPPORTIVE.  COUSINS GALORE, IN-LAWS.  AND THEN, EVERYONE ELSE

18   WHO FILLED IN THE REST OF THE 87, WHICH I DON'T DOUBT IT, IF YOU

19   COUNTED THEM THERE'S 87.  I JUST KNOW I READ A LOT OF LETTERS.

20         **MS. ARGUEDAS:**  WELL, THE LETTERS SHOW, AND THEY

21   REALLY HAVE COVERED HIS LIFE IN THE BEGINNING FROM WHEN HE WAS

22   BORN UNTIL NOW.  AND THE LETTERS SHOW SOMEBODY WHO IS, FRANKLY,

23   NOT SELF-INVOLVED, NOT NARCISSISTIC.

24          THEY SHOW A PERSON WHO IS A GOOD PERSON. AND THE

25   POINT OF THEM, REALLY, IS THAT THIS CONDUCT IS A DEPARTURE. IT

1    IS ABERRANT.  IT IS NOT ANYTHING LIKE ANYTHING HE HAS EVER DONE

2    BEFORE IN HIS LIFE.

3           AND I WOULD SAY ALSO TO THE COURT THAT IF YOU LOOK

4    AT THE WAY HE CONDUCTED THIS ABERRANT BEHAVIOR, THE BIZARRE AND

5    FOOLISH WAY THAT HE WENT ABOUT IT, SOMETHING THAT THE

6    GOVERNMENT IN ITS PLEADINGS CALLED "STRANGER THAN FICTION," IT

7    TELLS US COMMON SENSE BEFORE WE GET TO DR. WALCH'S REPORT,

8    TELLS US THAT THAT MEANS THAT THERE WERE MORE FORCES AFOOT IN

9    HIS CONDUCT THAN WHAT MEETS THE EYE.

10          WE ALSO WOULD MAKE THE POINT TO THE COURT THAT THE

11   PUNISHMENT THAT JEFF WERTKIN HAS ALREADY ENDURED IS POWERFUL.

12   HE'S NO LONGER A LAWYER. DISBARRED IN ONE PLACE, ABOUT TO BE

13   DISBARRED IN THE OTHER.

14          HE WAS FIRED FROM HIS TEACHING JOBS THAT HE HELD

15   BEFORE THIS. UNLIKELY THAT HE WOULD EVER BE HIRED AGAIN TO THE

16   POSITIONS THAT HE COULD GET BASED ON THE EDUCATION THAT HE'S

17   GOTTEN.

18          HE HAS BEEN HUMILIATED AND SHAMED IN FRONT OF

19   EVERYONE THAT HE KNOWS.  AND NOW, IN THE AGE OF GOOGLE, THAT

20   WILL BE THE CASE FOR EVERYONE THAT HE EVER MEETS IN HIS FUTURE.

21          HE WENT IN THE GOVERNMENT VERY, VERY QUICKLY. I

22   BELIEVE I'M RIGHT TO SAY THAT JEFF WERTKIN WENT IN THERE WITHIN

23   TWO WEEKS TO EXPLAIN EVERYTHING THAT HE DID AND EVERY WAY THAT

24   HE DID IT. THAT WAS USEFUL TO THE GOVERNMENT BECAUSE IT CALMED

25   THEM FROM HAVING TO THINK THINGS ABOUT THE WAY THEIR SYSTEM

1  WORKED AND WHAT ELSE MIGHT HAVE BEEN BREACHED.

2          SO, YOU KNOW, I MEAN, IT COUNTS. IT COUNTS. AND

3  FINALLY -- AND MAYBE THIS IS THE MOST IMPORTANT THING I'M GOING

4  TO SAY HERE TODAY -- IS THAT WE KNOW WHAT THE LAW REQUIRES.

5  WE'VE SAID IT A MILLION TIMES, WHICH IS A SENTENCE THAT IS

6  SUFFICIENT, BUT NOT GREATER THAN NECESSARY. AND THAT IS NOT

7  JUST A PHRASE:  "SUFFICIENT, BUT NOT GREATER."

8          AND THAT'S WHY I HEAR THE DEPARTMENT OF JUSTICE'S

9  PAIN AS THEY FEEL LIKE VICTIMS, WHICH THEY WERE, WHICH I FULLY

10  ACKNOWLEDGE, BUT THAT'S WHY I'M GLAD I'M IN FRONT OF AN ARTICLE

11  III JUDGE, BECAUSE YOU HAVE TO FIGURE OUT WHAT IS SUFFICIENT,

12  BUT NOT GREATER.

13          SO I WANT TO GIVE YOU SOME REASONS OR THINGS THAT I

14  THINK ARE RELEVANT TO THE COURT IN DETERMINING WHAT IS

15  SUFFICIENT, BUT NOT GREATER. ONE OF THE THINGS I THINK THE LAW

16  ASKS YOU TO DO IS LOOK AT HIS WHOLE LIFE, NOT JUST THIS PART OF

17  HIS LIFE.  AND WE'VE GIVEN YOU HIS WHOLE LIFE.  YOU HAVE IT

18  FROM THE GOVERNMENT INVESTIGATION.

19          EVEN IN THE THINGS THAT THE GOVERNMENT FILED AND IN

20  THE PRESENTENCE REPORT YOU CAN SEE HOW HE WAS RESPECTED AND

21  LIKED AND WORKED HARD, AND ALL THAT, AT THE DEPARTMENT OF

22  JUSTICE.

23          WE'VE GIVEN YOU A PSYCHOLOGICAL REPORT, AND WE'VE

24  GIVEN YOU THE LETTERS THAT DESCRIBE HIM FROM BIRTH TO TODAY.

25  AND THOSE SHOW AN UNBLEMISHED LIFE. THOSE SHOW ONE IN WHICH HE

1  EXEMPLIFIED WHAT IT WAS TO BE A GOOD PERSON, A GOOD FATHER, A

2  GOOD FRIEND, A GOOD SON, A GOOD LAWYER.

3          HE HELPED PEOPLE THROUGHOUT HIS LIFE.  AND THOSE

4  LETTERS DESCRIBE SOMEBODY WHO WAS A RULE FOLLOWER. YOU CAN FEEL

5  THE UTTER SHOCK AND DISBELIEF IN THOSE PEOPLE'S LETTERS ABOUT

6  THE JEFF THAT WE KNOW AND HAVE KNOWN REALLY WELL FOR ALL OF

7  THESE YEARS.  HOW COULD HE DO THAT?  BECAUSE IT WAS THE

8  DEFINITION OF "ABERRANT BEHAVIOR."

9          SO THE GOVERNMENT, WHEN THEY START TO BE SARCASTIC,

10 THEY SAY IT WASN'T ABERRANT.  IT WASN'T A MOMENT IN TIME.

11          YES, I AGREE.  IT WASN'T, YOU KNOW, A SINGLE

12 DECISION. IT WAS AN EPISODE THAT UNFOLDED. AND IT WAS AN

13 EPISODE BORNE OF UNDIAGNOSED AND UNTREATED DEPRESSION THAT WENT

14 ALONGSIDE A DEEP-ROOTED AND DEBILITATING ANXIETY DURING A SENSE

15 IN WHICH HE FELT THAT HE WAS FAILING IN BOTH HIS PROFESSIONAL

16 AND PERSONAL LIVES. IT WAS THAT.

17          WELL, LET ME JUST FIRST SAY, YOU KNOW THAT FROM THE

18 PSYCHIATRIST'S REPORT.  YOU KNOW THAT FROM THE 87 LETTERS THAT

19 DESCRIBE HIS LIFE.  AND YOU KNOW THAT BECAUSE OF THE BIZARRE

20 NATURE OF WHAT HE DID.

21          THE WAY THAT JEFF WERTKIN BEHAVED REFLECTED A PERSON

22 WHO WAS HAVING A BREAKDOWN, NOT A SMART, BIG-FIRM PARTNER WHO

23 WAS DOING A CALCULATED GREEDY THING.

24          LET'S JUST LOOK AT IT USING OUR OWN COMMON SENSE.

25 JEFF WERTKIN MADE A COLD CALL TO A COMPLETE STRANGER, A GENERAL

1    COUNSEL OF SILICON VALLEY, AND LEFT AN ILLEGAL OFFER ON HIS

2    VOICE MAIL.

3            THAT, BY ITSELF -- THEN HE PUT ON THE WIG AND

4    SUNGLASSES TO MEET UP WITH A STRANGER.  BUT THAT, BY ITSELF, IS

5    BREAKDOWN CONDUCT. IT IS NOT A COLD CALCULATION.

6            MAYBE EVEN MORE TO THE POINT.  AS HE WAS GETTING

7    INTO THE TAXI TO GO TO THE MEETING IN SUNNYVALE WHERE HE

8    EVENTUALLY GETS ARRESTED, WHEN HE'S DAN, WEARING THESE WIG AND

9    SUNGLASSES, HE GETS A PHONE CALL FROM SOMEBODY AT THE

10   DEPARTMENT OF JUSTICE IN ALABAMA WHERE HE HAD TRIED TO SELL

11   ANOTHER COMPLAINT TO THE COMPANY IN ALABAMA.  SOMEBODY FROM THE

12   DEPARTMENT OF JUSTICE CALLS UP DAN, AND SAYS:  "THEY ARE

13   INVESTIGATING."

14           SO HE KNEW THE JIG WAS UP. HE KNEW HE WAS GOING TO

15   BE CAUGHT, AND STILL HE WENT. THAT IS A SIGN OF A PERSON HAVING

16   A BREAKDOWN. NOT A BIG FIRM PARTNER WHO IS CALCULATED AND

17   GREEDY. IT WAS A SUICIDE MISSION. AND HE COULDN'T STOP HIMSELF

18   EVEN AFTER HE GOT THAT PHONE CALL. IT WAS DESPERATION.

19           DR. WALCH TELLS THE COURT THAT IT WAS DESPERATION AS

20   A PRODUCT OF UNDIAGNOSED AND UNTREATED DEPRESSION. THAT HE DID

21   NOT HAVE THE RESOURCES TO SCOPE WITH WHAT WAS HAPPENING TO HIM,

22   SO HE ACTED IN THIS STUPID, STUPID, TERRIBLE WAY.

23           BUT LET ME SAY WHEN I HEAR THE GOVERNMENT TRIVIALIZE

24   IT AND SAY: "OH, YEAH.  WE'VE ALL LOST BIG TRIALS.  SO WHAT IF

25   HE DIDN'T COME BACK A HERO LIKE HE HOPED?"  THAT IS AN

1   UNINFORMED POSITION, WHICH I UNDERSTAND THE EMOTIONS OF A

2   VICTIM.  BUT LET ME JUST SAY:  YES, THERE ARE A LOT OF PEOPLE

3   WHO LOSE TRIALS AND HAVE ALL THE OTHER PRESSURES THAT HE HAD ON

4   HIM, AND THEY DON'T HAVE BREAKDOWNS.  BUT THAT IS ENTIRELY

5   BESIDE THE POINT.

6          JEFF WERTKIN HAS PSYCHOLOGICAL MAKEUP THAT CRUMBLED

7   BECAUSE OF THE PRESSURES THAT HE WAS UNDER. NO, WE'RE NOT

8   BLAMING THE PRESSURES.  WE ARE NOT BLAMING AKIN GUMP.  WE'RE

9   NOT BLAMING THE DEPARTMENT OF JUSTICE.  WE'RE NOT BLAMING THE

10  JUDGE THAT THREW OUT HIS TRIAL.  NOT IN THE LEAST LITTLE BIT.

11         HE WAS LIVING A LIFE THAT HE COULDN'T

12  PSYCHOLOGICALLY HANDLE BECAUSE OF HIS PSYCHOLOGICAL MAKEUP. HE

13  BROKE DOWN AND HE LEFT AN ILLEGAL MESSAGE ON SOMEBODY'S VOICE

14  MAIL. AND THAT'S A SIGN OF IT, AND IT'S INCONTROVERTIBLE.

15         HE WAS -- HE THOUGHT HE WAS FACING FAILURE AT WORK,

16  FAILURE WITH HIS FAMILY, A DETERIORATING MARRIAGE.  HE STARTED

17  DRINKING AND USING DRUGS, AND HE FELL APART. THE 87 LETTERS

18  TELL YOU THAT WHEN HE FELL APART HE MADE DECISIONS THAT WERE

19  RADICALLY DIFFERENT THAN ANY OTHER ONES HE HAD EVER MADE AND

20  INCONSISTENT WITH THE WAY HE HAD LIVED HIS 39 YEARS.

21         DOES THIS MEAN HE DOESN'T GET PUNISHED?  OF COURSE

22  NOT, AND WE'RE NOT SAYING THAT. IT IS SOMETHING THAT THE COURT

23  MUST CONSIDER WHEN FIGURING OUT WHAT IS SUFFICIENT, BUT NOT

24  GREATER. IT IS EXPLANATORY AND IT IS MITIGATING.

25         SO, YES, WE ASK FOR A YEAR AND A DAY.  THE

1  GOVERNMENT ASKS FOR 34. PROBATION ASKS FOR 30. WE SUBMIT THAT

2  THOSE SENTENCES ARE GREATER THAN NEED BE, GREATER THAN WHAT IS

3  SUFFICIENT.  AND WE SAY THAT BECAUSE OF THE ABERRANT NATURE OF

4  HIS OFFENSE, HIS UNBLEMISHED WRONGDOING -- I'M SORRY -- HIS

5  UNBLEMISHED LIFE, HIS RUNNING IN TWO WEEKS AFTER TO CONFESS AND

6  TELL EVERYONE, THE VERY SEVERE CONSEQUENCE THAT HE'S ALREADY

7  SUFFERED THAT WILL LAST FOREVER.

8           AND WE'RE NOT ASKING FOR HALFWAY HOUSE OR HOME

9  DETENTION.  WE'RE ASKING FOR PRISON. SO WHEN YOU LOOK AT -- I

10 MEAN, OBVIOUSLY -- I THINK IT'S OBVIOUS -- AT LEAST I WILL

11 SUBMIT THAT HE DOESN'T NEED TO BE SPECIFICALLY DETERRED.  HE'S

12 NOT -- HE'S VERY UNLIKELY TO COMMIT ANOTHER CRIME.  SO YOU'RE

13 TALKING ABOUT GENERAL DETERRENCE, I THINK, WHEN YOU'RE TALKING

14 ABOUT A SENTENCE.

15          ANYBODY WHO IS LOOKING IN AND LOOKING AT WHAT

16 HAPPENED TO JEFF WERTKIN WILL SEE A LIFE DESTROYED, A MAN IN

17 PRISON, A LAWYER WHO FORFEITED HIS LICENSE, A MAN WHO LAID

18 WASTE TO ALL OF HIS EDUCATION, AND A MAN WHO'S BEEN HUMILIATED

19 AND SHAMED AND WILL BE THAT WAY FOREVER.

20          SO WE SUBMIT TO YOU THAT THAT IS A SUFFICIENT

21 SENTENCE, AND NOT GREATER THAN.

22          **THE COURT:**  ALL RIGHT. THANK YOU.

23          NOW, WHO WANTED TO MAKE THE REBUTTAL AND I'M GOING

24 TO GIVE MR. WERTKIN THE LAST WORD HERE, IF HE WANTS TO SPEAK.

25          SO WAS IT MS. HARRIS OR MR. FRENTZEN?  AND TO THE

 1    EXTENT PROBATION WANTS TO BE HEARD, MR. POLLAK, I WOULD HEAR

 2    FROM HIM, AS WELL.

 3              **MS. HARRIS:**  YOUR HONOR, THERE ARE JUST A COUPLE --

 4              **THE COURT:**  ACTUALLY, BEFORE YOU START, LET ME JUST

 5    SEE -- I WANT TO MAKE SURE THAT OUR COURT REPORTER ISN'T

 6    GETTING -- SHE SAYS SHE'S OKAY.

 7              IT'S A LITTLE HARDER TO TAKE DOWN THESE KINDS OF

 8    ARGUMENTS, AS YOU KNOW, THAN JUST THE BACK AND FORTH BETWEEN,

 9    LET'S SAY, A WITNESS AND A QUESTIONING LAWYER, OR SOMETHING.

10              BUT I GUESS WE'VE ONLY BE OUT HERE FOR ABOUT AN HOUR

11    AND A QUARTER OR SOMETHING LIKE THAT. IS THAT RIGHT?  OKAY.

12              SO WAIT A MINUTE. WE CAME OUT AT 2:15?  YES.  OKAY.

13    ALL RIGHT.  SHE SAID SHE'S OKAY.

14              GO AHEAD.

15              **MS. HARRIS:**  YOUR HONOR, THERE ARE ONLY A COUPLE OF

16    THINGS THAT I WANT TO ADDRESS.  THE FIRST IS I WANTED TO ADDRESS

17    WHAT MS. ARGUEDAS SAID ABOUT THE STAGING OF THE OFFICE NOT

18    REALLY BEING DESIGNED TO TRY AND GET SOMEONE INTO TROUBLE. IT

19    WAS DESIGNED TO GET SOMEONE OUT OF TROUBLE, AND THAT WAS THE

20    DEFENDANT.

21              AND HE SPECIFICALLY PUT TWO COMPLAINTS IN A

22    DEPARTMENT OF JUSTICE ENVELOPE THINKING THAT THAT WOULD LEAD

23    INVESTIGATORS TO BELIEVE THAT HE GOT THEM FROM SOMEONE AT THE

24    DEPARTMENT OF JUSTICE.  AND THERE WAS A RETURN ADDRESS ON THAT

25    ENVELOPE THAT HE SPECIFICALLY USED.  HE DIDN'T PUT IT IN AN

1    AKIN GUMP ENVELOPE.

2            AND SO HE WAS TRYING TO GET HIMSELF OUT OF TROUBLE

3    WITH A FALSE ALIBI AS TO HOW HE CAME INTO POSSESSION OF THOSE

4    COMPLAINTS.  AND IT SPARKED AN INVESTIGATION OF THIS INDIVIDUAL

5    THAT NEARLY LED TO A SEARCH WARRANT. HE DID COME IN AFTER TWO

6    WEEKS. THIS IS WHY THE GOVERNMENT IS RECOMMENDING A MID-RANGE

7    SENTENCE AND NOT SOMETHING SUBSTANTIALLY HIGHER.

8            MS. ARGUEDAS IS CORRECT.  HE CAME IN, AND HE HELPED

9    CLEAR UP THIS INCREDIBLE CLOUD THAT HE PLACED THIS EMPLOYEE

10   UNDER. BUT LET'S NOT BE MISTAKEN ABOUT WHAT WENT DOWN. HE

11   VICTIMIZED HER AND TRIED TO EXONERATE HIMSELF AT HER EXPENSE.

12           **THE COURT:**  COULD YOU JUST CLEAR ONE THING UP?  WAS

13   THAT ENVELOPE MAILED BACK?

14           **MS. HARRIS:**  NO, HE LEFT IT IN HIS OFFICE.

15           **THE COURT:**  FOR IT TO BE FOUND.

16           **MS. HARRIS:**  FOUND.  HE KNEW THAT WE WERE COMING.  WE

17   WOULD BE SEARCHING THE AKIN GUMP OFFICES.

18           **MS. ARGUEDAS:**  YOUR HONOR?

19           **THE COURT:**  OH, I JUST ASKED WAS THE ENVELOPE MAILED

20   BACK AS IF SOMEONE SAID: "OH, YOU SENT THESE TO ME BY MISTAKE."

21   IT WAS JUST LEFT THERE.  THAT'S WHAT MS. HARRIS WAS CLARIFYING.

22           **MS. HARRIS:**  YES.

23           **THE COURT:**  AND IF YOU GET A CHANCE AND YOU KNOW WHAT

24   THE CALL WAS THAT WAS BEING REFERENCED IN THE DEFENDANT'S PAPERS

25   BY MS. ARGUEDAS BEFORE MR. WERTKIN FLEW OUT TO CALIFORNIA.  IF

```
 1    YOU KNOW WHAT THAT WAS ABOUT, YOU CAN DESCRIBE THAT FURTHER.

 2    AND IF NOT, I MIGHT GO BACK TO MS. ARGUEDAS TO ASK HER.

 3            MS. HARRIS:  YOUR HONOR, THE CALL THAT DEFENSE

 4    COUNSEL WAS REFERENCING IS THE COLD CALL THAT THE DEFENDANT MADE

 5    TO THE GENERAL COUNSEL.

 6            THE COURT:  NO.  NO.  NO.

 7            MS. ARGUEDAS:  NO, IT'S --

 8            THE COURT:  EXCUSE ME.  WAIT.  WAIT.  SHE'S STILL

 9    TALKING.

10            MS. ARGUEDAS:  I KNOW.  JUST TRYING TO --

11            THE COURT:  IF I NEED YOU, I'LL HAVE YOU COME BACK.

12    OKAY.

13            ACCORDING TO THE DEFENDANT'S MEMORANDUM AND ALSO I

14    THINK IT'S IN THE DOCTOR'S REPORT.  BUT, WHEREVER, THERE'S

15    REFERENCE -- AND THIS CALL IS DESCRIBED IN MORE OR LESS DETAIL

16    DEPENDING ON WHO IS REFERENCING IT -- BUT THAT THERE WAS SOME

17    CALL THAT THE DEPARTMENT OF JUSTICE MADE TO -- I DON'T KNOW IF

18    IT WAS THE PHONE THAT MR. WERTKIN WAS USING OR TO HIM DIRECTLY,

19    BUT THE ARGUMENT IS HE KNEW THEY WERE ON TO HIM AND HE KEPT

20    GOING.

21            AND SO IF YOU KNOW WHAT THAT CALL IS AND YOU WANT TO

22    DESCRIBE IT, OR CAN, THAT'S FINE.  AND IF NOT, WHEN I GET

23    THROUGH TALKING TO THEM, I'LL GO BACK TO MS. ARGUEDAS.

24            MS. HARRIS:  YES, YOUR HONOR.  THERE ARE SEVERAL

25    CALLS THAT I WOULD LIKE TO TALK ABOUT.
```

1    **THE COURT:**  WELL, LET'S TALK ABOUT THE ONE I JUST

2  ASKED YOU ABOUT TO START WITH.

3    **MS. HARRIS:**  OKAY.

4    **THE COURT:**  I JUST WANT TO GET THAT INFORMATION.

5  THESE ARE JUST THINGS THAT WERE KIND OF DANGLING IN MY MIND.  I

6  WASN'T SURE WHAT PEOPLE WERE TALKING ABOUT.

7    **MS. HARRIS:**  THAT CALL THE DEFENDANT, AS THE COURT

8  KNOWS, SOLICITED MORE THAN JUST THE TWO COMPANIES WHO HAD

9  COMPLAINTS HERE.

10   HE COLD CALLED AN ALABAMA COMPANY THAT WAS THE

11  SUBJECT OF A SEALED QUI TAM.  AND, APPARENTLY, THAT ALABAMA

12  COMPANY CONTACTED THE U.S. ATTORNEY'S OFFICE IN BIRMINGHAM, AND

13  THE BIRMINGHAM U.S. ATTORNEY'S OFFICE MADE A CALL TO THE NUMBER

14  THAT WAS LEFT BY THE DEFENDANT FOR THE ALABAMA COMPANY, SAYING,

15  YOU KNOW:  "ARE YOU DAN?  YOU KNOW, WHAT'S UP?"

16   BUT WHILE WE'RE ON THE SUBJECT OF PHONE CALLS THERE

17  ARE A COUPLE.

18   **THE COURT:**  LET ME GO BACK TO THAT CALL FOR A MOMENT.

19  I'M SURE YOU WON'T FORGET THE OTHER ONES YOU WANT TO TALK ABOUT,

20  OR MR. FRENTZEN WON'T LET YOU FORGET THEM.

21   SO THIS CALL THAT I WAS JUST ASKING ABOUT, IS IT

22  YOUR UNDERSTANDING -- DID YOU TALK TO WHOEVER MADE THAT CALL BY

23  THE WAY?

24   **MS. HARRIS:**  I DON'T KNOW.

25   **THE COURT:**  OH.

1    **MS. HARRIS:**  I THINK HE MIGHT HAVE, I DON'T KNOW.  OR

2    MAYBE A MESSAGE WAS LEFT.  I'M NOT A HUNDRED PERCENT SURE.

3            **THE COURT:**  NO.  DID YOU TALK TO THEM?

4        **MS. HARRIS:**  OH, DID I?  YES, I DID.

5            **THE COURT:**  DID THEY TALK TO MR. WERTKIN?  DID HE

6    PICK UP THAT PHONE AND SAY: "HI, THIS IS DAN," OR SOMETHING?

7        **MS. HARRIS:**  I CAN'T -- I HONESTLY CAN'T RECALL.  I

8    CAN'T RECALL IF THEY LEFT A MESSAGE OR NOT.  BUT I DID SPEAK TO

9    THE UNITED STATES ATTORNEY.

10           **THE COURT:**  OKAY.  AND YOU'VE DESCRIBE IT AS A

11   "BURNER PHONE," ESSENTIALLY.  HE'S DESCRIBING IT AS AN OLD

12   IPHONE HE HAD.

13       **MS. HARRIS:**  ALL WE KNOW IS THAT IT WAS NOT HIS PHONE

14   THAT HE USED AND NOT THE PHONE THAT EVERYBODY, INCLUDING HIS

15   EMPLOYER, FAMILY AND FRIENDS KNEW.  I DON'T KNOW. WE WERE UNDER

16   THE IMPRESSION THAT HE HAD BOUGHT THE PHONE.  HE REFERS TO IT IN

17   HIS PERSONAL STATEMENT AS A PHONE HE ALREADY HAD.

18           BUT IT WAS CERTAINLY INTENDED TO DISGUISE WHO HE WAS

19   AND WHAT HE WAS DOING.

20           **THE COURT:**  OKAY.  YOUR UNDERSTANDING IT WASN'T

21   TRACEABLE TO HIM.

22       **MS. HARRIS:**  CORRECT.

23           **THE COURT:**  OKAY.  NOW, IF YOU WANT TO TALK ABOUT THE

24   OTHER CALLS, THAT'S FINE, OR KEEP GOING WHEREVER YOU WERE.

25   THAT'S FINE, TOO.

1       **MS. HARRIS:** ONE OF THE THINGS THAT THE DEFENDANT DID

2 THAT WE KNOW OF BECAUSE IT HAPPENED IN THE U.S. ATTORNEY'S

3 OFFICE IN SAN FRANCISCO IS HE CALLED THE CIVIL DIVISION FOR THE

4 ATTORNEY THAT WAS HANDLING THE QUI TAM COMPLAINT UNDER SEAL HERE

5 AND LEFT AN ANONYMOUS MESSAGE ABOUT WHAT A GREAT CASE IT WAS AND

6 IT REALLY OUGHT TO BE INVESTIGATED, THEREBY TRYING TO DRUM UP

7 BUSINESS FOR THE COMPANY THAT HE WAS TRYING TO SHAKE DOWN FOR

8 THE $310,000. SO HE WAS NOT SO CONCERNED ABOUT GETTING CAUGHT

9 THAT HE WASN'T TRYING TO MAKE SURE THAT THAT COMPANY IN

10 SUNNYVALE WAS GOING TO GIVE THE BIG PAYDAY.

11       AND THERE ARE A COUPLE OF OTHER THINGS. DR. WALCH

12 DOES NOT CHARACTERIZE WHAT THE DEFENDANT'S MENTAL STATE WAS AS

13 A BREAKDOWN. DEFENSE COUNSEL DOES, BUT THE PSYCHIATRIST DOES

14 NOT. AND A BREAKDOWN IS NOT ANALOGOUS TO CRIMINAL CONDUCT THAT

15 WAS NOT ALL THAT GOOD.

16       I THINK WE CAN ALL AGREE THE DEFENDANT ISN'T THE

17 BEST CRIMINAL.  IT DOESN'T MEAN THAT HE HAD A BREAKDOWN OR

18 DOESN'T DESERVE TO BE PUNISHED.  AND PART OF WHAT GENERAL

19 DETERRENCE IS ALL ABOUT IS MAKING SURE THAT THE SENTENCE IS

20 STRONG ENOUGH AND WITHIN THE GUIDELINES SO THAT THE PUBLIC

21 BELIEVES THE SYSTEM WORKS, AND WHEN A PUBLIC EMPLOYEE VIOLATES

22 THEIR OATH AND THEIR TRUST WILL BE PUNISHED.  NOT A SMALLER

23 SENTENCE SO THAT SOMEBODY CAN FIGURE OUT HOW TO DO THE CRIME

24 BETTER AND MORE SOPHISTICATED IN THE FUTURE, AND CALIBRATE THAT

25 RISK AGAINST THIS LOWER SENTENCE, WHICH IS REALLY WHAT IS BEING

 1    SUGGESTED.

 2              AND THERE WAS NO LEGITIMATE REASON TO LEAVE THOSE

 3    QUI TAM COMPLAINTS THAT HE STOLE IN THAT ENVELOPE OTHER THAN TO

 4    IMPLICATE SOMEONE OTHER THAN HIMSELF AND GIVE HIMSELF A FALSE

 5    ALIBI.

 6              **THE COURT:**  WELL, JUST TO CLARIFY THAT ONE POINT, I

 7    DON'T KNOW THAT THE EVIDENCE IS SHOWING THAT HE WAS TRYING TO

 8    GET HIS COWORKER IN TROUBLE. BUT HE WAS -- BUT THAT WAS THE END

 9    RESULT OF WHAT HAPPENED BECAUSE HE WASN'T TRYING -- HE WAS

10    TRYING TO SAY THEY WERE SENT TO HIM BY MISTAKE.  THAT ALREADY IS

11    A NEGLIGENT ACT THAT SOMEBODY MIGHT WILL LOOK INTO.

12              **MS. HARRIS:**  ABSOLUTELY.

13              **THE COURT:**  BUT NOT QUITE THE SAME AS A

14    CO-CONSPIRATOR, WHICH SHE WAS BEING INVESTIGATED FOR, AS WELL.

15    YOU KNOW, WAS SHE IN ON THIS?

16              SO, YES, YOU COULD STILL GET SOMEBODY IN TROUBLE FOR

17    BEING SO SLOPPY WITH THAT KIND OF MAILING, YES. ALTHOUGH NOT

18    NECESSARILY TRYING TO SAY THAT THEY WERE WORKING WITH HIM, SO

19    TO SPEAK.

20              **MS. HARRIS:**  YOUR HONOR, EVEN IF THAT WERE THE CASE,

21    ANYONE WHO WORKS IN THE DEPARTMENT OF JUSTICE IN THE CIVIL FRAUD

22    SECTION WOULD BE TERMINATED IF THEY NEGLIGENTLY MAILED SEALED

23    QUI TAMS TO A PRIVATE LAW FIRM. HER CAREER WAS IN JEOPARDY BASED

24    ON WHAT HE DID.  AND WHETHER YOU TAKE IT TO THE EXTREME THAT THE

25    GOVERNMENT DID WHEN IT WAS DOING ITS CRIMINAL INVESTIGATION, WE

1   HAVE TO LOOK AT EVERY POSSIBLE AVENUE.

2           IN ANY EVENT, EVEN IF YOU TAKE THE MOST FAVORABLE

3   INTERPRETATION OF WHAT HE DID, HE JEOPARDIZED HER CAREER AND

4   UNFAIRLY CAST A CLOUD ON SOMEONE WHO HAD ABSOLUTELY NOTHING TO

5   DO.  AND HE DID IT ALL FOR HIMSELF.  IT WAS TO EXONERATE

6   HIMSELF AND GIVE HIMSELF A FALSE EXPLANATION.

7           **THE COURT:**  I UNDERSTAND THAT PART OF IT.

8           **MS. HARRIS:**  SO I THINK THAT'S ALL I WOULD SAY.

9           **THE COURT:**  I INTERRUPTED YOU WHEN YOU WERE

10  CONFERRING WITH MR. FRENTZEN.

11          YOU CAN GO STAND OVER THERE, IF YOU WANT TO.

12          **MS. HARRIS:**  YOUR HONOR, I THINK I WILL HAVE MY LAST

13  REMARKS JUST BE THAT THERE WAS NO INDICATION THIS DEFENDANT WAS

14  GOING TO STOP.  IF HE HAD HAD SUCCESS, AND IF THE COMPANY UNDER

15  INVESTIGATION HADN'T HAD THE ETHICS THAT MR. WERTKIN SHOULD HAVE

16  HAD, HE WOULD HAVE GONE ON. HE WAS CALLING OTHER COMPANIES

17  BECAUSE HE THOUGHT HE WAS BEING SUCCESSFUL.

18          THAT'S NOT AN ABERRATION.  THAT IS A CONTINUED

19  COURSE OF CONDUCT THAT HE THOUGHT WAS BEING SUCCESSFUL. AND

20  THAT'S WHAT HE WAS DOING HERE. HE WANTED TO USE BITCOIN TO

21  DISGUISE THE PAYMENTS. IT WAS WELL THOUGHT OUT IN HIS MIND.

22  AND IT WAS VERY CAREFULLY CALCULATED OVER A LONG PERIOD OF

23  TIME.  THE COURT KNOWS WHAT IS ABERRATION.

24          THE COURT HAS SEEN DEFENDANTS THAT LIVE IN THEIR

25  CARS WITH CHILDREN AND COME ACROSS A CREDIT CARD AND COMMIT

1   CREDIT CARD FRAUD TO FEED THEIR CHILDREN.  AND IT'S A CRIME OF

2   OPPORTUNITY, A SINGLE EPISODE BASED ON DESPERATION.

3           THIS WAS A YEAR-LONG EPISODE FUELED BY MONEY.

4           **THE COURT:**  LET ME ASK MR. POLLAK IF HE WANTED TO SAY

5   ANYTHING IN CONNECTION WITH HIS RECOMMENDATION, AS WELL.

6           **PROBATION OFFICER:**  YES, YOUR HONOR.  PROBATION

7   RECOMMENDED A LOW END SENTENCE OF 30 MONTHS.  I DON'T THINK IT'S

8   IN DISPUTE THAT HE HAS SOME MITIGATING FACTORS IN HIS LIFE, AND

9   THIS WAS -- IT APPEARS TO BE AN OUTLIER, THIS CONDUCT. BUT WHERE

10  PROBATION DIFFERS IS I FELT THAT THE SERIOUSNESS OF THE OFFENSE

11  OF THIS CONDUCT IN THIS OFFENSE OUTWEIGHED A LOT OF HIS

12  MITIGATING FACTORS.  AND THAT'S WHERE WE LANDED AT THE LOW END

13  SENTENCED.

14          **THE COURT:**  NOW, MS. ARGUEDAS, WE CAN'T BE GOING

15  BACK, FORTH, BACK, FORTH.  SO IF THERE'S SOMETHING NEW BROUGHT

16  UP OR SOMETHING I EXPRESSED SOME --

17          **MS. ARGUEDAS:**  THAT'S ALL I WANT TO DO.

18          **THE COURT:**  -- NEED FOR INFORMATION ON, I WOULD LIKE

19  TO HEAR FROM YOU.

20          **MS. ARGUEDAS:**  YES, I ONLY WANT TO ADDRESS THE

21  QUESTIONS YOU ASKED.

22          **THE COURT:**  OKAY.

23          **MS. ARGUEDAS:**  AND TO MAKE ONE POINT THAT HAS NOT YET

24  BEEN MADE.  ALL OF THIS ABOUT THE THINGS THAT HAPPENED IN THE

25  OFFICE AT THE END, THE WAY YOU DESCRIBED IT IS EXACTLY THE

1    POINTS I WAS TRYING TO MAKE.  BUT ALSO TO SAY THOSE BEHAVIORS

2    HAVE ALREADY BEEN ACCOUNTED FOR IN THE GUIDELINES.  THEY ARE

3    THERE AS OBSTRUCTION.  SO IT'S BAKED INTO THE GUIDELINE SENTENCE

4    ALREADY.

5            THE PHONE CALL, WHICH I THINK IS VERY, VERY, VERY

6    IMPORTANT TO UNDERSTANDING HIS STATE OF MIND IS A PHONE CALL

7    THAT CAME TO HIM ON HIS PHONE.  AND, BY THE WAY, IT WAS AN OLD

8    IPHONE OF MR. WERTKIN.

9            IT WAS A PHONE CALL FROM SOMEBODY FROM THE

10   DEPARTMENT OF JUSTICE IN ALABAMA WHO WAS CALLING THAT NUMBER TO

11   SAY:  "WE ARE INVESTIGATING," YOU KNOW, "SOMETHING THAT

12   HAPPENED HERE WITH A QUI TAM LAWSUIT IN ALABAMA."  I DON'T KNOW

13   HOW THEY PHRASED IT.  AND THEY DID REACH HIM.

14           AND HE ESSENTIALLY SAID:  "I'LL GET BACK TO YOU," OR

15   SOMETHING.  YOU KNOW WHAT I MEAN?  JUST HUNG UP THE PHONE.  BUT

16   THAT IS A MOMENT THAT IS UNDENIABLE.  AND IT WAS LITERALLY AS

17   HE WAS IN AN UBER TO THE AIRPLANE TO COME OUT HERE TO

18   SUNNYVALE. THAT'S ALL I --

19           **THE COURT**:  OKAY. THANK YOU.

20           THEN, ALL RIGHT.  THEN, MR. WERTKIN, YOU WERE

21   SITTING HERE WHEN I HEARD FROM ANOTHER DEFENDANT EARLIER THIS

22   AFTERNOON.  YOU DO, AS THE DEFENDANT, HAVE AN OPPORTUNITY TO

23   SPEAK, IF YOU WOULD LIKE TO.

24           YOU MAY WELL WANT TO GIVE THE NUMBER OF PEOPLE THAT

25   ARE HERE TO SUPPORT YOU, AND BECAUSE I AM GIVING YOU THE LAST

1  WORD, AS WELL.  SO IF YOU WOULD LIKE TO, THAT WOULD BE FINE.

2          **THE DEFENDANT:**  THANK YOU, YOUR HONOR.

3          I AM DEEPLY ASHAMED BY MY ACTIONS. I WOULD LIKE TO

4  APOLOGIZE TO THE COURT, TO THE PROSECUTORS, TO MY FAMILY, TO MY

5  FRIENDS, AND TO MY -- AND MOST OF ALL TO MY FORMER COLLEAGUES

6  AT THE DEPARTMENT OF JUSTICE FOR MY MISCONDUCT AND BREACH OF

7  TRUST.

8          I WILL DEDICATE THE REST OF MY LIFE TO MAKING

9  AMENDS. AND I HOPE THAT ONE DAY I CAN EARN THEIR FORGIVENESS.

10          **THE COURT:**  THANK YOU. ALL RIGHT.

11          THEN, I WOULD DEEM THE MATTER SUBMITTED WITH ONE

12  EXCEPTION THAT I JUST WANT TO CLARIFY.  IN YOUR PLEA AGREEMENT

13  YOU AGREE TO REASONABLE CONDITIONS OF SUPERVISED RELEASE. AND

14  IN GOING OVER THE PROBATION OR PRESENTENCE REPORT, I JUST

15  WANTED TO FIND OUT WHETHER THERE WERE ANY CONDITIONS.  NOT

16  TALKING ABOUT TIME IN CUSTODY AT THE MOMENT, BUT OTHER

17  CONDITIONS THAT WERE SET OUT BY MR. POLLAK THAT ANYONE HAS ANY

18  QUESTION ABOUT.

19          NO?

20          **MS. ARGUEDAS:**  NO.

21          **THE COURT:**  FROM THE GOVERNMENT?  NO?

22          **MS. HARRIS:**  NO.

23          **THE COURT:**  ALL RIGHT. SO GOING BACK, AND I KNOW THAT

24  EVERYBODY WHO HAS SPOKEN HERE, ESSENTIALLY, BROUGHT SOME TYPE OF

25  NOTES WITH THEM TO REMIND THEM OF WHAT THEY WANTED TO SAY.

```
1              I DID NOT BECAUSE I REALLY DID NOT WANT TO FORM ANY

2    FINAL OPINION ON THE CASE WITHOUT HEARING FROM EVERYBODY,

3    INCLUDING MR. WERTKIN.  AND SO I MAY NOT SOUND AS POLISHED AS

4    SOME OF YOU HAVE.

5              I VERY MUCH APPRECIATE THE WORK THAT ALL OF THE

6    PARTIES PUT IN TO PRESENTING THEIR RESPECTIVE POSITIONS, AND

7    ALSO THE PROBATION OFFICER THAT DID THE REPORT THAT WAS

8    PREPARED HERE.

9              I WANT TO MAKE A FEW THINGS CLEAR.  JUST SO THAT

10   EVERYBODY WHO IS HERE AND INTERESTED KNOWS, THAT THE COURT IS

11   REQUIRED TO CALCULATE THE GUIDELINE RANGE AND CONSIDER IT IN

12   IMPOSING A SENTENCE.  BUT THE COURT IS NOT BOUND BY IT. THE

13   GUIDELINE RANGE HERE IS CALCULATED AND NOT DISPUTED BY ANYBODY.

14   IT IS FROM 30 TO 37 MONTHS.

15             SO THE GOVERNMENT, AS PART OF THE PLEA AGREEMENT,

16   AGREED, ESSENTIALLY, THAT THEY WOULD RECOMMEND A SENTENCE IN

17   THAT RANGE, ANYWHERE FROM 30 TO 37 MONTHS.  AND LEFT THE

18   DEFENDANT WITH THE OPPORTUNITY TO SEEK A SENTENCE BELOW THE

19   GUIDELINE RANGE.

20             IN THE OLD DAYS THE COURT'S ABILITY TO DO THAT WAS

21   FAR MORE RESTRICTED AND LIMITED TO SPECIFIC CATEGORIES OF

22   BEHAVIOR, BACKGROUND.  NOW, UNDER 18 U.S.C. SECTION 3553 (A),

23   THE COURT HAS TO CONSIDER A VARIETY OF FACTORS THAT INCLUDE

24   WHAT'S BEEN LISTED IN THE DEFENDANT'S SENTENCING MEMORANDUM.

25             AND JUST TO REPEAT THEM:  THE NATURE AND
```

1   CIRCUMSTANCES OF THE OFFENSE; THE HISTORY AND CHARACTERISTICS

2   OF THE DEFENDANT; THE NEED FOR THE SENTENCE IMPOSED TO REFLECT

3   THE SERIOUSNESS OF THE OFFENSE; TO PROMOTE RESPECT FOR THE LAW;

4   TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE; THE NEED FOR THE

5   SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF

6   THE DEFENDANT AND THE KINDS OF SENTENCES AVAILABLE.

7           IN THAT REGARD -- LET ME CHECK ONE OTHER MATTER.

8           I THINK THAT PRETTY WELL COVERS IT. AND SO I DID

9   CONSIDER ALL OF THESE FACTORS. OBVIOUSLY, THE GOVERNMENT IS

10  FOCUSING ON THE SERIOUSNESS OF THE OFFENSE AND THE DEFENDANT IS

11  FOCUSING ON THE BACKGROUND OF THE DEFENDANT AND HIS OTHERWISE

12  UNBLEMISHED HISTORY.

13          I HAVE TO SAY -- AND THIS PROBABLY DOESN'T COME AS A

14  SURPRISE TO MOST PEOPLE, THAT WHEN PEOPLE ARE ACCUSED OF CRIMES

15  THAT INVOLVE ABUSE OF TRUST, AND IN THIS CASE ABUSE OF THE

16  PUBLIC TRUST, IT IS HIGHLY UNLIKELY THAT THEY HAVE ANYTHING

17  OTHER THAN AN UNBLEMISHED PRIOR HISTORY.  OTHERWISE, THEY WOULD

18  NOT HAVE BEEN ABLE TO OBTAIN THE POSITION THEY OBTAINED IN THE

19  FIRST PLACE.

20          THE BACKGROUND OF THE DEFENDANT, THOUGH, IS

21  IMPORTANT.  THE COURT CAN ALSO CONSIDER HOW MUCH JUST BEING

22  ARRESTED, IF YOU WILL, AND THE CONVICTION HAS AFFECTED

23  SOMEONE'S LIFE.

24          IN THIS CASE, MR. WERTKIN HAS LOST HIS ABILITY TO

25  PRACTICE LAW. HE'S LOST TEACHING POSITION.  HE'S LOST, I THINK,

1    IN MANY QUARTERS OF RESPECT OF PEOPLE WHOSE RESPECT HE WISHED

2    TO ACQUIRE.   THERE ARE A NUMBER OF PEOPLE THAT ARE STILL

3    STANDING IN HIS CORNER, HOWEVER.   IN FACT, THEY ARE SITTING IN

4    THE COURTROOM.

5         I THINK THE COURT ALSO HAS TO CONSIDER, HOWEVER,

6    ALTHOUGH ONE THINKS ABOUT THAT, THAT JUST BECAUSE YOU ARE IN A

7    POSITION WHERE YOU CAN LOSE SOME THINGS SHOULDN'T PUT YOU IN A

8    TERRIBLY BETTER POSITION THAN SOME POOR PERSON WHO DIDN'T HAVE

9    ALL YOUR ADVANTAGES AND DIDN'T HAVE ANYTHING TO LOSE, AND

10   THEREFORE IS GOING TO END UP WITH A VERY LONG SENTENCE BECAUSE

11   THEY HAVE NOTHING ELSE TO GIVE UP AND OFFER.

12        I DON'T DOUBT THAT SOMETHING WENT VERY WRONG IN

13   MR. WERTKIN'S LIFE. I DON'T THINK IF YOU LOOKED AT HIS LIFE

14   OBJECTIVELY THAT IT WOULD BE APPARENT.

15        EVERYBODY WHO IS A TRIAL LAWYER HAS EXPERIENCED

16   GREAT PERIODS OF STRESS, OF PRESSURE, OF HAVING TO SATISFY ALL

17   YOUR OWN RESPONSIBILITIES, YOUR RESPONSIBILITIES OF YOUR

18   FAMILY, POSSIBLY WITH PEOPLE AT HOME.   ALTHOUGH I DIDN'T EVER,

19   FORTUNATELY, HAVE THAT SITUATION, PEOPLE AT HOME IN MANY

20   INSTANCES NOT UNDERSTANDING WHY YOU ARE SPENDING SO MUCH TIME

21   DOING WHAT YOU'RE DOING AND NOT SPENDING IT WITH THE FAMILY.

22   YOU ALMOST HAVE TO BE, YOU KNOW, MARRIED TO ANOTHER TRIAL

23   LAWYER FOR THEM TO UNDERSTAND THAT.

24        SO, YES.   THESE ARE TREMENDOUS PRESSURES.   BUT THEY

25   ARE PRESSURES THAT ARE DEALT WITH AND EXPERIENCED JUST

1  FREQUENTLY ON A REGULAR BASIS BY EVERYBODY IN THE PROFESSION

2  WHO HAS DECIDED TO DO TRIAL WORK.

3  IF YOU DON'T WANT TO BE FACING THOSE, THEN YOU GO DO

4  TRANSACTIONAL WORK ON CONTRACTS OR SOMETHING AND STAY OUT OF

5  THE COURTROOM.

6  I DO THINK MR. WERTKIN DID PERCEIVE HIS LIFE

7  DIFFERENTLY THAN IT ACTUALLY WAS. HE GREW UP IN THIS WELL-TO-DO

8  FAMILY IN SCARSDALE, HE HAD PARENTS WHO LOVED HIM. YES HE'S

9  SOMEWHAT CRITICAL, AS EVERYBODY IS, ABOUT THEIR PARENTS.  YOU

10  KNOW, THEY ARE TOO THIS OR TOO THAT.

11  THE DOCTOR SAYS IN HIS TEENAGE YEARS HE WAS REALLY

12  EXPERIENCING A LOT OF ANGST ABOUT THINGS.  WHO HASN'T IN THEIR

13  TEENAGE YEARS?  SO AND A LOT OF PEOPLE HAVE BEEN SHORT, AND

14  THEN GREW UP.

15  SO I DON'T KNOW IF YOU CAN SAY THAT SOMEBODY'S WHOLE

16  LIFE WENT DOWNHILL FROM THE START BECAUSE THEY WEREN'T

17  CLASSMATES. I DON'T KNOW. IT CAN CERTAINLY MAKE ONE WANT TO

18  ACHIEVE A LOT TO PROVE TO PEOPLE THAT SMALLER PEOPLE CAN BE

19  SUCCESSFUL, BUT I DON'T KNOW.

20  SO THERE'S A LOT THERE THAT REALLY DOES NOT EXCUSE

21  THE BEHAVIOR. AND IN THE SAME LIGHT HE CLEARLY, FOR WHATEVER

22  REASON, GOT IN OVER HIS HEAD WITH ALL THESE OBLIGATIONS THAT HE

23  TOOK ON HIMSELF AND DECIDED TO GO OUT IN THE VERY CUTTHROAT

24  WORLD OF BIG FIRM LITIGATION.

25  HE EVEN HAD A BUDDY AT WHAT LOOKED LIKE A

DISTINGUISHED FIRM WHO SAID WE'RE HAPPY TO HAVE HIM COME TO OUR

FIRM.  BUT HE CHOSE THIS OTHER FIRM.  I DON'T THINK HE WOULD

HAVE HAD THE SAME EXPERIENCE IF HE JUST WENT TO THE FIRM THAT

HIS FRIEND WAS ALREADY AT AND WHERE HE'D WORKED FOR ALL THESE

YEARS.

AND I REALLY DID READ ALL THESE LETTERS, AND I DON'T

KNOW.  I'LL JUST ARBITRARILY GRAB ONE.  SEE HIGHLIGHTS?  AND

HERE'S ANOTHER ONE HIGHLIGHTED.  I REALLY DID UNDERSTAND HE HAS

TREMENDOUS SUPPORT THAT SPEAKS WELL FOR HIM AND ALL HIS

RELATIONSHIPS WITH PEOPLE. THEY LOVE HIM. THEY ARE WILLING TO

ACCEPT WHAT HAPPENED AS AN ABERRATION.  AND, YES, IT IS IN THE

SENSE THAT HE WASN'T A CRIMINAL BEFORE THIS HAPPENED.  BUT HE

HAS COMMITTED A VERY SERIOUS CRIME.

AND I APPRECIATE THAT THE DEFENDANT RECOGNIZES THAT?

HOW COULD HE NOT?  I MEAN, HE WAS TOP STUDENT ALL THE WAY

THROUGH SCHOOL.  HE DIDN'T GET WHERE HE DID BY NOT RECOGNIZING

THAT.

BUT PEOPLE KEPT THROUGHOUT THESE LETTERS CALLING IT

A MISTAKE.  WELL, I THINK IT'S A LITTLE MORE THAN A MISTAKE.

AND AS I POINT OUT IT WASN'T A SPUR OF THE MOMENT, ONE TIME

MISTAKE, IF YOU WANT TO PUT IT THAT WAY, OR ACTING OUT OF

EXTREME EMOTION CAUSED BY A PARTICULAR SITUATION. IT WAS

PLANNED. HE WAS, AT A MINIMUM, GOING TO USE THESE COMPLAINTS TO

ENHANCE HIS POSITION AT THE FIRM.

THAT'S NOT WHAT THOSE COMPLAINTS ARE FOR.  YOU'RE

1  NOT SUPPOSED TO USE THEM OR, HEAVEN FORBID, TAKE THEM OUT OF

2  THE OFFICE. AND THEN, WHEN THINGS WERE NOT GOING WELL THAT HE

3  WASN'T BUILDING UP THE BOOK OF BUSINESS HE WAS HOPING TO BRING

4  TO THE FIRM, HE STARTS FIGURING OUT WHAT ELSE HE CAN DO WITH

5  THEM.

6         AND HE APPARENTLY PERCEIVED THAT HE WASN'T THE

7  FATHER AND HUSBAND HE SHOULD HAVE BEEN AND THAT HE SHOULD

8  PROVIDE BETTER HOME LIFE AND A BETTER HOME AND BETTER SCHOOLS.

9         HIS WIFE SAYS:

10            "GEE. I DIDN'T REALIZE. I WASN'T TRYING TO

11            PUT ANY PRESSURE ON HIM. I DID SAY I WOULD LIKE TO

12            HAVE A SAFER NEIGHBORHOOD."

13         BUT AKIN GUMP SAID:

14            "WE THOUGHT HE WAS AN UPRISING, YOU KNOW

15            RISING STAR IN THE FIRM. LOTS OF PROMISE."

16         THEY -- AND AFTER HE THOUGHT HE LOST AND EVERYBODY

17  THOUGHT HE WAS A FAILURE ON THIS ABERRATION THAT HAPPENED IN

18  ALABAMA, WHERE HE ONE THE CASE, APPARENTLY GOT AT GOOD VERDICT,

19  AND THEN THE JUDGE COMES UP WITH SOME SUA SPONTE IDEA THAT SHE

20  MADE A MISTAKE. AND THEN, DOESN'T GIVE HIM A NEW TRIAL, BUT

21  THEN HAS THIS IDEA SUMMARY JUDGMENT. I DON'T KNOW WHERE THAT

22  CAME FROM AS OPPOSED TO JUST JUDGMENT NOT WITHSTANDING THE

23  VERDICT.

24         I DON'T KNOW WHAT WENT ON THERE. BUT WHEN HE GOT

25  BACK TO THE FIRM IT WASN'T LIKE PEOPLE SAID:

1    "OH, BOY.  WHAT A LOSER."

2         THEY WERE SENDING HIM OUT ON ANOTHER BIG CASE. THEY

3    HAD TOTAL FAITH IN HIS ABILITY TO TRY ANOTHER BIG CASE. SO THEN

4    HE'S AFRAID:

5              "OH, WELL, NOW MY FAMILY IS GOING TO BE ALL

6              UPSET I'M GOING TO BE AWAY AGAIN."

7         THEY MUST HAVE TOLD HIM WHAT THE JOB ENTAILED BEFORE

8    HE TOOK IT.  BUT, ANYWAY, HE DOESN'T WANT TO DO THAT, AND HE

9    DOESN'T WANT TO LOOK LIKE HE'S TELLING THEM HE'S A QUITTER, SO

10   HE QUITS AND GOES TO AKIN GUMP.

11        NONE OF THIS IS REALLY GREAT.  AND THE DEFENDANT CAN

12   SAY:

13             "SEE, IT JUST SHOWS THAT HE REALLY WASN'T

14             HIMSELF."

15        AND HE WASN'T HIS BEST SELF, THAT'S CLEAR.  BUT I

16   DON'T KNOW THAT HE WASN'T SOME VERSION OF HIMSELF.  AND THAT'S

17   REALLY THE PROBLEM HERE THAT PEOPLE JUST DON'T DO THIS BECAUSE

18   THEY ARE DEPRESSED.

19        IF YOU ARE DEPRESSED YOU PULL THE COVERS OVER YOUR

20   HEAD AND STAY IN BED. PEOPLE DON'T DO THIS JUST BECAUSE THEY

21   ARE ANXIOUS, ALTHOUGH THE DOCTOR SAYS PEOPLE DO OFTENTIMES TRY

22   AND DEAL WITH ANXIETY BECAUSE THEY GET THIS IDEA:

23             "IF I COMMIT THESE CRIMES, IT WILL DO AWAY WITH

24             MY PAIN."

25        I DON'T KNOW. MAYBE. ANYWAY, I'M RAMBLING AGAIN.

1    BUT I HAVE READ ALL THIS.  AND I JUST WANT YOU TO

2    KNOW I'VE READ IT. I WAS PARTICULARLY CONCERNED THAT HE WENT

3    BACK TO THE OFFICE.  WHETHER HE WAS TRYING TO HARM HIS

4    CO-WORKER, NO, HE WASN'T.  BUT HE CERTAINLY WASN'T THINKING

5    ABOUT IT, AND SHE IS UPSET.

6    THIS YOUNG WOMAN -- I'M NOT SURE HOW YOUNG SHE IS --

7    BUT SHE WROTE A LETTER AND, IN EFFECT, PARENTHETICALLY:

8    "(I DIDN'T HAVE EVERYTHING HE HAD)," CLOSE

9    PAREN.

10   "I HAD TO FIGHT FOR EVERYTHING. I CAME FROM A

11   FAMILY" -- I DON'T KNOW WHAT NUMBER OF, A BIG NUMBER

12   OF KIDS -- "AND WE DIDN'T HAVE ANY MONEY, AND I HAD

13   TO EARN EVERYTHING FOR MYSELF.  AND I FINALLY GOT

14   WHERE I DID, AND THEN, BAM, EVERYONE IS QUESTIONING

15   WHETHER OR NOT I SHOULD EVEN BE IN THE OFFICE."

16   AND SHE IS UPSET.

17   THE DEPARTMENT OF JUSTICE IS UPSET WITH EVERYTHING

18   THAT HAPPENED THERE. THEY HAD TO CONDUCT AN INVESTIGATION.

19   THEY HAD TO CHECK EVERYTHING OUT.  THEY NO LONGER

20   LEAVE COMPLAINTS ON THE CORNER OF THE DESK. ALL RIGHT. THEY

21   SHOULDN'T HAVE BEEN LEAVING THEM THERE, ANYWAY.  BUT NOBODY HAD

22   EVER WALKED OUT WITH THEM BEFORE.

23   THEY ARE CONCERNED ABOUT ALL THE PEOPLE WHO HAVE

24   GIVEN THEM CONFIDENTIAL INFORMATION WHO NOW FEEL THE OFFICE IS

25   A SIEVE.

1        SO PEOPLE WHO ARE RELATERS, IN OTHER WORDS, PEOPLE

2   WHO MAKE THE QUI TAM COMPLAINTS IN THE FIRST PLACE. DEFENDANTS

3   WHO HAVE NOW BEEN ARRESTED ON THE QUI TAM COMPLAINTS, OR NOT

4   ARRESTED, BUT HAD THEM OPENED AND THE CASES BEING LITIGATED WHO

5   THEN ARE AS A RESULT COOPERATING IN SOME WAY IN ORDER TO MAKE

6   THEIR SENTENCE -- OR NOT "SENTENCE," BUT WHATEVER THEY ARE

7   DOING -- LIGHTER.  AND NOW THEY ARE AFRAID THAT'S ALL GOING TO

8   COME OUT.  THE GOVERNMENT'S AFRAID THAT PEOPLE WILL BE AFRAID

9   TO MAKE QUI TAM COMPLAINTS IN THE FUTURE.  SO -- AND THEN, AKIN

10  GUMP IS JUST CONCERNED THAT THEY DIDN'T WANT TO BE MADE THE

11  HEAVY IN THE CASE.  AND I CAN UNDERSTAND THAT. BUT THEY WEREN'T

12  REALLY VICTIMIZED. I DON'T KNOW. MAYBE THEY FELT:

13          "GEE, YOU KNOW, WE PUT ALL OUR FAITH IN THIS

14          YOUNG MAN, AND NOW LOOK WHAT HE DID."

15          BUT IT'S NOT THE SAME. SO IT'S A VERY SERIOUS

16  OFFENSE. THE COURT HAS SPENT A LOT OF TIME THINKING ABOUT THIS

17  BECAUSE IT'S TRUE THE DEFENDANT ISN'T GOING TO DO IT AGAIN.  I

18  MEAN, THIS ISN'T GOING TO HAPPEN AGAIN.

19          IN THE SAME LIGHT, HAVING READ ALL OF THE DIFFERENT

20  FACTORS THE COURT HAS TO CONSIDER AND THE IDEA OF RESPECT FOR

21  THE LAW, DETERRENCE, IN GENERAL, THAT ONE HAS TO MAKE AT LEAST

22  SOME TYPE OF A STATEMENT THAT THESE MATTERS ARE TAKEN SERIOUSLY

23  NO MATTER WHO YOU ARE.

24          AND SO FOR THAT REASON DO I FEEL A GUIDELINE

25  SENTENCE IS APPROPRIATE. AND, YOU KNOW, AT FIRST REACTION ONE

```
 1   CAN SAY:
 2               "GEE, IT SHOULD BE MORE THAN THE GOVERNMENT
 3         ASKED FOR BECAUSE IT JUST HAS SORT OF A ROUND NUMBER
 4         SOUND TO IT."
 5         AND IN THE SAME LIGHT, I AM IMPRESSED WITH THE
 6   PRESENTATION THE DEFENSE COMPLETED IN THIS CASE.  I DON'T THINK
 7   MR. WERTKIN COULD HAVE ASKED FOR A STRONGER SHOWING THAN WAS
 8   MADE ON HIS BEHALF.
 9         SO I'M GOING TO GO WITH THE PROBATION OFFICE'S
10   RECOMMENDATION OF THE LOWER END OF THE GUIDELINE RANGE. I COULD
11   GO ON, BECAUSE I COULD CONTINUE TO EXPLAIN WHY I ENDED UP WITH
12   THAT NUMBER.  BUT I THINK THAT YOU, AT LEAST, HAVE SOME IDEA
13   THAT I SPENT A LOT OF TIME STRUGGLING WITH THIS, READING IT,
14   CONSIDERING IT.
15         BUT THERE'S AN ABUSE OF PUBLIC TRUST HERE, AND IT
16   JUST HAS TO BE RECOGNIZED AT THE LEVEL OF SERIOUSNESS THAT IT
17   REFLECTS.
18         SO PURSUANT TO THE SENTENCING REFORM ACT OF 1984,
19   IT'S THE JUDGMENT OF THE COURT THAT JEFF WERTKIN IS HEREBY
20   COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS FOR A TERM OF
21   30 MONTHS, WHICH CONSISTS OF 30 MONTHS ON EACH OF THE THREE
22   COUNTS, ALL TO BE SERVED CONCURRENTLY.
23         UPON HIS RELEASE, HE WILL BE PLACED ON SUPERVISED
24   RELEASE FOR A TERM OF THREE YEARS, WHICH IS, AGAIN,
25   CONCURRENTLY ON ALL THREE COUNTS.
```

1        WITHIN 72 HOURS OF HIS RELEASE, HE'S TO REPORT TO

2   THE NEAREST U.S. PROBATION OFFICE.  WHILE ON SUPERVISED RELEASE

3   NOT TO COMMIT ANOTHER FEDERAL, STATE OR LOCAL CRIME.  HE'S TO

4   COMPLY WITH THE STANDARD CONDITIONS THAT HAVE BEEN ADOPTED BY

5   THE COURT.  HE'S TO REFRAIN FROM ANY UNLAWFUL USE OF A

6   CONTROLLED SUBSTANCE AND TO SUBMIT TO A DRUG TEST WITHIN 15

7   DAYS OF RELEASE AND TWO PERIODIC TESTS THEREAFTER.

8        AND HE'S TO COMPLY WITH THE FOLLOWING CONDITIONS.

9   HE'S TO PAY ANY FINE OR SPECIAL ASSESSMENT THAT IS IMPOSED.  IN

10  THIS INSTANCE, THE PROBATION OFFICE IS RECOMMENDING $10,000,

11  WHICH SEEMS REASONABLE UNDER ALL THE CIRCUMSTANCES.

12        THE COURT IS REQUIRED TO IMPOSE A $300 SPECIAL

13  ASSESSMENT, $100 FOR EACH OF THE VIOLATIONS. I'LL GO BACK TO

14  THE $10,000 AFTER THIS.

15        HE'S NOT TO OPEN ANY NEW LINES OF CREDIT OR INCUR

16  NEW DEBT WITHOUT THE PRIOR PERMISSION OF THE PROBATION OFFICE.

17  AND HE'S TO PROVIDE THE PROBATION OFFICER WITH ACCESS TO ANY

18  FINANCIAL INFORMATION, INCLUDING TAX RETURNS, AND AUTHORIZE THE

19  PROBATION OFFICE TO CONDUCT CREDIT CHECKS AND GET COPIES OF TAX

20  RETURNS.

21        HE'S TO PARTICIPATE IN A MENTAL HEALTH TREATMENT

22  PROGRAM, AS DIRECTED BY THE PROBATION OFFICE, AND TO PAY ALL OR

23  PART OF THE TREATMENT, NOT TO EXCEED, OBVIOUSLY, THE TOTAL COST

24  OF THE TREATMENT.  AND THE PROBATION OFFICER WOULD DECIDE WHAT

25  IS APPROPRIATE AS A PAYMENT, AS HE WILL HAVE OTHER PAYMENT

1    OBLIGATIONS.

2          HE WILL BE SUBJECT TO A SEARCH OF HIS PERSON,

3    RESIDENCE, OFFICE, VEHICLE, ELECTRONIC DEVICES AND THEIR DATA.

4    THAT INCLUDES CELL PHONES, COMPUTERS, ELECTRONIC STORAGE MEDIA,

5    ESSENTIALLY ANY PROPERTY UNDER HIS CONTROL.  AND TO SUBMIT TO

6    THAT SEARCH, IF IT'S CONDUCTED BY A UNITED STATES PROBATION

7    OFFICER, ANY FEDERAL, STATE OR LOCAL LAW ENFORCEMENT OFFICER AT

8    ANY TIME, WITH OR WITHOUT PROBABLE CAUSE OR SUSPICION.

9          I WOULD SAY THAT, YOU KNOW, LAW ENFORCEMENT CAN'T

10   CONDUCT A SEARCH JUST TO HARASS THE DEFENDANT.  BUT IF THEY

11   COULD OPERATE ON WHAT WOULD BE A POLICE MANEUVER, ESSENTIALLY,

12   THAT MIGHT NOT ORDINARILY RISE TO LEGAL CAUSE TO SEARCH.

13         FAILURE TO SUBMIT TO THE SEARCH WILL BE GROUNDS FOR

14   REVOCATION.  AND THE DEFENDANT'S TO WARN ANY RESIDENTS THAT THE

15   PREMISES ARE SUBJECT TO SEARCH.

16         NOW, GIVEN HIS COMMENTS ABOUT THE USE OF DRUGS,

17   MARIJUANA -- NOT OPIOIDS OR METHAMPHETAMINE -- BUT STILL

18   MARIJUANA AND HOW THAT, ADDED WITH THE ALCOHOL ABUSE, HE IS TO

19   PARTICIPATE IN A PROGRAM OF TESTING AND TREATMENT FOR DRUG

20   ABUSE AS DIRECT BY THE PROBATION OFFICER, AND TO PAY, AGAIN,

21   ALL OR PART OF THE COST AS DIRECTED, NEVER TO EXCEED THE TOTAL

22   COST OF COUNSELING, URINALYSIS TESTING.

23         HE'S TO ABSTAIN FROM THE USE OF ALCOHOLIC BEVERAGES.

24   HE'S TO COOPERATE IN THE COLLECTION OF DNA AS DIRECTED BY THE

25   PROBATION OFFICER. HE CAN'T POSSESS FIREARMS, AMMUNITION,

1    DESTRUCTIVE DEVICES OR OTHER DANGEROUS WEAPONS.

2              AS FAR AS THE AMOUNT OF MONEY THAT IS BEING ORDERED

3    HERE, HE'S TO PAY OFF THE TOTAL AMOUNT OF THESE FINANCIAL

4    CHARGES STARTING, I THINK, WITH THE SPECIAL ASSESSMENT, WHICH

5    WOULD BE PAID AT NOT LESS THAN $25 A QUARTER THROUGH THE BUREAU

6    OF PRISONS' INMATE FINANCIAL RESPONSIBILITY PROGRAM.

7              HE MAY WANT TO GET THAT OUT OF THE WAY, JUST IN

8    GENERAL. BUT THEN AS FAR AS PAYING A FINE, I'M JUST GOING TO

9    HOLD UP ON THAT UNTIL AFTER HE'S RELEASED RATHER THAN DURING

10   THE TIME THAT HE'S IN CUSTODY, WHICH IS WHAT THE PROBATION

11   OFFICER ASKED THAT IT BE PAID ESSENTIALLY ONGOING WITH WHILE

12   HE'S IN CUSTODY.

13             HE CAN DO THAT, IF HE WANTS. OTHERWISE, THOUGH, I'M

14   JUST GOING TO ORDER THAT IT BE PAID IN MONTHLY INSTALLMENTS AS

15   RECOMMENDED BY THE PROBATION OFFICER, IF NOT LESS THAN $300,

16   WHICH IS WHAT I CALCULATED WORKS OUT ESSENTIALLY, OR AT LEAST

17   TEN PERCENT OF HIS EARNINGS, WHICHEVER IS GREATER, UNLESS FOR

18   SOME REASON THAT PRESENTS A PARTICULAR PROBLEM.

19             AND THAT THOSE PAYMENTS ARE TO COMMENCE NO LATER

20   THAN 60 DAYS AFTER HE'S PLACED ON SUPERVISED RELEASE. I DON'T

21   KNOW IF HE HAS ANY PREFERENCES ABOUT A RECOMMENDATION TO A

22   FACILITY. I WOULDN'T BE INCLINED TO RECOMMEND, THOUGH, A

23   SPECIFIC ONE.

24             BUT WHAT DID YOU HAVE IN MIND?

25             **MS. ARGUEDAS:**  HE WAS WANTING FCI CUMBERLAND, BECAUSE

```
 1    IT'S NEAR FAMILY AND ALSO A REPORTING DATE OF MAY 21.

 2               THE COURT:  I DON'T HAVE A PROBLEM -- HE'S MADE ALL

 3    HIS APPEARANCES -- WITH STAYING ON HIS RELEASE CONDITIONS, AND

 4    THEN SELF-SURRENDERING.  I THINK THAT ALSO GIVES HIM A BENEFIT

 5    IN TERMS OF THE LEVEL OF CUSTODY, ALTHOUGH I DON'T THINK THEY

 6    ARE GOING TO PUT HIM IN WITH, YOU KNOW, ARMED ROBBERS AND AXE

 7    MURDERERS, SO IT'S NOT GOING TO HAPPEN.

 8               MS. ARGUEDAS:  I THINK IF YOU RECOMMEND A SPECIFIC

 9    PLACE THEY LISTEN AND DO IT IF THEY CAN, BUT THEY DON'T FEEL

10    LIKE THEY HAVE TO.

11               THE COURT:  WELL, NOW, CUMBERLAND IS LOCATED WHERE

12    THEN?

13               MS. ARGUEDAS:  IT'S IN MARYLAND.

14               THE COURT:  AND HIS PARENTS, I THOUGHT, RETIRED TO

15    FLORIDA.

16               MS. ARGUEDAS:  RIGHT.  BUT HIS WIFE'S IN D.C.

17               THE COURT:  BUT ISN'T SHE GOING TO GO BACK AND LIVE

18    IN WISCONSIN OR --

19               MS. ARGUEDAS:  WELL, I GUESS WE DON'T KNOW IS THE

20    TRUTH.

21               THE COURT:  WELL, ALL RIGHT. OKAY. I LOOKED AT THAT

22    PART, TOO, WHO WAS GOING TO COME AND STAY, DEPENDING.

23               MS. ARGUEDAS:  RIGHT.

24               THE COURT:  I GUESS I SHOULD SAY I AM, YOU KNOW, VERY

25    UNDERSTANDING OF THE EFFECTS THAT ANY PRISON SENTENCE IS GOING
```

1  TO HAVE ON FAMILY.  AND JUST THERE IS COLLATERAL DAMAGE IN EVERY

2  CRIMINAL CASE, UNLESS THE PERSON'S A HERMIT.  AND CERTAINLY

3  CHILDREN ARE COMMONLY AFFECTED AND SPOUSES.

4         I DIDN'T DISREGARD THAT, BY THE WAY. OKAY. ALL

5  RIGHT. I DON'T DO THIS, ORDINARILY, AND DON'T TELL ANYONE THAT

6  IT DID IT THIS TIME, BUT I'LL RECOMMEND THAT, IF APPROPRIATE,

7  HE BE PLACED IN FCI CUMBERLAND TO BE NEAR HIS WIFE AND MINOR

8  CHILDREN.

9         **MS. ARGUEDAS:**  THANK YOU, YOUR HONOR.

10        **THE COURT:**  OKAY. I DON'T KNOW IF THERE'S ANYTHING

11 ELSE WE CAN DO THIS AFTERNOON.

12        **MS. HARRIS:**  I DON'T THINK SO.

13        **THE COURT:**  OH, I DO NEED TO SIGN AN ORDER.  AND I

14 DON'T KNOW IF THE CLERK PUT ANYTHING IN EFFECT AS TO THE DATE

15 THAT HE WANTS, HOW FAR OFF.

16        **MS. ARGUEDAS:**  THE 21ST.

17        **THE COURT:**  I GUESS THAT'S ALL RIGHT.

18        SHE SAYS SHE'LL PREPARE ONE.

19        AND SO I WOULD ACCEPT THAT AND ORDER THAT HE

20 SURRENDER TO THE FACILITY TO WHICH HE'S DESIGNATED NO LATER

21 THAN THE 21ST.

22        **MS. ARGUEDAS:**  YES.

23        **THE COURT:**  ALL RIGHT.

24        AND IF NOT, THEN TO THE LOCAL MARSHAL'S OFFICE FOR

25 TRANSPORT.  OKAY.

1      **MS. ARGUEDAS:**  YOUR HONOR, CAN I JUST SAY THAT WE'RE

2  VERY APPRECIATIVE OF THE FACT THAT YOU READ THOSE 87 LETTERS AND

3  EVERY SINGLE OTHER WORD WE PUT IN FRONT OF YOU.  AND IT'S

4  OBVIOUS THAT YOU DID, AND WE APPRECIATE IT.

5      **THE COURT:**  ALL RIGHT. THANK YOU.

6      AND THANK YOU ALL AGAIN FOR YOUR RESPECTIVE

7  PRESENTATIONS.

8      WE'RE IN RECESS.

9      **MR. FRENTZEN:**  THANK YOU, YOUR HONOR.

10     **THE CLERK:**  COURT IS RECESS.

11     (THEREUPON, THIS HEARING WAS CONCLUDED.)

12  STENOGRAPHY CERTIFICATION

13     "I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER."

14     MARCH 12, 2018
       /S/KATHERINE WYATT

15  _____

16

17

18

19

20

21

22

23

24

25